UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REARDEN LLC, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>TWDC ENTERPRISES 18 CORP., et al.,<br><br>    Defendants. | Case No. 22-cv-02464-JST<br><br>**ORDER GRANTING MOTION TO DISMISS FOURTH AMENDED COMPLAINT**<br><br>Re: ECF No. 80 |

Before the Court is Defendants TWDC Enterprises 18 Corp. f/k/a The Walt Disney Company, Disney Content Services Co., Inc. d/b/a Disney Pictures Productions, LLC; Walt Disney Pictures; Marvel Studios, LLC; MVL Film Finance LLC; Lucasfilm Ltd. LLC; and Disney Studio Production Services Co., LLC's (collectively, "Disney") motion to dismiss Plaintiffs Rearden LLC and Rearden MOVA LLC's (collectively, "Rearden") Fourth Amended Complaint. ECF No. 80. The Court will grant the motion with leave to amend.

## I. BACKGROUND

The factual and procedural background of this case is summarized in greater detail in this Court's prior orders. *See* ECF Nos. 54, 76. This case is the latest in a longstanding controversy regarding ownership and use of the MOVA Contour Reality Capture program ("MOVA"), which is used to capture high-resolution 3D models of a performer's face and facial movements, in order to create facial animations for use in the production of movies. ECF No. 77 ("4AC") ¶¶ 28, 36. This Court initially adjudicated a dispute between Plaintiff Rearden LLC and Shenzhenshi Haitiecheng Science and Technology Company ("SHST") concerning the ownership of equipment and intellectual property associated with MOVA ("Ownership Litigation"). *Shenzhenshi Haitiecheng Sci. and Tech. Co., LTD v. Rearden LLC ("SHST")*, No. 15-cv-00797-JST, 2017 WL

3446585, at *1 (N.D. Cal. Aug. 11, 2017), *aff'd*, 823 F. App'x 455 (9th Cir. 2020). SHST is a Chinese entity associated with Digital Domain 3.0, Inc. ("DD3"), a visual effects company whose alleged conduct lies at the heart of the case at hand. In the Ownership Litigation, the Court issued a preliminary injunction prohibiting the sale, use, movement, concealment, transfer, or disposal of MOVA Assets by SHST or Virtual Global Holdings Limited ("VGH") – an entity related to DD3 and SHST. *See Virtue Glob. Holdings Ltd. v. Rearden LLC*, No. 15-cv-00797-JST, 2016 WL 9045855, at *2, *10 (N.D. Cal. June 17, 2016). After a bench trial, the Court dissolved the injunction and ruled that "Rearden, not . . . DD3, owns and at all relevant times has owned the MOVA Assets." *SHST*, 2017 WL 3446585, at *9. The Court further ordered the return of the assets to Rearden, which included "MOVA Software, Source code, and Output files." Order Regarding the Return of MOVA Assets 1, *SHST*, No. 15-cv-00797-JST (N.D. Cal. Oct. 2, 2017), ECF No. 449. The Court appointed a special master to supervise the return of those assets, and the special master, in turn, appointed DisputeSoft as a forensic expert to oversee this process. *See* Order Appointing Hon. Edward A. Infante (Ret.) as Special Master Pursuant to Federal Rule of Civil Procedure 53, *SHST*, No. 15-cv-00797-JST (N.D. Cal. June 17, 2019), ECF No. 529; Special Master's Order Appointing Forensic Expert *SHST* No. 15-cv-00797-JST (N.D. Cal. Aug. 20, 2019), ECF No. 534.

In this case, Rearden brings claims of copyright and patent infringement. As relevant to this order, Rearden alleges that Disney contracted with DD3 for facial performance capture services and output works for the films *Avengers: Infinity War* and *Avengers: Endgame*, and that following the issuance of the preliminary injunction in the Ownership Litigation, DD3 performed these services using MOVA, including animating the CG characters Thanos, Ebony Maw, and the Hulk. *See* 4AC ¶¶ 79–95. It alleges that Disney is accordingly liable for vicarious and contributory copyright infringement. *Id.*

This Court has twice previously dismissed Rearden's copyright infringement claims, on the ground that Rearden failed to plausibly allege that DD3 directly infringed its MOVA copyright by using MOVA to perform facial motion captures services for *Avengers: Infinity War* and *Avengers: Endgame*. *See* ECF Nos. 54, 76. In dismissing those claims in Rearden's Third

Amended Complaint ("TAC"), this Court granted Rearden "one final chance to amend its copyright infringement claim" and "solely to cure the deficiencies identified by [that] order." ECF No. 76 at 16. Rearden timely filed its 4AC on April 11, 2024, and Disney now moves to dismiss the 4AC's claims for contributory and vicarious copyright infringement. *See* ECF Nos. 77, 80.

