JOSHUA M. MASUR (SBN 203510)
  *joshua.masur@hglaw.com*
**HALEY GUILIANO LLP**
111 North Market Street, Suite 900
San Jose, California 95113
Telephone: +1 669 213 1056
Facsimile: +1 669 500 7375

BRIAN J. BECK (*pro hac vice*)
  *brian.beck@hglaw.com*
**HALEY GUILIANO LLP**
75 Broad Street, Suite 510
New York, New York 10004
Telephone: +1 669 213 1058
Facsimile: +1 669 500 7375

Attorneys for Plaintiffs
REARDEN LLC and REARDEN MOVA LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| REARDEN LLC, a California limited liability company, and REARDEN MOVA LLC, a California limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> TWDC ENTERPRISES 18 CORP. f/k/a THE WALT DISNEY COMPANY, a Delaware corporation, et al., <br><br> Defendants. | Case No. 4:22-cv-02464-JST <br><br> **PLAINTIFFS REARDEN LLC AND REARDEN MOVA LLC'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS IN PART FIFTH AMENDED COMPLAINT PURSUANT TO FED.R.CIV.P. 12(b)(6)** <br><br> Date:    May 22, 2025 <br> Time:    2:00 p.m. <br> Crtrm.:  6 (2nd Floor) <br> Judge:   Hon. Jon S. Tigar |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...........................................................................................1

II.  LEGAL STANDARD ....................................................................................3

III.  ARGUMENT ...............................................................................................4

    A.  The 5AC pleads all elements of contributory copyright infringement......................4

        1.  The 5AC pleads that Disney knew or had reason to know of DD3's direct infringement. ...........................................................................4

        2.  In the alternative, the 5AC pleads that Disney was willfully blind to DD3's direct infringement. ...................................................................8

        3.  The 5AC pleads that Disney materially contributed to and/or induced DD3's direct infringement. ......................................................10

    B.  The 5AC pleads all elements of vicarious copyright infringement..........................18

        1.  Disney cannot dispute that it had the legal right to stop DD3's directly infringing conduct. ...........................................................18

        2.  The 5AC pleads that Disney had the practical ability to stop DD3's direct infringement. ...........................................................19

        3.  The 5AC pleads that Disney derived a direct financial benefit from DD3's direct infringement. ...........................................................20

IV.  CONCLUSION ...........................................................................................21

10049121v1

1

## <u>TABLE OF AUTHORITIES</u>

2

3

<u>Page</u>

4

5

<u>Cases</u>

*Ansel Communs., Inc. v. Novell, Inc.*,
    No. C-97-21088, 1999 U.S. Dist. LEXIS 22737
    (N.D. Cal. Mar. 23, 1999) ........................................................................ 12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................... 3, 15, 20

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................... 3

*Harrington v. Pinterest, Inc.*,
    No. 5:20-cv-5290, 2021 U.S. Dist. LEXIS 167983
    (N.D. Cal. Sept. 3, 2021) ...................................................................... 4, 9

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ............................................................. 17, 21

*Levi Strauss & Co. v. Blue Bell, Inc.*,
    778 F.2d 1352 (9th Cir. 1985) ................................................................. 12

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
    658 F.3d 936 (9th Cir. 2011) ..................................................................... 4

*Luvdarts v. AT&T Mobility, LLC*,
    710 F.3d 1068 (9th Cir. 2013) ............................................................ 4, 7, 8

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
    521 F.3d 1097 (9th Cir. 2008) ................................................................... 3

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ................................................................. 18

*Soo Park v. Thompson*,
    851 F.3d 910 (9th Cir. 2017) ............................................................... 3, 17

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ........................................................... passim

*VHT, Inc. v. Zillow Grp., Inc.*,
    918 F.3d 723 (9th Cir. 2019) ..................................................................... 4

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10049121v1

1

**Rules**

2    Fed. R. Civ. P. 11(a) ............................................................................................ 17

3    Fed. R. Civ. P. 11(a)(3) ........................................................................................... 1

4    Fed. R. Civ. P. 12(b)(6) .................................................................................... 3, 17

5    Fed. R. Civ. P. 8 ............................................................................................... 3, 17

6    Fed. R. Civ. P. 8(a)(2) ............................................................................................ 3

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10049121v1

## I.  <u>INTRODUCTION</u>

The Court concluded that Plaintiffs Rearden LLC and Rearden MOVA LLC's (collectively "Rearden's" or "Plaintiffs'") Fourth Amended Complaint ("4AC") states claims for patent infringement and for direct copyright infringement by nonparty Digital Domain 3.0 ("DD3"). Dkt. 76 at 15; Dkt. 87 at 9. However, the Court dismissed the secondary copyright infringement claims against Defendants TWDC Enterprises 18 Corp. f/k/a The Walt Disney Company et al ("Defendants" or "Disney") in the 4AC without prejudice, on the grounds that it failed to plausibly allege that Disney knew or had reason to know of DD3's purported use in *Avengers: Infinity War* and *Avengers: Endgame* (collectively "*Avengers*") of the copyrighted MOVA technology (for contributory infringement), or that Defendants had the practical ability to identify DD3's acts of direct infringement in *Avengers* (for vicarious infringement). Dkt. 87 at 12, 14.

Rearden's Fifth Amended Complaint (Dkt. 90, "5AC") adds relevant factual allegations regarding Disney's motive for and knowledge of the use of MOVA for *Avengers*.  Because most or all evidence of Disney's motive and knowledge is, of course, inherently in the possession, custody, control of Disney, rather than Rearden, those facts have been pled as "likely [to] have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(a)(3).  Moreover, the plausibility of those factual assertions confirmed by evidence obtained in the prior *Rearden, LLC et al v. Walt Disney Company et al*, No. 4:2017-cv-4006-JST (N.D. Cal.) ("*Disney I*")[1] litigation regarding Disney's use of MOVA for the high budget ($200 million) *Beauty and the Beast* movie ("BATB"), and the timelines for production of relevant movies from the underlying litigation, *Shenzhenshi Haitiecheng Science & Technology Co., Ltd. v. Rearden LLC et al*, No. 3:15-cv-797-JST (the "*Ownership Litigation*") – including DD3's representations under oath in June-July 2016 that it could not offer Disney an adequate alternative to MOVA software for the high-resolution facial capture processing required for BATB.  The 5AC also includes new factual allegations regarding the nature of the filmmaking and facial capture

---

[1] The 5AC, and this opposition, refer to this case as *Disney I*, Dkt. 90 at ¶ 37; Disney refers to the same case as *Rearden I*. Dkt. 94 at 5:1.

10049121v1

1    processing process to demonstrate that Disney would have had to review the Ruffalo Maya Files

2    and Ebony Maw Maya Files, in Maya, to create *Avengers*.