## II. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Factual allegations need not be detailed, but the facts must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. While this standard is not "akin to a 'probability requirement' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In determining whether a plaintiff has met the plausibility requirement, a court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). In so doing, "a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." *Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (emphasis omitted). However, the Court "may . . . consider unattached evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the

3

1    document; (2) the document is central to the plaintiff's claim; and (3) no party questions the
2    authenticity of the document." *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir.
3    2011) (quoting *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)). Finally, a plaintiff may
4    "plead[] facts alleged upon information and belief where the facts are peculiarly within the
5    possession and control of the defendant or where the belief is based on factual information that
6    makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir.
7    2017) (quoting *Arista Records, LLC v. Doe 3*, 603 F.3d 110, 120 (2d Cir. 2010)).

**III.   DISCUSSION**

   **A.   Direct Copyright Infringement**

In order to bring a claim against Disney for secondary copyright infringement, Rearden must plead facts sufficient to plausibly allege direct copyright infringement by a third party—in this case, DD3. *See, e.g., VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019). This Court has twice dismissed Rearden's claims for failing to adequately allege direct infringement. *See* ECF Nos. 54, 76. The Court now considers whether Rearden's amendments to the 4AC cure the deficiencies identified in those orders.

As with the TAC, the 4AC alleges that DD3 directly infringed Rearden's copyright in MOVA in animating certain CG characters during the production of *Avengers: Infinity War* and *Avengers: Endgame*. *See* 4AC ¶ 86. The 4AC makes four broad categories of factual allegations to support this claim, all of which relate to DD3 files recovered and returned by DisputeSoft in connection with the Ownership Litigation. First, Rearden alleges that among the returned files, it has identified "listings and metadata" for files it believes to be MOVA capture files for Josh Brolin, the actor who played Thanos in *Avengers: Infinity War* and *Avengers: Endgame*. Specifically, Rearden alleges that it has identified a spreadsheet that describe metadata and file paths for these files, including file paths that include the word "mova" in the folder structure. *See* 4AC ¶¶ 41–49.[1] Second, Rearden alleges that it has identified three messages from DD3's internal messaging software called "Diffusion," which also reference the word "mova" on dates

---

[1] The 4AC (like the TAC and SAC before it) alleges that Rearden has yet to obtain the actual underlying files. *See* 4AC ¶ 40.

4

corresponding with *Avengers: Infinity War* and *Avengers: Endgame. See id.* ¶ 50. Third, Rearden alleges that it has identified a set of Maya[2] files containing or reflecting a capture of Mark Ruffalo, the actor who played the Hulk in *Avengers: Infinity War* and *Avengers: Endgame* (the "Ruffalo Maya Files"). Rearden alleges that the Ruffalo Maya Files "contain[] substantial amounts of copied Mova source code" and have "creation dates ranging from August 11, 2016 through September 22, 2016[,]" after the issuance of the *SHST* Preliminary Injunction and consistent with the production timeline of *Avengers: Infinity War* and *Avengers: Endgame. See id.* ¶¶ 52–57. Fourth, and finally, Rearden alleges that it has identified another Maya file returned by DD3 for the character Ebony Maw, who appeared only in *Avengers: Infinity War* and *Avengers: Endgame* (the "Ebony Maw Maya File"). Rearden alleges that the Ebony Maw Maya File "includes over 100 MEL script references to 'mova' . . . , as well as extensive references to external files named according to Mova naming conventions that are loaded into RAM when the Ebony Maw Maya File is opened in Maya." *Id.* ¶¶ 58–60. Rearden further alleges that "[t]he Ebony Maw Maya File has source code that includes identical elements and calls to standard Mova objects such as 'mova_cache_md,' 'mova_originalHeadMotion,' 'mova_cache_publish_set,' 'movaDeformedBlend,' and 'MOVA_XFORM_rotatex,'" which are identical to elements that appear in files that were indisputably created using MOVA. *Id.* ¶ 60.