3        The 5AC's allegations support, among others, the plausibility of certain key facts:

4    - It is plausible to infer that, in August-September 2016, when Disney hired DD3 to perform

5    facial capture processing for the *Avengers* movies, which were even higher budget than

6    BATB, Disney knew that DD3 had no adequate alternative to MOVA software for facial

7    capture processing for *Avengers*, based at least on DD3's June-July 2016 sworn

8    representations.

9    - "The Ruffalo Maya Files returned by DD3 have creation dates ranging from August 11,

10    2016, through September 22, 2016" and "[contain] substantial amounts of copied Mova

11    source code." Dkt. 90 at ¶¶ 75, 73.  It is plausible to infer that the Ruffalo Maya Files were

12    intended to be and were used to animate The Hulk for *Avengers*, including because those

13    creation dates – in the same period during which Disney believed DD3 had no adequate

14    alternative to MOVA – are consistent with the production timeline of the *Avengers* movies.

15    - It is plausible to infer that Disney would have had to review the files DD3 created with

16    MOVA software, and would have done so by viewing them in Maya. Because viewing

17    them would have revealed extensive references to "MOVA", it is plausible to infer that

18    Disney knew about the specific acts of direct infringement of MOVA software that the

19    Court already held to have been adequately pleaded.

20        Keeping in mind that a plaintiff may allege facts on information and belief and/or as likely

21    to be supported by facts obtained in discovery, especially when they are peculiarly in the

22    defendant's possession and the factual allegations within plaintiff's possession plausibly raise an

23    inference of culpability, these inferences plausibly allege the necessary elements of both

24    contributory and vicarious infringement. They plausibly allege the two elements of contributory

25    infringement: that (1) Disney knew of DD3's infringement (because it had to review files showing

26    the infringing use of MOVA software by viewing them in Maya, where that infringement was

27    apparent and obvious); and (2) Disney materially contributed to or induced that infringement (by

28    directing DD3 to proceed with its infringing use of MOVA software, knowing that no alternative

2

1  adequate facial capture processing was available to DD3). They also plausibly allege the two

2  elements of vicarious copyright infringement: (1) that Disney had the legal right and practical

3  ability to stop the infringement (because the review of files it had to undertake as part of the

4  filmmaking process would immediately reveal the infringement); and (2) that Disney derived a

5  direct financial benefit from the direct infringement (because without DD3's infringement, Disney

6  had no other way to adequately make its capstone multi-billion-dollar *Avengers* movies).

7       Under the liberal pleading standards of Rule 8, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)*, and*

8  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Court should deny Disney's renewed

9  motion to dismiss, and allow this case to proceed.

10 **II.    LEGAL STANDARD**

11      "To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

12 complaint must contain 'a short and plain statement of the claim showing that the pleader is

13 entitled to relief.'" Dkt. 87 at 3 (quoting Fed. R. Civ. P. 8(a)(2)). "Dismissal 'is appropriate only

14 where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable

15 legal theory.'" *Id.* (quoting *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th

16 Cir. 2008)). A claim has facial plausibility, and therefore survives a motion to dismiss, "when the

17 plaintiff pleads factual content that allows the court to draw the reasonable inference that the

18 defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal, supra,* at 678.

19      In the Ninth Circuit, "[i]f there are two alternative explanations, one advanced by

20 defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint

21 survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only

22 when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is

23 *implausible*." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (emphasis in original).

24      "[A] plaintiff may 'plead[] facts alleged upon information and belief where the facts are

25 peculiarly within the possession and control of the defendant or where the belief is based on

26 factual information that makes the inference of culpability plausible.'" Dkt. 87 at 4 (quoting *Soo

27 Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017)).

28

10049121v1

III.    **ARGUMENT**

A.    **The 5AC pleads all elements of contributory copyright infringement.**

"Contributory liability requires that a party (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." Dkt. 87 at 10 (quoting *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 745 (9th Cir. 2019)). "The first element is satisfied where "the secondary infringer know[s] or has reason to know of direct infringement." *Id.* (quoting *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 943 (9th Cir. 2011)). The first element can also be established by a plausible allegation of willful blindness, which requires allegations that "the defendant '(1) subjectively believed that infringement was likely occurring' and '(2) took deliberate actions to avoid learning about the infringement.'" *Harrington v. Pinterest, Inc.*, No. 5:20-cv-5290, 2021 U.S. Dist. LEXIS 167983, at *13 (N.D. Cal. Sept. 3, 2021) (quoting *Luvdarts v. AT&T Mobility, LLC*, 710 F.3d 1068, 1073 (9th Cir. 2013)).

1.    **The 5AC pleads that Disney knew or had reason to know of DD3's direct infringement.**

The 5AC includes new factual allegations that support a plausible inference that Disney knew, or had reason to know, of DD3's direct infringement in connection with *Avengers*. First, a series of new allegations at paragraphs 46 through 60 explains that based on evidence that did not become public until the trial in *Disney I*, Disney knew, from DD3's sworn declarations to this Court in June-September 2016, in the same period during which the Ruffalo Maya Files were created, that DD3 had no adequate alternative to MOVA software for the high-resolution facial capture processing required for high budget movies. The 5AC alleges, quoting DD3's President O.D. Welch's sworn declaration in the Ownership Litigation, that DD3 told the Court that if the Injunction was not lifted or modified, DD3 would be unable to complete work on BATB, and that "if DD3 is unable to process the [MOVA] captured data, this client [Disney] will be required to recapture the data with another vendor," rather than DD3. Dkt. 90 at ¶¶ 48-49. The 5AC then quotes emails showing that DD3 told its employees that there were no tested alternatives to MOVA software around the same time the Ruffalo Maya Files were created. *Id. at* ¶¶ 50-52. The 5AC then connects these activities to Disney by alleging that Disney knew about the continued use

1    of MOVA software because after Disney was aware of the Injunction in the Ownership Litigation,

2    Disney continued to order "selects," described as "the MOVA facial capture takes that best match

3    the actor's live action performance" which "[a]t a later date after the MOVA facial capture

4    session, a studio representative (the Director, in the case of BATB) reviews videos of the takes and

5    selects the takes they want to use in the movie. These are called 'selects'. The selects are then

6    processed by MOVA software…." *Id. at* ¶¶ 56-60, n. 2.