The Court begins with the first and second categories of allegations, which are unchanged from Rearden's TAC and Second Amended Complaint ("SAC"). *Compare* 4AC ¶¶ 41–50 *with* TAC ¶¶ 41–50. This Court has already found these allegations insufficient to plausibly allege direct infringement, and the Court need not repeat itself here. *See* ECF No. 54 at 6 (finding allegations of folder and file-path names and internal messages containing "MOVA" "insufficient to support a reasonable inference that MOVA was operated for facial captures or for processing

---

[2] "Maya is a widely used computer graphics program developed and sold by Autodesk. A .ma file, or Maya animation file, is a plain text project file that contains art asset data, along with commands and/or scripts. A .ma file is typically created, edited, and executed in connection with the production of 3D graphics content." *Rearden LLC v. Walt Disney Co.*, No. 17-CV-04006-JST, 2023 WL 7185737, at *1 (N.D. Cal. Sept. 8, 2023) (citation and quotation omitted).

5

captures into output works.").

The 4AC's third category of allegations regarding the Ruffalo Maya Files are also substantially similar to those in the TAC; in the TAC, Rearden alleged that it had identified a singular Ruffalo Maya File that contained substantial amounts of MOVA source code and that "[o]n information and belief, based on the date of creation of the Ruffalo Maya File and other indications of its purpose, the Ruffalo Maya File was used to animate The Hulk in at least one of Avengers: Infinity War and Avengers: Endgame." TAC ¶ 53. This Court found those allegations insufficient, as the TAC had failed to allege what the "date of creation" or "other indications of purpose" were, leaving the Court to speculate as to how those facts could support a plausible inference of direct infringement. *See* ECF No. 76 at 5–6. Rearden's 4AC attempts to cure this deficiency by alleging that the now multiple Ruffalo Maya Files have creation dates "ranging from August 11, 2016, through September 22, 2016[,]" which are consistent with the production timeline of at least, *Avengers: Infinity War*. *See* 4AC ¶ 54–57. The Court finds these amendments, taken as true on a motion to dismiss, support a plausible inference that the Ruffalo Maya Files were created using MOVA, during a time period consistent with production of at least *Avengers: Infinity War.*

Disney argues that these allegations are still insufficient, because the DD3 contract for *Avengers: Infinity War* was only for facial motion work for Thanos, and not The Hulk; that the contract also barred DD3 from using MOVA for this work; and if DD3 had used MOVA to animate The Hulk, there would have been terabytes of files, not just the few that Rearden has identified. *See* ECF No. 80 at 12–13. These arguments are not persuasive; they raise factual disputes that, even if true, do not preclude the possibility that the Ruffalo Maya Files were created using MOVA after the issuance of the *SHST* preliminary injunction and during production of *Avengers: Infinity War.* Similarly, Disney's arguments that the 4AC's creation date allegations are contradicted by the metadata of the files themselves, and Rearden's own prior representations, s*ee* ECF No. 80 at 11 n.4; ECF No. 83 at 5 n.1, 2, fail because they raise a factual dispute as to the creation dates of these files, which need not be resolved on a motion to dismiss. Finally, Disney argues that Rearden's 4AC "concedes that it cannot tell whether the [Ruffalo Maya Files] were

6

1  created using MOVA or another performance capture system." ECF No. 80 at 13 (quotation
2  omitted). This argument misstates the 4AC's allegations that the Ruffalo Maya Files contain
3  facial animation elements that can be used to generate a 3D model using MOVA or other software.
4  *See* 4AC ¶ 53. Nothing in this allegation suggests a concession that the Ruffalo Maya Files may
5  have been created with such "other software," and the immediately preceding paragraph alleges
6  that the files "contain[] substantial amounts of copied Mova Source code . . . ." *Id.* ¶ 52.
7  Ultimately, on a motion to dismiss, the Court must take as true well-pled allegations of the
8  complaint. Here, Rearden's allegations, when viewed in this light, plausibly state a claim that
9  DD3 created the Ruffalo Maya Files using MOVA, and did so during the production of at least,
10 *Avengers: Infinity War*.