7        A second set of new allegations at paragraphs 90-106 of the 5AC then connects Disney's

8    activities with respect to BATB to its knowledge of use of MOVA software for *Avengers*. The

9    5AC explains that Disney's actions in continuing to order "selects" for BATB demonstrates its

10   knowledge that in July-September 2016 (three months after the Injunction), DD3 was still using

11   MOVA software for Disney's project. Dkt. 90 at ¶ 93. The 5AC further supports Disney's

12   knowledge by comparing Disney's post-Injunction actions in continuing to direct DD3 to use

13   MOVA software to those of other studios who immediately ensured compliance with the

14   Injunction and ceased all MOVA use (e.g., *not* ordering MOVA selects), and by pointing to

15   Disney's paying nothing for DD3's post-Injunction BATB services—on information and belief,

16   because Disney knew DD3 was illegally using MOVA software for Disney past-Injunction, and as

17   such, Disney knew DD3 would similarly provide illegal MOVA software services for Disney's

18   bigger flagship *Avengers* movies. *Id. at* ¶¶ 94-95. The 5AC proceeds to connect these new

19   allegations to *Avengers* by alleging that Disney either directed DD3 to continue to use MOVA

20   software for *Avengers* or was willfully blind to its use by DD3 because DD3 and Disney both

21   knew that MOVA software was the only technology DD3 possessed that could adequately provide

22   high-resolution facial capture processing for characters for *Avengers. Id. at* ¶¶ 96-97. Then the

23   5AC also directly alleges that Disney must have reviewed the Ruffalo and Ebony Maw Maya files

24   that demonstrate use of MOVA software because, based on Rearden's experience, those are

25   "among the types of files that would routinely be reviewed by studio representatives to inspect the

26   progress of the work, as was provided for in the contracts between DD3 and Defendants for work

27   on *Avengers Infinity War* and *Avengers: Endgame*." *Id. at* ¶ 98. It is reasonable to infer that

28   Disney knew about the illegal post-Injunction use of MOVA software by DD3 for *Avengers. Id. at*

5

10049121v1

1    ¶¶ 99-104.

2           Disney makes two arguments in response to the allegations of actual knowledge. The first

3    is the least plausible: that Disney could not have known that DD3's conduct was infringing until

4    the final decision in the Ownership Litigation on April 11, 2017. Dkt. 94 at 7:16-20. Disney's only

5    support for this claim is a citation to this Court's grant of summary judgment in *Disney I* holding

6    that actions pre-dating the *2013* sale of MOVA assets to SHST are "not probative as to whether

7    [Disney] knew in [2015] that DD3, which had licensed the MOVA assets from SHST, was not

8    authorized to use MOVA technology." *Disney I*, Dkt. 569, Attachment at 7-8. But there was a

9    finding of fact, entered on June 17, 2016, that Rearden had shown a likelihood of success on the

10   merits as to its claim for fraudulent conveyance of the MOVA Assets, and an order entered

11   prohibiting SHST and its purported licensees, explicitly including DD3 and "any producers,

12   distributors of motion pictures", from continuing to use MOVA. *Ownership Litigation*, Dkt. 188

13   at 12, 15-16. Indeed, the Injunction was entered and Default Judgment was recommended based

14   on SHST absconding from the case. *Ownership Litigation* Dkt. 168 3:19-4:10 and Dkt. 252 at

15   13:4-14. The 5AC pleads, on information and belief, that Disney was aware of the Ownership

16   Litigation no later than February 23, 2016, and of that Injunction no later than June 22, 2016.

17   Dkt. 90 at ¶ 41, 44[2]. Once the Injunction was entered on June 17, 2016, Disney was aware that any

18   continued use of MOVA by DD3 was not only highly unlikely to be legitimate, including given

19   that the plaintiff and counterclaim defendant of the *Ownership Litigation*, SHST, had absconded,

20   but also that DD3's continued possession, let alone use, of MOVA software was also in contempt

21   of the Court's Injunction order as Disney continued to order MOVA selects to be processed by

22   _____

23   [2] The factual allegations of the 5AC are to be taken as true on a motion to dismiss, and therefore
     do not require further factual support. However, to the extent Disney argues (applying an incorrect

24   legal standard) that certain allegations are implausible, Rearden provides additional citation to
     supporting evidence in the footnotes. As to the question of when Disney became aware of the

25   *Ownership Litigation* and the preliminary injunction, Disney's Senior Vice President of Visual
     Effects David Taritero, who directly supervised DD3, and Disney in-house counsel Jon Chow

26   admitted to these dates. *Disney I* Dkt. 684-1 p.96 146:18-21, Trial Transcript. 1011:15-16. As the
     Court relied on testimony regarding these matters to find Rearden's allegations implausible

27   through application of the judicial notice rule, Rearden may rely on "publicly available filings in
     related cases" as well. Dkt. 87 at 8 n. 3.

28

10049121v1

1  DD3 for months post-Injunction. Disney's actions stand in stark contrast to all other studios who

2  immediately complied with the Injunction and stopped all their MOVA work with DD3. Disney

3  cannot credibly argue that it only had an "insufficient 'generalized knowledge … of the possibility

4  of infringement' by DD3." *Cf. Disney I*, Dkt. 569 at 8 (quoting *Luvdarts, LLC v. AT&T Mobility,*

5  *LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013)).

6      Disney's second argument, that the 5AC does not allege that the specific Ruffalo and

7  Ebony Maw Maya Files identified in the Complaint were provided to Disney (Dkt. 94 at 7-8), also

8  fails. The 5AC alleges that the Ruffalo and Ebony Maw Maya Files are evidence of much more

9  extensive infringing use of MOVA software, not that they are the only infringing files ever

10  created. The 5AC explains that files were returned in the *Ownership Litigation* under narrow

11  criteria intended *only* to identify MOVA assets properly belonging to Rearden, and were not

12  intended to, and did not, provide discovery concerning the claims of either *Disney I* or the present

13  lawsuit; there was no general search for infringing files created for BATB, *Avengers*. Dkt. 90 at

14  ¶ 88. The 5AC also alleges, on information and belief, that DD3 deliberately changed MOVA

15  references to fake words like AVOM ("MOVA" spelled backwards) or "Moova" to evade word

16  searches for MOVA, and that DD3's purported alternated "Masquerade" facial capture system was

17  merely MOVA under yet another "mockingly[] masking" pseudonym. *Id. at* ¶ 89.

18      The factual allegations in the 5AC, taken as a whole, raise a plausible inference that

19  Disney knew of DD3's post-injunction use of MOVA software for *Avengers*. In addition to the

20  new allegations in the 5AC described above that Disney knew of and directed DD3 to continue

21  using MOVA software for *Avengers* in August-September 2016 because it knew there was no

22  comparable alternative available to DD3 at the time, the 5AC still contains the allegations that:

23      • A spreadsheet recovered from DD3 lists many files with file paths combining "MARY"

24        (the codeword for production on *Avengers*), "thanos_head", and "mova/data,") with

25        modification dates from March-December 2017. Dkt. 90 at ¶¶ 63-66.

26      • Disney knew that DD3 continued to have MOVA personnel such as Jonathan Berry work

27        on *Avengers*, even crediting them in the movie, despite purporting to prohibit their

28        involvement in facial capture for *Avengers*. *Id. at* ¶ 78.

7

10049121v1

- The use of MOVA software in the Ruffalo and Ebony Maw Maya Files was so pervasive and obvious that it would be immediately apparent to anyone who viewed the files in Maya. *Id. at* ¶¶ 81-85.