11  Similarly, Rearden's new allegations regarding the Ebony Maw Maya File, taken as true
12 and construed in the light most favorable to Rearden, support a plausible inference that at some
13 point during production of *Avengers: Infinity War* and/or *Avengers: Endgame*, DD3 used MOVA
14 software to animate at least the Ebony Maw character. This Court previously dismissed as
15 insufficient allegations regarding the Ebony Maw Maya File in the TAC, because in the TAC
16 Rearden alleged that a *screenshot* of the Ebony Maw Maya File contained some naming
17 conventions using the word "mova". *See* ECF No. 76 at 7. In that order, the Court found that
18 "[a]llegations that a Maya file of the Ebony Maw character used the word 'mova' in its naming
19 conventions, without more, is insufficient to establish a reasonable inference that the file itself
20 contained MOVA source code . . . . " *Id.*

21  The allegations of the 4AC are sufficient to cross that threshold. Specifically, the 4AC
22 alleges that the Ebony Maw Maya File itself contains "100 MEL script references to 'mova'" and
23 extensive elements that are identical to those used by MOVA to call objects such as
24 "mova_cache_md," "mova_originalHeadMotion," "mova_cache_publish_set,"
25 "movaDeformedBlend," and "MOVA_XFORM_rotatex". 4AC ¶ 60. In other words, the Ebony
26 Maw Maya File does not merely use the word "mova" in some naming conventions, rather it
27 allegedly contains extensive references to elements in the MOVA software, and is identical in
28 many ways to files created using MOVA software. Such allegations, taken as true on a motion to

7

dismiss, support a plausible inference that DD3 used MOVA to create the Ebony Maw Maya File and therefore directly infringed Reardens' copyright in MOVA during the production of *Avengers: Infinity War* and *Avengers: Endgame.*

However, the 4AC does not merely claim that DD3 infringed Rearden's copyright by using MOVA to create some Maya files such as the Ruffalo Maya Files or the Ebony Maw Maya File. Rather, Rearden argues that these facts suggest that DD3 used MOVA extensively to animate characters during production of *Avengers: Infinity War* and *Avengers: Endgame*, and/or that DD3 copied substantial amounts of MOVA source code into its own Masquerade facial motion capture software such that Masquerade is either an unauthorized copy or unauthorized derivative work of MOVA. *See* 4AC ¶¶ 64. Because such allegations are integral to Rearden's secondary infringement claims against Disney, the Court finds it necessary to address them here first.

The Court finds neither claim plausible in view of the facts plead in the 4AC. Specifically, the 4AC alleges that in the course of returning files from DD3, DisputeSoft has "identified *millions* of Mova Source Code files in DD3's possession—for which recovery is not yet complete after five years[.]" 4AC ¶ 64 (emphasis in original). Similarly, the 4AC alleges that Rearden has received a spreadsheet of potential files in DD3's possession, that contains at least 8,395 rows of entries. *See id.* ¶ 43. And, on February 28, 2023 in the Ownership Litigation, Rearden represented to this Court that "[s]ince 2016, DD3 has returned many thousands of MOVA files that contain images and video of studio actors (so-called 'STUDIO' files) to Rearden with no restrictions." *SHST*, ECF No. 602 at 9.[3] In all of these files, Reardens' 4AC puts forth allegations of, at most, the single Ebony Maw Maya File and small number of Ruffalo Maya Files that could plausibly have been created using MOVA during the relevant time period, and about twenty additional Thanos files containing the word "mova" in file names or folder paths. *See* 4AC ¶¶ 43–

---

[3] The Court may take notice judicial notice of publicly available filings in related cases. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2010); *see also DEPCOM Power, Inc. v. CSUN Solar, Inc.*, No. 18-CV-00729-JST, 2020 WL 5176193, at *3 (N.D. Cal. July 30, 2020) (taking *sua sponte* notice of court filings, but not accepting the matters asserted therein as true). Rearden's 4AC makes multiple allegations as to the status of DisputeSoft's forensic review process, *see e.g.*, 4AC ¶¶ 40, 51, 64, and as such, Rearden's own representations to the Court about the status of those proceedings is relevant to those allegations.

49; 52–60. Likewise, Rearden alleges that among a spreadsheet of at least 683 entries, it has identified a total of three "diffusion" messages that reference "mova" in the relevant time period. *See id.* ¶ 50.