Disney's answer to this is a competing theory: that MOVA was "an outdated facial capture technology" in 2016, and that rather than being representative of DD3's *Avengers* work product, the Ruffalo and Ebony Maw Maya Files were merely four isolated and unique files out of "many terabytes of files" used for the movie. Dkt. 94 at 8:1-9. But where Rearden and Disney have advanced competing theories regarding Disney's knowledge of DD3's use of MOVA software for *Avengers*, the complaint may only be dismissed if Disney's "plausible alternative explanation is so convincing that [Rearden's] explanation is *implausible*." *Starr*, 652 F.3d at 1216. Disney's alternative explanation for these facts – that DD3 *just happened* to use MOVA software to generate Maya files for multiple *Avengers* characters but *these particular files* were not ones that Disney ever looked at; that DD3 *just happened* to use file names combining the *Avengers* code name with its main villain Thanos and "mova/data" without Disney's knowledge; that DD3 *just happened* to have MOVA personnel working on the movie in violation of its contract with Disney, and these were *all just isolated acts* about which Disney knew nothing (all while Disney was sending DD3 post-Injunction MOVA selects to use MOVA software illegally in DD3's possession, for which use DD3 charged Disney nothing) – is barely plausible at best, let alone so convincing as to make Rearden's explanation *im*plausible.

Occam's Razor suggests that Disney knew about and directed DD3 to infringe (and better yet, knew the services would be free, since Disney knew DD3 couldn't list "MOVA Software Services" provided in contempt of the Injunction on an invoice), not that DD3 was a rogue actor. And that is more than enough to survive a motion to dismiss.

### 2. In the alternative, the 5AC pleads that Disney was willfully blind to DD3's direct infringement.

Even if the allegations added to the 5AC were insufficient to show actual knowledge, they would still plead willful blindness, which courts in this District have already held would be sufficient to state a claim. Dkt. 87 at 11 (quoting *Luvdarts*, 710 F.3d at 1072-73; "Willful

1  blindness of specific acts would establish knowledge for contributory liability."). This Court has

2  previously explained the standard for willful blindness in the context of contributory copyright

3  infringement as requiring that "the defendant '(1) subjectively believed that infringement was

4  likely occurring' and '(2) took deliberate actions to avoid learning about the infringement.'"

5  *Harrington*, 2021 U.S. Dist. LEXIS 167983, at *13.

6      The new allegations of the 5AC plausibly allege, supported by evidence, that *Disney had a*

7  *subjective belief that infringement was likely occurring*. They allege that Disney was aware, as of

8  the June 2016 preliminary injunction, that any use by DD3 of MOVA was infringing, and that

9  DD3 had represented, under oath, that it had no adequate alternative to MOVA to complete the

10  high budget BATB project for which it was under contract with Disney. Dkt. 90 at ¶¶ 45-60. They

11  specifically allege that for months past the Injunction Disney's repeatedly ordering "selects" – the

12  takes from a MOVA capture session that the studio wants to use in the film (*Id. at* ¶ 59 n. 2) –

13  supports the inference that Disney must have known that DD3 was in possession on and using the

14  infringing MOVA software, because (a) the only way to process MOVA "selects" was by using

15  MOVA software, and (b) the only reason to use the MOVA software-processed "selects" that

16  Disney ordered would be for use with MOVA; hand-animation would use the actual *live action*

17  performance as a reference with no need to choose the "selects" that are the closest approximation

18  of the live action performance. *Id. at* ¶ 59. As alleged in the 5AC, this was hardly a minor activity

19  by Disney: Disney's ordering of post-Injunction MOVA "selects" was at such a large scale that

20  *"after* the entry of the Injunction, the DD3 Production Services team that runs DD3's servers that

21  support all projects in DD3's Playa Vista headquarters reported they were running MOVA

22  software so heavily that the usage had threatened to 'slow down the whole Playa environment.'".

23  *Id.* ¶ 52. And the 5AC goes further in alleging, based *inter alia* on Rearden's knowledge of the

24  return process in the *Ownership Litigation*, that there are many more Maya files that, like the

25  Ruffalo and Ebony Maw Maya files, show similar use of MOVA for *Avengers* that will meet

26  *discovery* criteria, but did not meet the narrow Special Master's Rearden *theft return* criteria. *Id. at*

27  ¶ 88. The allegation in the 5AC is not that Disney "subjectively believed DD3 created a handful of

28  infringing files" (Dkt. 94 at 8), but that Disney subjectively believed DD3 was continuing to use

9

1   MOVA software after the injunction for *Avengers* as well as BATB.

2   The new allegations of the 5AC also demonstrate that Disney, if it did not know about

3   DD3's post-injunction MOVA use directly, took steps to avoid learning about it. The 5AC alleges

4   that despite knowing of the likely (and necessary, in the case of post-injunction selects) post-

5   injunction use of MOVA software by DD3, Disney continued to have DD3 complete the projects

6   that it hired DD3 to use MOVA for. Dkt. 90 at ¶ 97. Disney has admitted, and the 5AC

7   accordingly alleges, that its contracts provided it with the right to inspect the files provided by

8   DD3 for its projects including *Avengers*. *Id. at* ¶ 98. And the 5AC alleges that a simple inspection

9   of the Ruffalo and Ebony Maw Maya files, and of any similar files, would immediately reveal use

10  of MOVA software. *Id. at* ¶¶ 73-85; 100. Accordingly, either Disney did open the files

11  demonstrating use of MOVA software and had actual knowledge of DD3's use of MOVA

12  software, or intentionally avoided inspecting the files despite having a contractual right and

13  obligation to do so, willfully staying blind to the use of MOVA software. *Id. at* ¶ 100. The

14  allegation is further supported by Disney's willful failure to enforce its contractual prohibition on

15  DD3's use of MOVA personnel for *Avengers*, listing Jonathan Berry as the "Lead Facial Motion

16  Capture Artist" for *Avengers*. *Id. at* ¶ 68. The 5AC therefore plausibly alleges that Disney either

17  knew of DD3's use of MOVA software for *Avengers*, or that Disney was willfully blind to its use;

18  either way, the 5AC sufficiently pleads the knowledge element of contributory copyright

19  infringement.

20   **3.   The 5AC pleads that Disney materially contributed to and/or induced**

21   **DD3's direct infringement.**

22   As to the material contribution element of copyright infringement, the 5AC alleges that

23  Disney contributed to and induced DD3's infringement in connection with *Avengers* by directing

24  DD3 to continue to use MOVA software (or to continue to provide high resolution facial capture

25  processing work on *Avengers*, knowing DD3 had no high resolution facial capture processing

26  alternative to MOVA software but remaining willfully blind to its use), in order to ensure the

27  timely completion of *Avengers* with the required 3D facial performance quality. As discussed

28  previously, the 5AC alleges, based on the public sworn declarations of DD3's President O.D.