Based on these allegations, the Court finds it implausible that DD3 used MOVA extensively during production of *Avengers: Infinity War* and *Avengers: Endgame*. If DD3 truly used MOVA extensively to animate characters in those movies, there would be ample other evidence of such use in the form of other files and references. That Rearden has only identified such limited examples among the thousands of files it has received and millions that DisputeSoft has reviewed leads this Court to conclude that such extensive use is implausible. Likewise, the Court does not find it plausible to infer, from the Ebony Maw Maya File's references to MOVA elements and naming conventions, that DD3's Masquerade software contained substantial amounts of MOVA source code. If that were the case, then DD3's files would be replete with other examples of similar Maya files that reference those MOVA elements and naming conventions. Absent further factual support, Rearden's allegation that Masquerade is an unauthorized copy or derivative work of MOVA results from nothing more than conclusory speculation.

Accordingly, the Court finds that the 4AC sufficiently alleges that DD3 directly infringed the MOVA copyright by using MOVA to create certain files such as the Ruffalo Maya Files or Ebony Maw Maya File during production of *Avengers: Infinity War* and *Avengers: Endgame*. However, the Court does not find plausible Rearden's conclusory allegations that these limited examples support the inference that DD3 used MOVA extensively during production of those movies, or that DD3 copied MOVA source code to create its Masquerade software.

### B. Indirect Copyright Infringement

Having found that the 4AC as adequately alleged direct copyright infringement by DD3, the Court turns to Rearden's allegations that Disney should be secondarily liable for said conduct. Rearden alleges that Disney should be liable for both contributory copyright infringement and vicarious copyright infringement. *See* 4AC ¶¶ 85–95.

### 1. Contributory Infringement

"Contributory liability requires that a party (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." *VHT*, 918 F.3d at 745 (internal quotation and citation omitted)). The first element is satisfied where "the secondary infringer know[s] or has reason to know of direct infringement," *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 943 (9th Cir. 2011) (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 (9th Cir. 2001)), but "requires more than a generalized knowledge . . . of the possibility of infringement," *Luvdarts, LLC v. AT & T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013).

Rearden has failed to allege facts to support a plausible inference that Disney knew or had reason to know of DD3's alleged acts of direct infringement. The 4AC's sole allegations of knowledge are the following paragraphs:

> 69. On information and belief, Defendants were fully aware that DD3 used unauthorized Contour output files created using the stolen and copyrighted Mova software, or using software that included copied source code from the stolen and copyrighted Mova software without Rearden's authorization, to capture and/or animate Thanos, Hulk or Smart Hulk, Ebony Maw, and other characters in *Avengers: Infinity War* and in *Avengers: Endgame*.

> 70. On information and belief, Defendants knew that DD3 continued to use employees involved with MOVA Technology, including Greg LaSalle, Jonathan Berry, and Lucio Moser, to perform visual effects work on *Avengers: Infinity War* and in *Avengers: Endgame*, and raised no objections to their doing so.

> . . .

> 85. Disney had actual knowledge of DD3's specific acts of infringement at least by virtue of having notice of the Preliminary Injunction Order, and despite that Order continued to induce, cause, and materially contribute to DD3's infringement.

4AC ¶¶ 69–70, 85. Discarding Rearden's conclusory allegations, the Court is left with only two factual allegations—that Disney knew or had reason to know of DD3's purported infringement because it had notice of the *SHST* preliminary injunction, and that Disney knew or had reason to know of DD3's purported infringement because it continued to use employees "involved with MOVA Technology, including Greg LaSalle, Jonathan Berry, and Lucio Moser, to perform visual

effects work on *Avengers: Infinity War* and [] *Avengers: Endgame*[.]" *Id.* ¶ 70.

These allegations are plainly insufficient to establish that Disney had the requisite knowledge, actual or constructive, of DD3's "specific acts of infringement." *Napster*, 239 F.3d at 1021; *see also Luvdarts*, 710 F.3d at 1072–73 ("In *Napster, . . .* the court emphasized that 'actual knowledge of specific acts of infringement' is required for contributory infringement liability. . . . Willful blindness of specific acts would establish knowledge for contributory liability."). To begin with, notice of the *SHST* preliminary injunction meant that Disney knew of Rearden's copyright in MOVA, but is irrelevant to whether Disney knew or had reason to know of DD3's purported *use* of MOVA while working on *Avengers: Infinity War* or *Avengers: Endgame*. As for Disney's continued use of DD3 employees such as LaSalle, Berry, or Moser, who were "involved in MOVA Technology," at most these allegations support an inference that Disney had a "generalized knowledge . . . of the possibility of infringement[,]" and not the requisite knowledge of the specific acts of infringement. *See Ludvarts*, 710 F.3d at 1072.