10

10049121v1

Welch (plus further support in Disney's possession that the 5AC alleges is likely to be found after the opportunity for discovery) that Disney was aware that the only high-resolution facial capture processing technology DD3 possessed as of August 2016 (when work began on *Avengers*) was MOVA software. Dkt. 90 at ¶¶ 48-60; 96. The 5AC also alleges that DD3 charged Disney nothing for its infringing MOVA services on BATB, because DD3 couldn't charge for post-injunction illegal use of MOVA software, which was an inducement for Disney to hire DD3 to provide infringing MOVA services for *Avengers*. *Id. at* ¶ 95. And the 5AC alleges that DD3 treated films from different studios differently after the injunction was entered: DD3 immediately ceased *all* MOVA work on movies from *all* other studios, receiving *no* selects from them, but continued to use MOVA software for pending work on Disney's BATB and *Avengers*, including using MOVA software *extensively* in response to Disney sending DD3 post-Injunction selects. *Id. at* ¶ 94. The factual allegations regarding Disney's motivations for *Avengers*, and the difference between DD3's actions on *Avengers* and its actions with respect to other studios' films, raise a plausible inference that DD3 continued to use MOVA for *Avengers* at Disney's direction; had DD3 simply chosen to ignore the Injunction of its own accord, it would have done so for at least *one* other studio and *one* other movie, not just Disney on *three* Disney movies (BATB and both *Avengers* movies). *Id. at* ¶ 94.

Rearden is not collaterally estopped from making this argument because it does not rely on allegations identical to any that were decided in *Disney I*. Disney argues primarily that collateral estoppel applies based on the Court's finding that Rearden was unable to "identify any evidence" at the summary judgment phase in *Disney I* to contradict evidence that Disney "did not use in [BATB] any shots prepared by DD3 using MOVA" after the issuance of the injunction. Dkt. 94 at 9 (quoting *Disney I*, Dkt. 569 at 12). The Court's summary judgment decision in *Disney I* did not, however, adjudicate the question of whether DD3 used MOVA software post-injunction—indeed, Disney readily admits DD3 *did* use MOVA software heavily post-injunction as amply supported by discovery in *Disney I*—it only held that this heavy post-injunction MOVA software use did not result in any MOVA-derived shots in the final BATB film. Disney quotes the portion of the Court's summary judgment decision discussing vicarious infringement, not contributory

1    infringement. *Disney I*, Dkt. 569 at 12. Disney's motion conveniently omits the underlined

2    language where *Disney admits to DD3's post-injunction use of MOVA software for BATB shots,*

3    but alleges they were not used in final cut of the film: "<u>In the alternative, Disney argues that it did</u>

4    <u>not have a direct financial interest in DD3's use of MOVA after this Court's issuance of the</u>

5    <u>preliminary injunction in the *Ownership Litigation* because Disney</u> did not use in the film any

6    shots prepared by DD3 using MOVA <u>after this point</u>." *Compare id.* (emphasis added) to Dkt. 94 at

7    9. Notably, the Court does not identify any dispute that DD3 used MOVA after the injunction was

8    entered, or that Disney knew of DD3's post-injunction MOVA use; the only issue the Court

9    identifies as disputed is whether the post-injunction MOVA use made it into the final film. *Id.*

10        The 5AC, however, does not allege or rely on any allegation that the admitted post-

11    injunction MOVA use made it into the final cut of BATB; indeed, whether MOVA content was in

12    the final cut of BATB is fundamentally irrelevant to whether it was in *Avengers*. Rather, the

13    5AC's allegations raised above concern Disney's post-injunction direction to DD3 to continue

14    using MOVA software *heavily* after entry of the Injunction in the *Ownership Litigation* (evidenced

15    by Disney's and DD3's own sworn declarations, *Disney I* discovery, and Special Master returns);

16    Disney's post-injunction actions with respect to both BATB and *Avengers*; and the fact that

17    Disney directed DD3 to begin work on *Avengers* in August or September 2016, at or about the

18    time when DD3 had represented in sworn declarations that it had no adequate high-resolution

19    facial capture processing alternative to MOVA. Dkt. 90 at ¶¶ 48-60, 94-96. The 5AC's allegations

20    regarding BATB do not involve the application of the same rule of law involved in *Disney I*, and

21    do not encompass the issue of ultimate inclusion of Disney- and DD3-admitted post-injunction

22    MOVA software-processed shots in the final cut of the completed BATB film that was the basis

23    for the Court's decision in *Disney I*. They are therefore not identical and do not invoke collateral

24    estoppel. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1357 (9th Cir. 1985) ("Similarity

25    between issues does not suffice; collateral estoppel is applied only when the issues are identical.");

26    *see also Ansel Communs., Inc. v. Novell, Inc.*, No. C-97-21088, 1999 U.S. Dist. LEXIS 22737, at

27    *8 (N.D. Cal. Mar. 23, 1999).

28

1        Disney's attempt to twist these non-identical factual allegations into a collateral estoppel

2  argument also fails. Disney attempts to argue that because the Court found that Rearden did not

3  present evidence that post-injunction MOVA use was included in the final cut of BATB, there

4  must have been an adequate alternative for *Avengers*. Dkt. 94 at 9-10. But Disney's argument

5  ignores significant differences between the state of the two films as of July 2016 that are alleged in

6  the 5AC. In July 2016, BATB was largely finished through pre-injunction use of MOVA, but

7  Disney added a *single* new scene (the "Bridge Scene") late in the movie, for which Disney used

8  the MOVA rig for a late-stage facial capture session on June 14, 2016. Dkt. 90 at ¶ 42. Disney

9  then represented that it provided post-Injunction MOVA selects to DD3 for MOVA processing,

10  that DD3 indeed processed these selects using MOVA software, but as a result of the Injunction,

11  DD3 unilaterally[3] allegedly decided to not use MOVA **for the final cut of the BATB only for**

12  **this one scene**, instead allegedly hand-animating the Beast's facial movements for this *single*

13  scene.  Dkt. 90 *at* ¶ 58. It remains undisputed that Disney still used MOVA extensively for Beast

14  animation in the final cut of BATB[4]. *Id.* at ¶ 39. In contrast, as of July 2016, *Avengers* had just

15  begun shooting, with multiple characters with large amounts of screen time to animate, including

16  the main villain Thanos (*id. at* ¶¶ 62-71), a major hero character The Hulk played by Mark Ruffalo

17  (*id. at* ¶¶ 73-78), and a secondary villain Ebony Maw (*id. at* ¶¶ 79-87). The 5AC alleges, based on

18  files returned in the *Ownership Litigation*, that DD3 performed work on all of these characters

19

---

20  [3] The factual allegations that Disney either directed DD3 to continue using MOVA, or knew of
DD3's MOVA use and did not tell it to stop, must be taken as true on a motion to dismiss, and if

21  there is any doubt as to their plausibility, they are further supported by judicially noticeable trial
testimony from *Disney I* (*see* Dkt. 87 at 8 n. 3).Disney witnesses and discovery provided ample

22  evidence in the *Disney I* record that post-Injunction Disney gave DD3 MOVA selects to process

23  for this scene and DD3 complied, extensively using MOVA software. Despite DD3's and VGH's
alleged MOVA licensor SHST absconding on May 3, 2016, and of the Injunction on June 17,

24  2016, Disney admitted it *deliberately* did not tell DD3 to stop using MOVA. When asked under
oath "Do you know if anyone at Disney ever instructed Digital Domain to stop using the MOVA

25  assets in the production of 'Beauty and The Beast'?", Disney Senior Vice President of Visual
Effects David Taritero replied, "This is not something we would have done." *Disney I* Dkt. 684-1

26  p.94 127:03-07.