Rearden argues that Disney had knowledge of DD3's infringement because "DD3 was required to and/or did 'submit elements and work in progress to the Producer on at least a weekly basis to allow the Producer to order refinements and adjustments.' " ECF No. 83 at 16 (citing 4AC ¶ 91). For example, Rearden argues that Disney knew or had reason to know of DD3's infringement in the Ebony Maw Maya File, because "[w]hen loaded into Maya for inspection, the Ebony Maw Maya File's pervasive references to Mova would immediately jump out at the user, as the screenshots in the 4AC show." *Id.* (citing 4AC ¶¶ 62–63). However, Rearden has not alleged facts sufficient for the Court to infer that the Ebony Maw Maya File, or as-yet unknown files like it, were ever provided to Disney such that Disney would have had the opportunity to inspect them. Again, among the millions of files reviewed by DisputeSoft, or thousands of files it has returned, Rearden has only identified a few files that reflect plausible direct infringement by DD3. In light of the limited scope of Rearden's direct infringement allegations, it is not plausible that Disney had actual or constructive knowledge of these limited instances of infringement, merely by virtue of its receipt *generally* of elements and work in progress.

Rearden also fails to adequately allege that Disney either induced or materially contributed

1  to DD3's purported direct infringement. Rearden argues that the 4AC alleges inducement or
2  material contribution because Disney hired DD3 to perform facial motion capture for *Avengers:*
3  *Infinity War* and *Avengers: Endgame*, including personnel such as LaSalle, Berry, and Moser. *See*
4  ECF No. 83 at 17–18. But the bare allegations that Disney hired individuals who had experience
5  working with MOVA in the past does not suffice to plead that Disney "substantially assist[ed]"
6  DD3's purported direct infringement. *See Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658
7  F.3d 936, 943 (9th Cir. 2011). Apparently recognizing this, Rearden argues that "the complaint
8  alleges that Defendants directed DD3 to use MOVA, but used a contract to cover up its direction."
9  ECF No. 83 at 17–18. However, the Court finds no support for this assertion in the 4AC. Rearden
10 has not plausibly alleged that Disney knew or had reason to know of DD3's purported use of
11 MOVA during *Avengers: Infinity War* and *Avengers: Endgame*, much less that Disney *instructed*
12 DD3 to do so. There is likewise no factual support for Rearden's speculation that Disney
13 contractually barred DD3 from using MOVA as merely misdirection. Disregarding these
14 conclusory allegations, the 4AC does not plausibly allege that Disney induced or materially
15 contributed to DD3's purported direct infringement here.
16     Accordingly, because Rearden has failed to plausibly allege that Disney had either the
17 requisite knowledge of DD3's purported direct infringement, or materially contributed and/or
18 induced such infringement, Rearden has failed to state a claim for contributory copyright
19 infringement.

### 2. Vicarious Infringement

21     Vicarious copyright infringement requires "that the defendant exercises the requisite
22 control over the direct infringer and that the defendant derives a direct financial benefit from the
23 direct infringement." *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1173 (9th Cir. 2007).
24 Under Ninth Circuit law, "a defendant exercises control over a direct infringer when he has both a
25 legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so."
26 *Perfect 10*, 508 F.3d at 1173. The Ninth Circuit has consistently held that a party lacks the
27 practical ability to control infringing conduct if it lacks the practical ability to identify infringing
28 conduct or material as infringing. *See Napster*, 239 F.3d at 1023–24; *Perfect 10*, 508 F.3d at

1173–74; *VHT*, 918 F.3d at 746.

The 4AC alleges that Disney had the legal right and practical ability to control DD3's infringing conduct because "[o]n information and belief, the contract between DD3 and Disney . . . requires that DD3 design all '[s]hots and composited elements' 'pursuant to Producer's requirements,' and requires that DD3 submit elements and work in progress to the Producer on at least a weekly basis to allow the Producer to order refinements and adjustments." 4AC ¶ 91. It further alleges that Disney thus "had the authority and practical ability to observe and evaluate services provided by [DD3] and—if [it] deemed those services inadequate, improper, or unlawful—require [DD3] to remedy the services or cancel [DD3's] provision of services." *Id.*

As pled, the 4AC does not plausibly allege that Disney, by virtue of its contractual right to review "composited shots," "elements," or "work in progress," had the practical ability to identify DD3's purported direct infringement. Notably, while the 4AC alleges that Disney was entitled to, and in fact, received weekly reports including elements and work in progress shots, it does not contain any allegations that individual Maya files like the Ebony Maw Maya File were included in these weekly reports, such that Disney would have occasion to notice DD3's purported use of MOVA. Nor does the 4AC allege that these weekly reports contained any mention of MOVA, such that Disney had the practical ability to recognize that DD3 was using MOVA in any capacity. Finally, to the extent that Rearden alleges that DD3's "Masquerade" software contained substantial amounts of MOVA source code, the 4AC contains no allegations that it would have been practical for Disney to review the *source code* of DD3's software to police whether DD3 was infringing Rearden's copyright in developing its own software.