27  [4] Disney's expert testified 8.9% of BATB shots used MOVA. Rearden's expert testified BATB

28  runtime was 118 minutes. 8.9% of 118 is 10.5 minutes. *Disney I* Tx. 1547:12-22, Tx. 799:6-8

10049121v1

using the infringing MOVA software. *Id. at* ¶ 88. The 5AC's allegations that Disney had no acceptable alternative to MOVA for the extensive high-resolution animation needs of *Avengers* are not rendered implausible by the Court's adjudication that DD3 was able to hand-animate *a single scene* in BATB without using MOVA software against Disney and DD3 witnesses testifying that MOVA software *was* used for 8.9% of BATB shots.

Disney's allegations regarding the Medusa and Masquerade systems also do not render the 5AC's allegations implausible; at most, they merely create a competing alternative explanation that cannot defeat a complaint on a motion to dismiss. *Starr*, 652 F.3d at 1216. Specifically, the 5AC adds allegations that correct any interpretation of the 4AC as suggesting that the Special Master reviewed every document in DD3's possession under broad *discovery* search criteria, and found MOVA content only in the Ruffalo and Ebony Maw Maya Files. Regarding Masquerade, the Court previously found that the Ebony Maw Maya File's references alone are insufficient to allege that Masquerade is an unauthorized copy or derivative work of MOVA because, if Masquerade were an unauthorized copy, "then DD3's files would be replete with other examples of similar Maya files that reference those MOVA elements and naming conventions." Dkt. 87 at 9. The 5AC adds allegations that explain why the Ebony Maw Maya File is the only example Rearden has yet obtained of a purported Masquerade file containing MOVA references: specifically, the *theft return* process was performed under narrow criteria that generally excluded Masquerade files from review. Dkt. 90 at ¶ 88. The 5AC explains and alleges that the Special Master *return* review criteria process did not entail review of *any* DD3 files under *discovery* review criteria. *Id.* Rather, the Ruffalo and Ebony Maw Maya Files serendipitously leaked out of the Special Master's review because they were part of other files that were identified under the Special Master's narrow operative *return* review criteria, which is the only reason Rearden saw the files. *Id.* The 5AC also alleges that DD3 deliberately changed keywords and names in files to evade the Special Master's return process. *Id. at* ¶ 89. The new allegations regarding DD3's lack of an adequate alternative to MOVA in September 2016 also provide further support for Rearden' allegations regarding Masquerade. If DD3 did not have an adequate alternative to MOVA in July 2016, had no reason to develop a successor technology until the Injunction entered in June 2016,

14

10049121v1

yet *suddenly* had in its possession a fully developed, evolved, and tested high-resolution technology called "Masquerade" a month later for *Avengers*, one of the highest budget/highest risk movies ever made, it is a plausible inference (which must be taken in Rearden's favor) that DD3 did not perform the miracle of creating an entirely new facial capture technology from scratch in a month—and that Disney knew (or was willfully blind to the fact) that DD3 could not perform that miracle either.

Indeed, it is implausible that Disney would risk using a technology that had never been used and proven to be successful in previous lower-risk movies. Even Disney's own facial capture technologies were first tested for a few shots in low-risk movies before used throughout a major movie for main character. It took Rearden 6 years to develop MOVA, 9 years to prove MOVA was both practical and produced consistently high quality results in dozens of major motion pictures (including ones with higher budgets than BATB), a 2008 Academy Award for Best Visual Effects for use of MOVA in *The Curious Case of Benjamin Button*, and a 2015 Sci-Tech Academy Award acknowledging MOVA's extraordinary contributions to the movie industry over the prior 9 years, before Disney risked using MOVA for the Beast, the main character of BATB. It is absurd that Disney would adopt a facial capture processing technology allegedly developed in one month from DD3, a company just sanctioned by an Injunction (which Disney admitted knew DD3 was violating) for the main character of two of the highest budget movies ever made. If Rearden's previous allegations regarding Masquerade were insufficiently plausible to be accepted as true,[5] this "further factual support" converts Rearden's allegation that Masquerade is an unauthorized

---

[5] While the Court may take judicial notice of publicly available filings in related cases, neither Disney nor the Court may draw inferences against Rearden from the limited number of "smoking guns" concerning *Avengers* revealed through the theft *return* process in the Ownership Litigation. The allegations that Masquerade includes large amounts of MOVA code (Dkt. 90 at ¶¶ 84-89) are factual allegations that must be taken as true, not "legal conclusion[s] couched as [] factual allegation[s]" that the Court is not bound to accept as true. *Iqbal*, 556 U.S. at 678. The contrary inference, that if Masquerade were MOVA in disguise, then there would be more evidence of that fact returned in the *Ownership Litigation*, relies on both extrinsic evidence and a competing inference, both of which may not defeat the factual allegations in a complaint on a motion for dismiss. *Starr*, 652 F.3d at 1216.

1    copy or derivative work to a sufficiently pleaded factual allegation that must be accepted as true

2    on a motion to dismiss.

3        As to MEDUSA, the 5AC does not allege that MEDUSA was an acceptable alternative to

4    MOVA software in September 2016, when the alleged infringing use of MOVA for *Avengers*

5    began. In fact, the quoted Disney Research Studios' statement in the 5AC explains that at least for

6    *Avengers*, the purported MEDUSA system *relied on Masquerade*, which as discussed above, in

7    turn was derived from MOVA software. Dkt. 90 at ¶ 108. As to subsequent use of MEDUSA for

8    other, later movies and television shows identified in paragraph 112 of the 5AC, even if Disney

9    did develop an alternative to MOVA software later, it would not contradict the factual allegation

10   that as of September 2016, Disney knew that DD3 had no adequate alternative to MOVA software

11   for *Avengers*.