Rearden argues that Disney "absolutely had the ability to see that DD3 was continuing to use Jonathan Berry and continuing to provide Maya files with Mova references" and the MOVA references "were big flashing signs that should have jumped out at Defendants . . . ." ECF No. 83 at 18. These arguments fail for several reasons. First, to the extent that Disney had the ability to control *who* was working on *Avengers: Infinity War* and/or *Avengers: Endgame* at DD3, Rearden has pled no facts to suggest that LaSalle, Berry, or Moser were in fact the individuals at DD3 who created the Ruffalo Maya Files or Ebony Maw Maya File, such that the removal of them would have "stop[ped] or

13

limit[ed] the directly infringing conduct." *Perfect 10*, 508 F.3d at 1173. Similarly, Rearden's argument that the MOVA references in the Ebony Maw Maya File "were big flashing signs that should have jumped out at Defendants" is undermined by the fact that Rearden has only identified one such file with these MOVA references in the many millions of files DisputeSoft has reviewed. This argument presumes that Disney either had the occasion to open that specific file in the Maya software during its review process, or that Disney would have had the practical ability to request, and review, every single such file created by DD3 in the course of its work on *Avengers: Infinity War* and *Avengers: Endgame*. Neither is plausible in light of the allegations in the 4AC.

Again, Rearden's arguments as to practical ability are predicated upon its allegations that DD3's use of MOVA was either extensive, or that DD3 effectively copied MOVA into Masquerade, such that Disney could easily identify infringing conduct in the "entire *Infinity War* production[.]" ECF No. 83 at 18–19. But the Court has already rejected Rearden's allegations of such extensive direct infringement as implausible. *See* Section III (A), *supra*. The facts as alleged in the 4AC—that among millions of files reviewed by DD3 over the course of many years, Rearden has only managed to identify four files that were plausibly created using MOVA—simply does not support a plausible inference that Disney would have had the practical ability to identify or control these limited instances of direct infringement. Because ferreting out these few instances in the entire production of the two *Avengers* films would be "beyond hunting for a needle in a haystack," *VHT*, 918 F.3d at 746, Rearden has failed to adequately plead a claim for vicarious copyright infringement.

### C. Leave to Amend

Disney requests that this Court dismiss the 4AC with prejudice, arguing that further amendment would be futile. *See* ECF No. 80 at 19–20. Rearden argues that the Court should grant it leave to amend if this Order finds sufficient its direct infringement allegations but not its secondary infringement allegations. *See* ECF No. 83 at 19–20.

This Court's prior Order granted Rearden "one final chance to amend its copyright infringement claim, wherein Rearden must be willing to make its averments without caveat and/or with additional detail explaining the basis of [its] beliefs." ECF No. 76 at 15 (quotations and

14

1  citations omitted).  However, that order stated that "Rearden may file an amended complaint . . .
2  solely to cure the deficiencies identified by th[at] order" and that "[f]ailure to do so . . . shall result
3  in dismissal with prejudice." *Id.* at 16.  Rearden, in its 4AC, has cured the deficiency in its direct
4  infringement allegations that resulted in dismissal of its TAC.  Accordingly, because the Court
5  now dismisses the 4AC based on inadequacies in Reardens *secondary* infringement allegations, in
6  the interest of fairness the Court will grant Rearden one more opportunity to remedy those
7  deficiencies.

## CONCLUSION

For the foregoing reasons, Disney's motion to dismiss is granted with leave to amend. Rearden may file an amended complaint within twenty-one days of this order solely to cure the deficiencies identified by this order.  Failure to do so, or to cure the deficiencies identified in this order, shall result in dismissal with prejudice.

**IT IS SO ORDERED.**

Dated:  December 20, 2024

JON S. TIGAR
United States District Judge