12       As to Disney's third argument that Rearden has not alleged extensive use of MOVA

13   software, Disney is simply misreading the 5AC while stretching the Court's previous decisions

14   beyond their actual conclusions. The Court's order dismissing the Second Amended Complaint

15   held only that the spreadsheets full of file paths combining MARY, Thanos, and MOVA were

16   insufficient **by themselves** to allege direct infringement. Dkt. 54 at 5-7. The Court's order

17   dismissing-in-part the Third Amended Complaint required Rearden to provide additional details

18   regarding the Ruffalo and Ebony May Maya Files. Dkt. 76 at 4-7. And the Court's order

19   dismissing-in-part the Fourth Amended Complaint (notwithstanding that the Special Master's

20   return process was a *theft return* process, not an exhaustive *discovery* process, and therefore would

21   not include all or most files created for *Avengers*) held that the complaint had to allege more

22   extensive infringement for its allegations of inducement or material contribution to be plausible.

23   Dkt. 87 at 11-12. But when all the allegations are taken together, even if the Court has held

24   previously that certain allegations by themselves in isolation are insufficient to allege the broad

25   use of MOVA to which Disney directed or contributed, the 5AC now alleges that Disney was

26   motivated to direct DD3 to use MOVA, and that the use was so broad—that rather than isolated

27   instances, the Thanos spreadsheets, use of MOVA personnel, and Ruffalo and Ebony Maw Maya

28

OPPOSITION TO MOTION TO DISMISS IN PART FIFTH AMENDED
COMPLAINT PURSUANT TO FED.R.CIV.P. 12(b)(6)

10049121v1

1  files were representative broadly of DD3's activities—that they show direction and contribution

2  by Disney.

3        Finally, as to Rearden's factual allegations that the Ruffalo and Ebony Maw Files are

4  representative of broader infringement, Disney ignores the legal rule, previously stated by this

5  Court, that "a plaintiff may 'plead[] facts alleged upon information and belief where the facts are

6  peculiarly within the possession and control of the defendant or where the belief is based on

7  factual information that makes the inference of culpability plausible.'" Dkt. 87 at 4 (quoting *Soo*

8  *Park*, 851 F.3d at 928). No discovery has yet occurred in this case, and Disney's suggestion that

9  the Court draw inferences against Rearden from the disputed breadth of the Special Master *theft*

10  *return* process and discovery taken in the *Ownership Litigation* and *Disney I* is an invitation to

11  error, both because Rearden is entitled to inferences in its favor, and because Disney relies on

12  materials outside the complaint. *E.g.*, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998

13  (9th Cir. 2018) ("Generally, district courts may not consider material outside the pleadings when

14  assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil

15  Procedure."). The facts regarding the breadth of the use of MOVA software for *Avengers* are

16  peculiarly within the possession of and control of Disney and DD3. The totality of the evidence

17  Rearden has obtained and alleged in the 5AC—the spreadsheets, the use of MOVA personnel in

18  breach of DD3's contract with Disney and Disney's knowledge thereof, the leaked Ruffalo and

19  Ebony Maw Maya files, DD3's representations regarding the unavailability of alternative facial

20  capture methods, DD3's alteration of MOVA files to evade review by the Special Master—makes

21  the inference plausible that Disney and DD3's use of MOVA for *Avengers* was far more extensive

22  than merely the Ruffalo and Ebony Maw Maya files. The 5AC's allegations on information and

23  belief as to the extensive nature of DD3's infringement and Disney's knowledge and direction

24  thereof (Dkt. 90 at ¶¶ 88-89) are therefore sufficiently pleaded and must be taken as true on a

25  motion to dismiss. To hold otherwise would require Rearden to present evidence to the Court in a

26  complaint before it ever has an opportunity to obtain it through discovery, in direct contradiction

27  to the liberal pleading standard of Rule 8 and the express requirements of Rule 11(a).

28

10049121v1

B.    **The 5AC pleads all elements of vicarious copyright infringement.**

"Vicarious copyright infringement requires 'that the defendant exercises the requisite control over the direct infringer and that the defendant derives a direct financial benefit from the direct infringement.'" Dkt. 87 at 12 (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007). In order to allege that the defendant exercises the requisite control, a complaint must allege that the defendant "has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Id.* (quoting *Perfect 10*, 508 F.3d at 1173).

1.    **Disney cannot dispute that it had the legal right to stop DD3's directly infringing conduct.**

In its Order dismissing-in-part the 4AC, the Court accepted that the 4AC sufficiently pleaded Disney's legal right to stop DD3's directly infringing conduct, only holding that the 4AC did not sufficiently plead practical ability. Dkt. 87 at 13. This holding was consistent with its holding in the summary judgment decision from *Disney I*, in which the Court held that Disney and DD3's contract for BATB afforded Disney both the legal right and practical ability to stop DD3's infringing conduct. *Disney I*, Dkt. 569-1 at 9-10. The Court rejected Disney's argument, made again in its current motion, that *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1174 (9th Cir. 2007), holds that a contractual relationship cannot demonstrate a legal or practical right to control, explaining that a contract can demonstrate a legal and practical right depending on what power the contract grants. *Compare Disney I*, Dkt. 569-1 at 10 ("unlike Google's contract with third-party websites on the internet, Disney's contract with DD3 affords Disney considerable supervisory power over DD3's conduct in connection with *Beauty and the Beast*") to Dkt. 94 at 11. The 5AC alleges that the contract between DD3 and Disney affords Disney considerable supervisory power over DD3's conduct in connection with *Avengers*, including the right to review and inspect files and to direct how facial capture services are performed. Dkt. 90 at ¶¶ 98, 120. This is sufficient to allege that Disney had the legal right to prevent DD3's infringement.

### 2.    The 5AC pleads that Disney had the practical ability to stop DD3's direct infringement.

In dismissing-in-part the 4AC, the Court held that the 4AC "does not contain any allegations that individual Maya files like the Ebony Maw Maya File were included in these weekly reports, such that Disney would have occasion to notice DD3's purported use of MOVA." Dkt. 87 at 13. The 5AC accordingly adds allegations that based on Rearden's experience in providing facial capture technology, and on information and belief, individual Maya files like the Ebony Maw and Ruffalo Maya Files "are among the types of files that would routinely be reviewed by studio representatives to inspect the progress of the work." Dkt. 90 at ¶ 98. The 5AC specifies that the inspection would typically be done "using Maya in order to allow the character to be placed at multiple angles, in different poses, and with different lighting, etc.; a studio would not accept being provided only with still images or videos of critical franchise characters during movie production." *Id.* The 5AC alleges extensively that merely opening the Maya Files in Maya would immediately reveal the use of MOVA (*id. at* ¶¶ 70-84), and so, on information and belief (because the facts regarding private meetings between DD3 and Disney are peculiarly in Disney's possession), "Defendants either knew, or should have known, through inspection of the Ruffalo Maya Files and Ebony Maw Maya Files, or through similar files containing similar indications of MOVA usage, that DD3 continued to use MOVA for work done on *Avengers*." *Id. at* ¶ 100.

Disney's claim that Rearden "made no new allegations that plausibly suggest that Defendants in fact reviewed the four Maya files for which Rearden has alleged infringement" is simply wrong. Dkt. 94 at 11-12. As discussed in far more detail *supra* regarding Disney's knowledge of DD3's infringement with respect to contributory infringement, the 5AC includes new allegations that plausibly suggest that Disney in fact reviewed the four Maya files for which Rearden has alleged infringement together with other similar infringing Maya files that are still in Disney and/or DD3's possession (Dkt. 90 at ¶¶ 98-100). The 5AC, again, is not merely alleging that the Ruffalo and Ebony Maw Maya files were DD3's only acts of direct infringement with respect to *Avengers*, but were representative of far greater amounts of direct infringement based on the totality of pleaded evidence. Disney did not have to delve into Masquerade source code or look

1  for a needle in a haystack; it merely had to open the Maya files in Maya that showed MOVA

2  usage. On a motion to dismiss, that is sufficient to plead that Disney had the practical ability to

3  detect DD3's infringement.

4      Beyond this, as detailed above, (a) Disney knew DD3's and VGH's alleged MOVA

5  licensor, SHST, had absconded, so there little or no chance DD3 had a legitimate license to the

6  MOVA software; (b) Disney not only knew DD3 retained unlawful possession of the MOVA

7  software in contempt of the Injunction, but admittedly ordered DD3 post-injunction MOVA

8  selects requiring DD3 to illegally use the MOVA software in contempt of the Injunction; (c)

9  DD3's admitted illegal post-injunction use of MOVA software to process Disney's post-injunction

10  selects was so heavy it almost overloaded *all* of DD3's servers, (d) DD3's sworn statements state

11  Disney knew it had no adequate alternative high resolution facial capture processing technology to

12  MOVA software, and (e) Disney then contracted with DD3 to provide high resolution facial

13  capture processing services for two of the highest budget movies in history. Yet, Disney's theory

14  is now that it had the "practical ability" to secretly connive with DD3 to illegally use MOVA

15  software post-injunction so heavily for BATB, and the "practical ability" to surgically exclude it

16  from the final cut of BATB, but not the "practical ability" to suspect, let alone stop, illegal use of

17  MOVA software in *Avengers* at the very time. Disney and DD3 have testified that Disney was

18  knee-deep in illegal post-injunction use of MOVA software. For Disney to now say it had no

19  practical ability to police MOVA software use for a new capstone pair of movies that *began* post-

20  injunction in the midst of this illegal use of MOVA software is absurd, and certainly not

21  convincing enough to render Rearden's allegations implausible as is required to support a motion

22  to dismiss. *Starr*, 652 F.3d at 1216.

23          **3.      The 5AC pleads that Disney derived a direct financial benefit from**

24                  **DD3's direct infringement.**

25      As with much of its argument, Disney once again improperly seeks to force Rearden to

26  prove its case in advance of discovery at the pleading stage, imposing a heightened pleading

27  requirement not supported by *Iqbal*. Disney's argument is summed up as "[a]fter years of

28  amendments in this case, litigation in related cases, and millions of reviewed files in the asset

1   return process, Rearden has only managed to plead that four individual Maya files may have

2   infringed." Dkt. 94 at 12, But no discovery has taken place in this lawsuit during the years of

3   amendments, and none of the litigation in related cases or millions of reviewed files involved any

4   search for MOVA software use for *Avengers*. Dkt. 90 at ¶¶ 88-89. The breadth of discovery in

5   related cases and the scope of return review are outside the bounds of the Complaint, and may not

6   be considered on a motion to dismiss. *Khoja*, 899 F.3d at 998. The 5AC explains that the Ruffalo

7   and Ebony Maw Maya Files that serendipitously leaked out of the *theft return* process were not

8   the few files that came out of a *discovery* search for use of MOVA software in *Avengers*, but were

9   attached to other files marked for *theft return* based on criteria unrelated to this lawsuit. Dkt. 90 at

10  ¶ 88. In other words, on a motion to dismiss, the Court cannot conclude, based on unpleaded

11  details regarding the *Ownership Litigation* theft return process, that a lack of production to

12  Rearden of large numbers of *Avengers* files evidencing MOVA software use establishes that there

13  was no broad use of MOVA software for *Avengers*.

14          Applying the correct standard on a motion to dismiss, the 5AC adequately pleads direct

15  financial benefit. The 5AC alleges that Disney had DD3 begin work on *Avengers* in August-

16  September 2016, knowing that DD3 had no adequate alternative to MOVA software at the time to

17  ensure those movies' timely release. Dkt. 90 at ¶ 101. The 5AC also pleads that Disney obtained a

18  direct benefit from DD3's use of MOVA software by making "the Thanos, Ebony Maw, Hulk, and

19  Smart Hulk CG characters more believable and compelling, which would in turn draw a wider

20  audience to the films." *Id. at* ¶ 126. At the pleading stage, that is all Rearden is required to do.

21  **IV.    CONCLUSION**

22          The 5AC's additional allegations cure the defects the Court identified in the 4AC by

23  elaborating on Rearden's bases for alleging that the Ruffalo and Ebony Maw Maya Files are

24  representative of much broader infringement with respect to *Avengers*, explaining why there are

25  not additional files evidencing MOVA software use with *Avengers* produced in related cases,

26  adding additional allegations concerning DD3's lack of alternatives to MOVA software  around

27  August-September 2016 and Disney's resulting motives for directing and/or remaining willfully

28  blind to DD3's use of MOVA software for *Avengers*, and accordingly drawing the plausible

1  inference from the diverse evidence of infringement set forth in the 5AC that DD3's infringement

2  was so broad that Disney had to have known about it, induced it, contributed to it, and profited

3  from it. Disney's motion to dismiss raises its own competing theory that the Ruffalo and Ebony

4  Maw Maya Files were the sole instances of infringement committed by its rogue vendor, but that

5  competing theory is not so convincing or supported by competent evidence—indeed, it is

6  supported only by a lack of evidence, though the evidence is peculiarly in Disney's possession—

7  as to render Rearden's allegations implausible.

8       The Court should deny Disney's motion in its entirety.

9

10  Dated:  April 10, 2025                    Respectfully submitted,

11                                           **HALEY GUILIANO LLP**
                                             JOSHUA M. MASUR
12                                           BRIAN J. BECK

13

14                               By:   _/s/ Brian J. Beck_____
                                       Brian J. Beck
15                                     Attorneys for Plaintiffs
                                       REARDEN LLC and REARDEN MOVA LLC
16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION TO DISMISS IN PART FIFTH AMENDED
COMPLAINT PURSUANT TO FED.R.CIV.P. 12(b)(6)

10049121v1