# Exhibit A

SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

JOSEPH TAYLOR GOOCH (SBN 294282)
Taylor.Gooch@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
50 California St., Suite 3600
San Francisco, California 94111
Telephone: (628) 235-1000
Facsimile: (628) 235-1001

KELLY M. KLAUS (SBN 161091)
kelly.klaus@mto.com
BLANCA F. YOUNG (SBN 217533)
blanca.young@mto.com
JOHN L. SCHWAB (SBN 301386)
john.schwab@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, 27th Floor
San Francisco, California 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

REARDEN LLC, et al.,

Plaintiffs,

v.

TWDC ENTERPRISES 18 CORP. f/k/a THE WALT DISNEY COMPANY, et al.,

Defendants.

Case No. 4:22-cv-02464-JST

**DEFENDANTS' INVALIDITY CONTENTIONS**

Hon. Jon S. Tigar

## I. INTRODUCTION

Pursuant to Rule 3-3 of the Local Rules of Practice for Patent Cases Before the United States District Court for the Northern District of California ("Patent L.R."), Defendants TWDC Enterprises 18 Corp., Disney Studio Production Services Co., LLC, Walt Disney Pictures, Marvel Studios LLC, MVL Film Finance LLC, and Lucasfilm Ltd. LLC (collectively, "Disney") hereby serve Invalidity Contentions on Plaintiffs Rearden LLC and Rearden Mova LLC (collectively, "Rearden"). Rearden has asserted that Disney infringes the following patents: U.S. Patent Nos. 11,004,248 (the "'248 patent"), 10,825,226 (the "'226 patent"), 11,024,072 (the "'072 patent"), and 11,030,790 (the "'790 patent") (collectively, the "Asserted Patents") (Dkt. 90).

Rearden has asserted the following claims from the Asserted Patents (collectively referred to herein as the "Asserted Claims"):[1]

| Asserted Patent | Asserted Claims |
|---|---|
| '248 patent | 1-30 |
| '226 patent | 1-5, 7 |
| '072 patent | 1-30 |
| '790 patent | 1-30 |

With respect to the Asserted Claims of the Asserted Patents identified above, and based on its investigation to date, Disney hereby: (a) identifies each item of prior art that anticipates the claim or renders it obvious; (b) specifies whether each such item of prior art anticipates the claim or renders it obvious, and, if it renders it obvious, explains why the prior art renders the claim obvious

[1] Disney identifies the above-listed patents and claims in view of the patents identified in the operative pleading, *i.e.*, the Fifth Amended Complaint (Dkt. 90), and the claims identified by Rearden in Rearden's Infringement Contentions served on May 5, 2026. As Disney raised in its May 21, 2026 letter, the patents added in Rearden's proposed Sixth Amended Complaint were improperly included in Rearden's Infringement Contentions, service of those contentions was not effective, and Rearden has pointed to no case law authorizing a party to inject patents into Infringement Contentions in advance of a court ruling on a motion for leave to amend the pleadings. Disney reserves the right to amend its Invalidity Contentions should Rearden's contested Motion for Leave to File Sixth Amended Complaint (Dkt. 134) be granted on an appropriate timeline and in accordance with the Federal Rules and Patent Local Rules, and is willing to meet and confer regarding such a timeline. Disney further reserves the right to amend its Invalidity Contentions if Rearden is permitted to make any amendment to its Infringement Contentions.

and identifies any combinations of prior art showing obviousness; (c) submits a chart identifying specifically where and how in each item of prior art each limitation of the claim is found, including, for each limitation that is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function; and (d) identifies grounds of invalidity based on 35 U.S.C. § 101, indefiniteness under 35 U.S.C. § 112(2), and enablement and/or written description under 35 U.S.C. § 112(1) for the claim.

In addition, with these Invalidity Contentions and based on its investigation to date, Disney produces the documents within its possession, custody, and control that are required pursuant to Patent L.R. 3-4.

Disney provides these Invalidity Contentions based in whole or in part on its present understanding of the Asserted Claims and on the constructions and positions as to claim scope that Rearden appears to be advancing based on Rearden's Infringement Contentions, served on May 5, 2026, and Rearden's Fifth Amended Complaint ("5AC"). Nothing in these Invalidity Contentions should be understood or deemed to be an express or implied admission or contention with respect to the proper construction of any terms contained within the Asserted Claims of the Asserted Patents or as to the proper scope of the Asserted Claims. Disney's Invalidity Contentions are not intended to be, nor should they be construed as, adoptions or admissions by Disney as to the accuracy of Rearden's allegations, admissions, positions, or constructions. Disney will offer its proposed claim constructions in accordance with the Patent Local Rules and any other applicable scheduling order. Nothing herein or the accompanying charts is an admission that Rearden's apparent constructions or positions as to claim scope are correct or that any of the Accused Instrumentalities infringe the Asserted Patents.

## II. RESERVATION OF RIGHTS

Consistent with Patent L.R. 3-6, Disney reserves the right to modify and/or amend these Invalidity Contentions consistent with the Patent Local Rules. Disney reserves all rights to amend and/or supplement these Invalidity Contentions after the Court issues any claim construction ruling and/or if Rearden further modifies and/or amends its Infringement Contentions as permitted by the Court and/or by local rules. Disney expressly reserves the right to amend these disclosures and the

accompanying document production should Rearden provide any information that it failed to provide in its Patent L.R. 3-1 and 3-2 disclosures, or if Rearden amends its Patent L.R. 3-1 or 3-2 disclosures in any way, including if Rearden's contested Motion for Leave to File Sixth Amended Complaint (Dkt. 134) is granted, or if Rearden further moves to amend its Complaint.

Additionally, Rearden's operative Infringement Contentions include various defects, and Disney has notified Rearden of these defects, which fail to adequately notify Disney of the scope of Rearden's Infringement Contentions. Disney sent Rearden a letter on May 21, 2026 outlining deficiencies in Rearden's Infringement Contentions; this letter is hereby incorporated by reference. As detailed in Disney's May 21, 2026 letter, Rearden's Infringement Contentions fail to comply with Patent L.R. 3-1 in numerous respects. Among other things, Rearden's claim charts rely on conclusory allegations rather than identifying specifically and in detail where each element of each asserted claim is found within each Accused Instrumentality. Rearden also improperly mixes and matches among the Medusa, Anyma, Masquerade, and MOVA systems within a single claim chart rather than separately charting each Accused Instrumentality on a limitation-by-limitation basis as required by Patent L.R. 3-1. Additionally, Rearden asserts only boilerplate doctrine-of-equivalents[2] and willful infringement contentions without the specificity required by Patent L.R. 3-1(e) and (i), and fails to identify a specific priority date as required by Patent L.R. 3-1(f). Disney specifically reserves the right to amend these Invalidity Contentions if Rearden further amends its operative Infringement Contentions to address these defects, or if Rearden advances an infringement theory that was not adequately set forth in its operative Infringement Contentions. As memorialized in a letter on June 5, 2026, and incorporated here by reference, Rearden agreed to supplement its Infringement Contentions on July 22, 2026. To the extent any of Rearden's positions change, Disney reserves the right to supplement its Invalidity Contentions appropriately.

Rearden purports to "reserve[] the right to supplement [its] disclosures as information becomes available after further discovery" and "reserve[] the right to assert additional claims of the Asserted Patents, accuse different products, or find alternative literal and/or equivalent

[2] Rearden has stated that it "does not accuse any instrumentality under a doctrine of equivalents theory." June 3, 2026 Rearden Ltr. at 5. Disney reserves the right to amend these Invalidity Contentions if Rearden asserts theories under the doctrine of equivalents.

infringement elements in the Accused Instrumentalities as information becomes available." Plaintiffs' Infringement Contentions (May 5, 2026). To the extent that Rearden is permitted to do so, Disney reserves its rights to modify, amend, supplement and/or otherwise alter its contentions in response.

Disney further reserves the right to supplement and amend these disclosures and associated document production based on further investigation, analysis, and discovery, and Disney's consultation with experts and others.

Discovery in connection with this lawsuit is ongoing, and these disclosures are based on information obtained by Disney to date. To the extent that Disney obtains additional information, Disney reserves the right to supplement these Invalidity Contentions. Disney expects that further discovery will reveal additional prior art, including related disclosures and corresponding evidence for many of the prior art references identified below. For example, for prior art systems described in Disney's Invalidity Contentions, Disney expects that additional documentation and evidence relating to these systems will be discovered, from Rearden or third parties. Because Disney is continuing its search for and analysis of relevant prior art, Disney reserves the right to amend and/or supplement the information provided herein, including identifying, charting, and/or relying upon additional prior art references, relevant disclosures, and bases for these Invalidity Contentions. Disney has issued or is working to diligently issue subpoenas to the following third parties seeking documents and information regarding prior art products and/or systems. Disney may also issue additional subpoenas as its diligent and ongoing investigation reveals additional possible prior art products, systems, and/or services. Responses to these subpoenas are outstanding, and Disney expects to supplement these disclosures with information it gains regarding third-party prior art systems that is not yet available because the information is non-public or not yet known to Disney. This includes, but is not limited to, information from:

- Clear Angle Studios, LLC, including, e.g., for the products and/or systems relating to the technology claimed in the Asserted Patents, including the products and/or systems developed by Dimensional Imaging (DI4D) (f/k/a Virtual Clones);
- Framestore, Inc., including, e.g., for the products and/or systems relating to the

technology claimed in the Asserted Patents, including the products and/or systems used for *Charlie and the Chocolate Factory*;

- ESC Entertainment, including, e.g., for the products and/or systems relating to the technology claimed in the Asserted Patents, including the Universal Capture system used in *The Matrix Reloaded*;
- Vicon Motion Systems, Inc., including, e.g., for the products and/or systems relating to the technology claimed in the Asserted Patents;
- University of Southern California, including, e.g., for the products and/or systems relating to the technology claimed in the Asserted Patents, including the Light Stage system;
- Sony Pictures Imageworks, Inc., including, e.g., for the products and/or systems relating to the technology claimed in the Asserted Patents, including the ImageMotion system;
- Image Metrics (a/k/a Faceware), including, e.g., for the products and/or systems relating to the technology claimed in the Asserted Patents, including the products and/or systems used for *The Getaway: Black Monday*.
- Artem Digital and/or former employees or customers of Artem Digital, including, e.g., for the products and/or systems relating to the technology claimed in the Asserted Patents;

Disney reserves the right to revise, amend, and/or supplement the information provided herein, including identifying and relying on additional references, should Disney's further search and analysis yield additional information or references, consistent with the Patent Local Rules and the Federal Rules of Civil Procedure. Prior art not included in this disclosure, whether known or unknown to Disney, may become relevant. In particular, Disney is currently unaware of the extent, if any, to which Rearden will contend that limitations of the Asserted Claims are not disclosed in the prior art identified by Disney, or will contend that any of the identified references do not qualify as prior art. The identification of any patent or patent publication shall be deemed to include any counterpart patent or application filed, published, or issued anywhere in the world.

Moreover, Disney reserves the right to revise its ultimate contentions concerning the invalidity of the Asserted Claims, which may change depending on the Court's construction of the Asserted Claims, any findings as to the priority or invention date of the Asserted Claims, and/or positions that Rearden or its expert witness(es) may take concerning claim construction, infringement, and/or invalidity issues.

Disney's claim charts in **Exhibits 248-A, 248-B, 226-A, 226-B, 072-A, 072-B, 790-A, and 790-B** cite to particular teachings and disclosures of the prior art as applied to limitations of the Asserted Claims. However, persons having ordinary skill in the art may view an item of prior art generally in the context of other publications, literature, products, and understanding. Accordingly, the cited portions are only examples, and Disney reserves the right to rely on uncited portions of the prior art references and on other publications and expert testimony as aids in understanding and interpreting the cited portions, as providing context thereto, and as additional evidence that a claim limitation is known or disclosed. Citations to figures are inclusive of all discussion of those figures. Disney further reserves the right to rely on uncited portions of the prior art references, other publications, documents explicitly or implicitly incorporated by reference, and testimony, to establish bases for combinations of certain cited references that render the Asserted Claims obvious. Further, for any combination, Disney reserves the right to rely additionally on information generally known to those skilled in the art and/or common sense.

The references discussed herein and in the claim charts in **Exhibits 248-A, 248-B, 226-A, 226-B, 072-A, 072-B, 790-A, and 790-B** may disclose the elements of the Asserted Claims explicitly and/or inherently, and/or they may be relied upon to show the state of the art in the relevant timeframe. The suggested obviousness combinations are provided in the alternative to Disney's anticipation contentions and are not to be construed to suggest that any reference included in the combinations is not itself anticipatory.

Disney further reserves the right to assert that the Asserted Claims are invalid under 35 U.S.C. § 102(f) in the event that Disney obtains evidence that the named inventors of the Asserted Patents did not invent (either alone or in conjunction with others) the subject matter recited in the Asserted Claims. Should Disney obtain such evidence, Disney will provide the name of the

person(s) from whom, and the circumstances under which, the invention or any part of it was derived. Disney further intends to rely on inventor admissions concerning the scope of the Asserted Claims or of the prior art relevant to the Asserted Claims found in, *inter alia*: the patent prosecution history and/or reexamination history for the Asserted Patents and related patents and/or patent applications; any deposition testimony of the named inventors of the Asserted Patents; and the papers filed and any evidence submitted by Rearden in conjunction with this litigation or any related actions. To the extent any such evidence is identified for the Asserted Patents, Disney reserves the right to contend that the Asserted Claims are invalid under Section 102(f) for failure to name the correct inventor, and/or to contend that Rearden lacks standing to bring this litigation with respect to such patents.

Disney further reserves the right to assert that the Asserted Patents are unenforceable due to inequitable conduct, at least on the grounds that any of the references identified herein were material and withheld with an intent to deceive the Patent Office.

### A. Rearden's Infringement Contentions

Furthermore, nothing stated herein shall be treated as an admission or suggestion that Disney agrees with Rearden regarding either the scope of the Asserted Claims or the claim constructions or claim scope Rearden advances in its Infringement Contentions or anywhere else. To the extent that Disney's Invalidity Contentions reflect constructions of claim limitations or assertions of claim scope consistent with or suggested by Rearden's Infringement Contentions, no inference is intended, nor should any be drawn, that Disney agrees with Rearden's claim constructions or scope. Nor shall anything in these Invalidity Contentions be treated as an admission that Disney's accused technology meets any limitation of the Asserted Claims; Disney denies that it infringes any claim of the Asserted Patents. To the extent that any prior art reference identified by Disney contains a claim element that is the same as or similar to an element in an accused product based on a claim construction or claim scope inferred from or implied by Rearden's Infringement Contentions, inclusion of that reference in Disney's Invalidity Contentions shall not be deemed a waiver by Disney of any claim construction, noninfringement position, or other argument. Disney expressly reserves the right to contest any assertion of claim construction or

claim scope by Rearden and expressly reserves all noninfringement arguments.

Depending on the Court's construction of the Asserted Claims of the Patents-In-Suit and/or positions that Rearden or its expert witness(es) may take concerning claim interpretation, infringement, and/or invalidity issues, different prior art references charted in **Exhibits 248-A, 248-B, 226-A, 226-B, 072-A, 072-B, 790-A, and 790-B**, or otherwise identified herein, may be of greater or lesser relevance, and different combinations of these references may be implicated. Given this uncertainty, the charts may reflect alternative applications of the prior art against the Asserted Claims. Nothing stated herein shall be construed as an admission or a waiver of any particular construction of any claim term. Disney also reserves all of its rights to challenge any of the claim terms herein under 35 U.S.C. § 112, including by arguing that they are indefinite, not supported by the written description, and/or not enabled. Accordingly, nothing stated herein shall be construed as a waiver of any argument available under 35 U.S.C. § 112. Disney also reserves its right to challenge the patentability of any of the Asserted Claims under 35 U.S.C. § 101. Disney further reserves the right to raise any affirmative defenses as to Rearden's allegations, including, but not limited to, the defense of inequitable conduct and estoppel. Disney reserves the right to amend or modify its Invalidity Contentions in view of any response to such an affirmative defense.

## III. IDENTIFICATION OF PRIOR ART PURSUANT TO PATENT L.R. 3-3(A)

In addition to the disclosures provided below, Disney attaches separate charts detailing its Invalidity Contentions on a claim-by-claim basis. *See* **Exhibits 248-A, 248-B, 226-A, 226-B, 072-A, 072-B, 790-A, and 790-B**. Moreover, Disney hereby discloses and reserves the right to rely upon all references incorporated by reference into the references disclosed below and in the accompanying charts.[3]

### A. The '248 Patent

#### 1. Prior Art Patent References

The following prior art patent and patent publication references, including those patent

[3] To the extent any of the cited references is found not to predate the patent for which it is cited, it remains relevant, for example, to show the technological background and/or to secondary considerations of obviousness and/or obviousness based on simultaneous/contemporaneous invention by others.

references listed in Ex. 248-A, anticipate and/or render obvious the asserted claims of the '248 patent.

| **Patent or Application Number** | **Country of Origin** | **Date of Publication/Issue** | **Date of Filing** |
|---|---|---|---|
| U.S. Patent Application Publication No. 2003/0012408 ("Bouguet-408") | U.S. | 1/16/2003 | 5/9/2001 |
| U.S. Patent Application Publication No. 2005/0083333 ("Gordon-333") | U.S. | 4/21/2005 | 12/3/2004 |
| European Patent EP1370075B1 ("Illsley-075") | EP | 10/13/2004 | 6/6/2002 |
| U.S. Patent No. 6,931,145 ("Kroos-145") | U.S. | 8/16/2005 | 11/15/2000 |
| U.S. Patent No. 6,272,231 ("Maurer-231") | U.S. | 8/7/2001 | 11/6/1998 |
| WO1996/025710 ("Mok-710") | U.S. | 8/22/1996 | 2/14/1996 |

### 2. Prior Art Publications

The following prior art publications, including those patent references listed in Ex. 248-A, anticipate and/or render obvious the asserted claims of the '248 patent.

| **Publications** |
|---|
| Abrantes, G. et al., "MPEG-4 Facial Animation Technology: Survey, Implementation, and Results," IEEE (March 1999) ("Abrantes-1999") |
| Borshukov, G. et al., "Universal Capture – Image-based Facial Animation for 'The Matrix Reloaded,'" In ACM SIGGRAPH 2003 *Sketches & Applications* ("Borshukov-2003") |
| Chiang, J.Y et al., "Automatic Modeling and Animation of 3D Face with Very Dense Mesh from Stereo Image Sequence," SPIE vol. 4875 pp. 866-874 (2002) ("Chiang-2002") |
| Chuang, E. et al., "Performance Driven Facial Animation using Blendshape Interpolation," Computer Science Technical Report, Stanford University (2) (2002) ("Chuang-2002") |
| Chuang, E., "Analysis, Synthesis, and Retargeting of Facial Expressions," Thesis, Stanford University (March 2004) ("Chuang-2004") |
| D'Apuzzo, N., "Surface Measurement and Tracking of Human Body Parts from Multi Station |

| **Publications** |
|---|
| Video Sequence," Swiss Federal Institute of Technology Zurich (2003) ("D'Apuzzo-2003") |
| Eisert, P., "Immersive 3-D Video Conferencing: Challenges, Concepts, and Implementations," SPIE (2003) ("Eisert-2003") |
| Fedorov, A. et al., "Talking Head: Synthetic Video Facial Animation in MPEG-4," International Conference Graphicon (2003) ("Fedorov-2003") |
| Guenter B. et al., "Making Faces," Proceedings of the 25th Annual Conference on Computer Graphics and Interactive Techniques Orlando, FL, (1998) ("Guenter-1998") |
| Hawkins, T. et al., "Animatable Facial Reflectance Fields," Eurographics Symposium on Rendering (2004) ("Hawkins-2004") |
| Huang, X. et al., "A Hierarchical Framework for High Resolution Facial Expression Tracking," Proceedings of the 2004 IEEE Computer Society Conference on Computer Vision and Pattern Recognition Workshops (2004) ("Huang-2004") |
| Kanade, T. et al., "Virtualized Reality: Constructing Virtual Worlds from Real Scenes," IEEE Multimedia Vol. 4(1) pp. 34-47 (1997) ("Kanade-1997") |
| MacVicar, D. et al., "3D Performance Capture for Facial Animation," Proceedings of the 2nd International Symposium on 3D Data Processing, Visualization, and Transmission (2004) ("MacVicar-2004") |
| Noh, J. et al., "Expression Cloning," ACM SIGGRAPH pp. 277-288 (2001) ("Noh-2001") |
| Pighin, F. et al., "Synthesizing Realistic Facial Expressions from Photographs," (1998) ("Pighin-1998") |
| Scharstein, D. et al., "A Taxonomy and Evaluation of Dense Two-Frame Stereo Correspondence Algorithms," Proceedings of the 2001 IEEE Workshop on Stereo and Multi-Baseline Vision (SMBV 2001) ("Scharstein-2002") |
| Urquhart, C., "The Active Stereo Probe: The Design and Implementation of an Active Videometrics System," Ph.D Dissertation, University of Glasgow (on file with ProQuest Dissertations & Publishing, Publication No. 13815378) (1997) ("Urquhart-1997") |
| Vlasic, D. et al., "Face transfer with multilinear models," ACM Trans. Graph. 24(3) pp. 426–433 (2005) ("Vlasic-2005") |
| Wang, Y. et al., "High Resolution Acquisition, Learning and Transfer of Dynamic 3-D Facial Expressions," EUROGRAPHICS (2004) ("Wang-2004") |
| Yang, R. et al., "Multi-Resolution Real-Time Stereo on Commodity Graphics Hardware," Proceedings of the 2003 IEEE Computer Society Conference on Computer Vision and Pattern Recognition (2003) ("Yang-2003") |

| **Publications** |
|---|
| Zhang, L. et al., "Spacetime Faces: High Resolution Capture for Modeling and Animation," ACM SIGGRAPH Proceedings pp. 548-558 (2004) ("Zhang-2004") |
| Zinßer, T. et al., "Efficient Feature Tracking for Long Video Sequences," Pattern Recognition, 26th DAGM Symposium, Springer-Verlag, Berlin, pp. 326-333 (2004) ("Zinßer-2004") |

### 3. Prior Art Products, Systems, and Services

In addition to the patents and publications listed above, Disney may rely on the sale, public use, and/or prior invention of prior art products, systems, and/or services. The prior art products, systems, and services listed below may invalidate the Asserted Claims, alone or in combination with the state of the art and/or any of the other prior art disclosed in Disney's Invalidity Contentions. Based on publicly available information and Disney's diligent investigation to date, Disney has reason to believe that the following products, systems, and services may have been on sale, in public use, and/or invented before the priority dates of the Asserted Claims, and, if confirmed, would be prior art under at least one of pre-AIA 35 U.S.C. §§ 102(a), (b) or (g) and/or pre-AIA 35 U.S.C. § 103. Disney is diligently seeking discovery as to prior art systems and services and reserves the right to supplement these contentions with additional prior art systems and services according to Patent L.R. 3-6 when the appropriate discovery becomes available.

The information available to date indicates that each product, system, or service below may have been, at least as of the date indicated below or before, (1) known or used in this country before the alleged invention of the claimed subject matter of the Asserted Claims, (2) in public use and/or on sale or offered for sale in this country more than one year before the filing date of the patent; and/or (3) invented by another who did not abandon, suppress, or conceal it before the alleged invention of the claimed subject matter of the Asserted Claims.

Disney has issued or is working to diligently issue subpoenas to third parties seeking documents and information regarding prior art products and/or systems. Disney may also issue additional subpoenas as its diligent and ongoing investigation reveals additional possible prior art products, systems, and/or services.

| System(s) / Service(s) | Relevant Date | Company / Relevant Entities | Referred to Herein |
|---|---|---|---|
| Facial Capture and 4D Motion Capture Systems | ~2004 | Clear Angle / DI4D / Virtual Clones | Virtual Clones |
| Universal Capture System | ~2001 | ESC Entertainment | Universal Capture |
| Light Stage | ~2001 | University of Southern California | Light Stage |
| Vicon's motion and/or facial capture system | ~2004 | Vicon Motion Systems, Inc. | Vicon |
| Image Motion System | ~2004 | Sony Pictures Imageworks, Inc. | Sony System |
| Human Face Project and Project Gemini Systems and Technology | ~2001 | Disney Animation | Project Gemini |
| Optasia / gameFACE / realFACE / filmFACE | ~2004 | Image Metrics (Faceware/Fubo) | Image Metrics |
| Static Scanning and 4D Live Action Scanning Systems and Services | ~2004 | Artem Digital / Richard Hince | Artem Digital |

Disney's investigation of these sources of prior art is ongoing. Disney further reserves the right to assert earlier priority dates for the prior art listed above. Disney's investigation of the availability of these references and system art is ongoing.

#### 4. References Reflecting the State of the Art and/or Knowledge of a Person of Ordinary Skill in the Art

The following references may be relied upon to demonstrate the state of the art relating to the '248 patent in the relevant timeframe:

- All patents and publications identified in §§ III.A.1, III.A.2, and III.A.3, *supra*;
- All documents cited on the face of the '248 patent or patents related to the '248 patent, whether or not such documents are incorporated by reference into the specification;
- All documents cited during prosecution of the '248 patent;

- References, concepts, and technologies included, discussed, raised, or cited during prosecution of the ’248 patent or patents related to the ’248 patent;
- References, concepts, and technologies discussed in the Specification, including the “Background of the Invention” section of the ’248 patent;
- All other documents cited herein; and/or
- The references specifically listed below.

| **Publications** |
|---|
| Baker, S. et al., “Lucas-Kanade 20 Years On: A Unifying Framework: Part 1,” CMU-RI-TR-02-16 (2002) |
| Apostolopoulos, J. G., et al., “Video Streaming: Concepts, Algorithms, and Systems,” Hewlett-Packard Company (2002) |
| Baker, S. et al., “Lucas-Kanade 20 Years On: A Unifying Framework: Part 2,” CMU-RI-TR-03-01 (2003) |
| Baker, S. et al., “Lucas-Kanade 20 Years On: A Unifying Framework: Part 3,” CMU-RI-TR-03-35 (2003) |
| Baker, S. et al., “Lucas-Kanade 20 Years On: A Unifying Framework: Part 4,” CMU-RI-TR-04-14 (2004) |
| Baker, S. et al., “Lucas-Kanade 20 Years On: A Unifying Framework: Part 5,” CMU-RI-TR-04-64 (2004) |
| Baker, S. et al., “Lucas-Kanade 20 Years On: A Unifying Framework,” Int'l J. of Computer Vision 56(3):221-225 (2004) |
| Berger, A.W., “Chapter 4: ATM Networks,” Compressed Video Over Networks, CRC Press (2000) |
| Bouguet, J-Y., “Pyramidal Implementation of the Lucas Kanade Feature Tracker Description of the Algorithm,” Intel Corp. Microprocessor Research Labs (1999) |
| Bourke, P., “Calculating Stereo Pairs,” July 1999, https://web.archive.org/web/20010424172531/http://astronomy.swin.edu.au:80/pbourke/stereographics/stereorender/ |
| Bourke, P., “Cross Correlation: AutoCorrelation -- 2D Pattern Identification,” (Aug. 1996) |
| Bourke, P., “3D Stereo Rendering Using OpenGL (and GLUT),” (Nov. 1999), https://web.archive.org/web/20010424172259/http://astronomy.swin.edu.au:80/pbourke/opengl/stereogl/ |

| Publications |
|---|
| DARPA, Proceedings Image Understanding Workshop, Voume 1 (AD-A186 103) (Feb. 1987) |
| Forsyth, D. et al., “Computer Vision, A Modern Approach,” Pearson (2002) |
| Grewe, L. et al., “Chapter 8: Stereo Vision,” Handbook of Pattern Recognition and Image Processing: Computer Vision, Academic Press (1994) |
| Haber, J. et al., “SIGGRAPH 2004 Course Notes: Facial Modeling & Animation” (2004) |
| Hannah, M., “Computer Matching of Areas in Stereo Images,” Thesis, Stanford University (July 1974) |
| Hartley, R. et al., “Multiple View Geometry in Computer Vision,” Cambridge, 2d Edition (2003) |
| Huang, X, et a., “A Hierarchical Framework for High Resolution Facial Expression Tracking,” 2004 IEEE Computer Society Conference on Computer Vision & Pattern Recognition (2004) |
| Iocchi, L. et al., “Stereo Vision: Triangulation,” https://web.archive.org/web/19991110131005/http://www.dis.uniroma1.it:80/~iocchi/stereo/triang.html |
| Lewis, J. P., “Fast Normalized Cross-Correlation” https://www.researchgate.net/publication/2378357_Fast_Normalized_Cross-Correlation (2001) (“Lewis-2001”) |
| Lorensen, W. et al., “Marching Cubes: A High Resolution 3D Surface Construction Algorithm,” Computer Graphics 21(4):163-169 (July 1987) |
| Lucas, B. & Kanade, T. “An Iterative Image Registration Technique with an Application to Stereo,” Proceedings DARPA Image Understanding Workshop, pp. 121-130 (Apr. 1981) (“Lucas & Kanade”) |
| Pighin, F., et al., “SIGGRAPH 2005 Digital Face Cloning Course Notes,” (2005) |
| Szeliski, R. et al., “Computer Vision: Algorithms and Applications,” Springer (2010) |
| Trucco, E. et al., “Introductory Techniques for 3-D Computer Vision,” Prentice Hall (1998) |
| Wu, D. et a., “Steaming Video over the Internet: Approaches and Directions,” IEEE Transactions on Circuits and Systems for Video Technology 11(3), pp. 282-300 (Mar. 2001) |
| Zhang, Z., “Determining the Epipolar Geometry and its Uncertainty: A Review,” RR-2927, INRIA (1996) |

**B. The ’226 Patent**

**1. Prior Art Patent References**

The following prior art patent and patent publication references, including those patent references listed in Ex. 226-A, anticipate and/or render obvious the asserted claims of the '226 patent:

Disney hereby incorporates by reference the prior art patent and patent publication references listed above with respect to the '248 patent. *See supra* § III.A.1.

**2. Prior Art Publications**

The following prior art publications, including those patent references listed in Ex. 226-A, anticipate and/or render obvious the asserted claims of the '226 patent:

Disney hereby incorporates by reference the prior art publications listed above with respect to the '248 patent. *See supra* § III.A.2.

**3. Prior Art Products, Systems, and Services**

In addition to the patents and publications listed above, Disney may rely on the sale, public use, and/or prior invention of prior art products, systems, and/or services. The prior art products, systems, and services listed below may invalidate the Asserted Claims, alone or in combination with the state of the art and/or any of the other prior art disclosed in Disney's Invalidity Contentions. Based on publicly available information and Disney's diligent investigation to date, Disney has reason to believe that the following products, systems, and services may have been on sale, in public use, and/or invented before the priority dates of the Asserted Claims, and, if confirmed, would be prior art under at least one of pre-AIA 35 U.S.C. §§ 102(a), (b) or (g) and/or pre-AIA 35 U.S.C. § 103. Disney is diligently seeking discovery as to prior art systems and services and reserves the right to supplement these contentions with additional prior art systems and services according to Patent L.R. 3-6 when the appropriate discovery becomes available.

The information available to date indicates that each product, system, or service below may have been, at least as of the date indicated below or before, (1) known or used in this country before the alleged invention of the claimed subject matter of the Asserted Claims, (2) in public use and/or on sale or offered for sale in this country more than one year before the filing date of the patent; and/or (3) invented by another who did not abandon, suppress, or conceal it before the alleged invention of the claimed subject matter of the Asserted Claims.

Disney has issued or is working to diligently issue subpoenas to third parties seeking documents and information regarding prior art products and/or systems. Disney may also issue additional subpoenas as its diligent and ongoing investigation reveals additional possible prior art products, systems, and/or services.

Disney hereby incorporates by reference the prior art products, systems, and/or services listed above with respect to the '248 patent. *See supra* § III.A.3.

Disney's investigation of these sources of prior art is ongoing. Disney further reserves the right to assert earlier priority dates for the prior art listed above. Disney's investigation of the availability of these references and system art is ongoing.

**4. References Reflecting the State of the Art and/or Knowledge of a Person of Ordinary Skill in the Art**

The following references may be relied upon to demonstrate the state of the art relating to the '226 patent in the relevant timeframe:

- All patents and publications identified in §§ III.B.1, III.B.2, and III.B.3, *supra*;
- All documents cited on the face of the '226 patent or patents related to the '226 patent, whether or not such documents are incorporated by reference into the Specification;
- All documents cited during prosecution of the '226 patent;
- References, concepts, and technologies included, discussed, raised, or cited during prosecution of the '226 patent or patents related to the '226 patent;
- References, concepts, and technologies discussed in the Specification, including the "Background of the Invention" section of the '226 patent;
- All other documents cited herein; and/or
- The references specifically listed above with respect to the '248 patent, which Disney hereby incorporates by reference here. *See supra* § III.A.4.

### C. The ’072 Patent

#### 1. Prior Art Patent References

The following prior art patent and patent publication references, including those patent references listed in Ex. 072-A, anticipate and/or render obvious the asserted claims of the ’072 patent:

Disney hereby incorporates by reference the prior art patent and patent publication references listed above with respect to the ’248 patent. *See supra* § III.A.1.

#### 2. Prior Art Publications

The following prior art publications, including those patent references listed in Ex. 072-A, anticipate and/or render obvious the Asserted Claims of the ’072 patent:

Disney hereby incorporates by reference the prior art publications listed above with respect to the ’248 patent. *See supra* § III.A.2.

#### 3. Prior Art Products, Systems, and Services

In addition to the patents and publications listed above, Disney may rely on the sale, public use, and/or prior invention of prior art products, systems, and/or services. The prior art products, systems, and services listed below may invalidate the Asserted Claims, alone or in combination with the state of the art and/or any of the other prior art disclosed in Disney’s Invalidity Contentions. Based on publicly available information and Disney’s diligent investigation to date, Disney has reason to believe that the following products, systems, and services may have been on sale, in public use, and/or invented before the priority dates of the Asserted Claims, and, if confirmed, would be prior art under at least one of pre-AIA 35 U.S.C. §§ 102(a), (b) or (g) and/or pre-AIA 35 U.S.C. § 103. Disney is diligently seeking discovery as to prior art systems and services and reserves the right to supplement these contentions with additional prior art systems and services according to Patent L.R. 3-6 when the appropriate discovery becomes available.

The information available to date indicates that each product, system, or service below may have been, at least as of the date indicated below or before, (1) known or used in this country before the alleged invention of the claimed subject matter of the Asserted Claims, (2) in public use and/or on sale or offered for sale in this country more than one year before the filing date of the patent;

and/or (3) invented by another who did not abandon, suppress, or conceal it before the alleged invention of the claimed subject matter of the Asserted Claims.

Disney has issued or is working to diligently issue subpoenas to third parties seeking documents and information regarding prior art products and/or systems. Disney may also issue additional subpoenas as its diligent and ongoing investigation reveals additional possible prior art products, systems, and/or services.

Disney hereby incorporates by reference the prior art products, systems, and/or services listed above with respect to the ’248 patent. *See supra* § III.A.3.

Disney’s investigation of these sources of prior art is ongoing. Disney further reserves the right to assert earlier priority dates for the prior art listed above. Disney’s investigation of the availability of these references and system art is ongoing.

**4. References Reflecting the State of the Art and/or Knowledge of a Person of Ordinary Skill in the Art**

The following references may be relied upon to demonstrate the state of the art relating to the ’072 patent in the relevant timeframe:

- All patents and publications identified in §§ III.C.1, III.C.2, and III.C.3, *supra*;
- All documents cited on the face of the ’072 patent or patents related to the ’072 patent, whether or not such documents are incorporated by reference into the specification;
- All documents cited during prosecution of the ’072 patent;
- References, concepts, and technologies included, discussed, raised, or cited during prosecution of the ’072 patent or patents related to the ’072 patent;
- References, concepts, and technologies discussed in the Specification, including the “Background of the Invention” section of the ’072 patent;
- All other documents cited herein; and/or
- The references specifically listed above with respect to the ’248 patent, which Disney hereby incorporates by reference here. *See supra* § III.A.4.

### D. The ’790 Patent

#### 1. Prior Art Patent References

The following prior art patent and patent publication references, including those patent references listed in Ex. 790-A, anticipate and/or render obvious the Asserted Claims of the ’790 patent:

Disney hereby incorporates by reference the prior art patent and patent publication references listed above with respect to the ’248 patent. *See supra* § III.A.1.

#### 2. Prior Art Publications

The following prior art publications, including those patent references listed in Ex. 790-A, anticipate and/or render obvious the Asserted Claims of the ’790 patent:

Disney hereby incorporates by reference the prior art publications listed above with respect to the ’248 patent. *See supra* § III.A.2.

#### 3. Prior Art Products, Systems, and Services

In addition to the patents and publications listed above, Disney may rely on the sale, public use, and/or prior invention of prior art products, systems, and/or services. The prior art products, systems, and services listed below may invalidate the Asserted Claims, alone or in combination with the state of the art and/or any of the other prior art disclosed in Disney’s Invalidity Contentions. Based on publicly available information and Disney’s diligent investigation to date, Disney has reason to believe that the following products, systems, and services may have been on sale, in public use, and/or invented before the priority dates of the Asserted Claims, and, if confirmed, would be prior art under at least one of pre-AIA 35 U.S.C. §§ 102(a), (b) or (g) and/or pre-AIA 35 U.S.C. § 103. Disney is diligently seeking discovery as to prior art systems and services and reserves the right to supplement these contentions with additional prior art systems and services according to Patent L.R. 3-6 when the appropriate discovery becomes available.

The information available to date indicates that each product, system, or service below may have been, at least as of the date indicated below or before, (1) known or used in this country before the alleged invention of the claimed subject matter of the Asserted Claims, (2) in public use and/or on sale or offered for sale in this country more than one year before the filing date of the patent;

and/or (3) invented by another who did not abandon, suppress, or conceal it before the alleged invention of the claimed subject matter of the Asserted Claims.

Disney has issued or is working to diligently issue subpoenas to third parties seeking documents and information regarding prior art products and/or systems. Disney may also issue additional subpoenas as its diligent and ongoing investigation reveals additional possible prior art products, systems, and/or services.

Disney hereby incorporates by reference the prior art products, systems, and/or services listed above with respect to the ’248 patent. *See supra* § III.A.3.

Disney’s investigation of these sources of prior art is ongoing. Disney further reserves the right to assert earlier priority dates for the prior art listed above. Disney’s investigation of the availability of these references and system art is ongoing.

**4. References Reflecting the State of the Art and/or Knowledge of a Person of Ordinary Skill in the Art**

The following references may be relied upon to demonstrate the state of the art relating to the ’790 patent in the relevant timeframe:

- All patents and publications identified in §§ III.D.1, III.D.2, and III.D.3, *supra*;
- All documents cited on the face of the ’790 patent or patents related to the ’790 patent, whether or not such documents are incorporated by reference into the Specification;
- All documents cited during prosecution of the ’790 patent;
- References, concepts, and technologies included, discussed, raised, or cited during prosecution of the ’790 patent or patents related to the ’790 patent;
- References, concepts, and technologies discussed in the specification, including the “Background of the Invention” section of the ’790 patent;
- All other documents cited herein; and/or
- The references specifically listed above with respect to the ’248 patent, which Disney hereby incorporates by reference here. *See supra* § III.A.4.

## IV. DISCLOSURES PURSUANT TO PATENT L.R. 3-3(B)

### A. Anticipation of the Asserted Patents

Subject to the reservation of rights above and based on Disney's present understanding of the Asserted Claims, and the apparent constructions and claim scope Rearden is asserting based on Rearden's Infringement Contentions, the below prior art references anticipate the Asserted Claims. As explained above, the charts provided in **Exhibits 248-A, 248-B, 226-A, 226-B, 072-A, 072-B, 790-A, and 790-B** identify examples of where each element of each Asserted Claim can be found in each item of prior art, on a claim-by-claim basis:

#### 1. '248 Patent

| Reference | Anticipated Claims | Claim Charts |
|---|---|---|
| Borshukov–2003 | 1-30 | 248-A2 |
| Bouguet–408 | 1-30 | 248-A3 |
| Chiang–2002 | 1-30 | 248-A4 |
| D'Apuzzo–2003 | 1-30 | 248-A7 |
| Eisert–2003 | 1-30 | 248-A8 |
| Gordon–333 | 1-30 | 248-A10 |
| Guenter-1998 | 1-30 | 248-A11 |
| Pighin–1998 | 1-30 | 248-A21 |
| Wang–2004 | 1-30 | 248-A25 |
| Zhang–2004 | 1-30 | 248-A27 |
| Artem Digital | 1-30 | 248-B1 |
| Project Gemini | 1-30 | 248-B2 |
| Universal Capture System | 1-30 | 248-B4 |

**2. ’226 Patent**

| Reference | Anticipated Claims | Claim Charts |
|---|---|---|
| Abrantes–1999 | 1-5, 7 | 226-A1 |
| Borshukov–2003 | 1-5, 7 | 226-A2 |
| Eisert–2003 | 1-5, 7 | 226-A8 |
| Vlasic–2005 | 1-5, 7 | 226-A23 |
| Wang–2004 | 1-5, 7 | 226-A25 |
| Zhang–2004 | 1-5, 7 | 226-A27 |
| Artem Digital | 1-5, 7 | 226-B1 |
| Project Gemini | 1-5, 7 | 226-B2 |
| Universal Capture System | 1-5, 7 | 226-B4 |

**3. ’072 Patent**

| Reference | Anticipated Claims | Claim Charts |
|---|---|---|
| Borshukov–2003 | 1-30 | 072-A2 |
| Chiang–2002 | 1-30 | 072-A4 |
| D’Apuzzo–2003 | 1-30 | 072-A7 |
| Eisert–2003 | 1-30 | 072-A8 |
| Fedorov–2003 | 1-30 | 072-A9 |
| Gordon–333 | 1-30 | 072-A10 |
| Huang–2004 | 1-30 | 072-A13 |
| Kanade–1997 | 1-30 | 072-A15 |
| Kroos–145 | 1-30 | 072-A16 |
| MacVicar–2004 | 1-30 | 072-A17 |
| Vlasic–2005 | 1-30 | 072-A23 |
| Wang–2004 | 1-30 | 072-A25 |

| Reference | Anticipated Claims | Claim Charts |
|---|---|---|
| Zhang–2004 | 1-30 | 072-A27 |
| Artem Digital | 1-30 | 072-B1 |
| Project Gemini | 1-30 | 072-B2 |
| Universal Capture System | 1-30 | 072-B4 |

**4. ’790 Patent**

| Reference | Anticipated Claims | Claim Charts |
|---|---|---|
| Borshukov–2003 | 1-30 | 790-A2 |
| Chiang–2002 | 1-30 | 790-A4 |
| D’Apuzzo–2003 | 1-30 | 790-A7 |
| Eisert–2003 | 1-30 | 790-A8 |
| Fedorov–2003 | 1-30 | 790-A9 |
| Gordon–333 | 1-30 | 790-A10 |
| Huang–2004 | 1-30 | 790-A13 |
| Kanade–1997 | 1-30 | 790-A15 |
| Kroos–145 | 1-30 | 790-A16 |
| MacVicar–2004 | 1-30 | 790-A17 |
| Vlasic–2005 | 1-30 | 790-A23 |
| Wang–2004 | 1-30 | 790-A25 |
| Zhang–2004 | 1-30 | 790-A27 |
| Artem Digital | 1-30 | 790-B1 |
| Project Gemini | 1-30 | 790-B2 |
| Universal Capture System | 1-30 | 790-B4 |

Subject to the reservation of rights above and based on Disney’s present understanding of

the Asserted Claims, and the apparent constructions and claim scope Rearden is asserting based on its Infringement Contentions, the prior art references identified above, and charted in **Exhibits 248-A, 248-B, 226-A, 226-B, 072-A, 072-B, 790-A, and 790-B** , each anticipate the Asserted Claims. To the extent a finder of fact finds that a limitation of a given claim is not disclosed by one of the references identified above pursuant to Patent L.R. 3-3(a), those claims are nevertheless obvious in view of those references because the Asserted Claims contain nothing that goes beyond ordinary innovation, and are therefore invalid. To the extent any Asserted Claim is not anticipated, none of the Asserted Claims goes beyond combining known elements to achieve predictable results or does more than choose between clear alternatives known to those of skill in the art, particularly in view of the state of the art as reflected in the relevant references listed above.

Moreover, to the extent the foregoing references are found not to anticipate the Asserted Claims, the foregoing references render the Asserted Claims obvious either alone or in combination with one or more of the other references identified above pursuant to Patent L.R. 3-3(a). As explained herein and/or in the accompanying charts, it would have been obvious to a person of skill in the art at the time of the alleged invention of the Asserted Claims to extend any of the references or to combine the various references cited herein so as to practice the Asserted Claims. In addition to the specific combinations of prior art and the specific combinations of groups of prior art disclosed, Disney reserves the right to rely on any other combination of any prior art references disclosed herein. Disney further reserves the right to rely upon combinations disclosed within the prosecution history of the references cited herein. These obviousness combinations reflect Disney's present understanding of the potential scope of the claims that Rearden appears to be advocating and should not be construed as Disney's acquiescence to Rearden's interpretation of the patent claims.

**B. Obviousness of the Asserted Patents**

In accordance with Patent L.R. 3-3(b), prior art references rendering all asserted claims of the '248, '226, '072, and '790 patents invalid, alone or in combination with other references, are identified in Part III above and in **Exhibits 248-A, 248-B, 226-A, 226-B, 072-A, 072-B, 790-A, and 790-B**. Reasons to combine these references include: the nature of the problem being solved;

the express, implied and inherent teachings of the prior art; the knowledge of persons of ordinary skill in the art at the time of the alleged invention; that such combinations would have yielded predictable results; and that such combinations would have represented known alternatives to a person of ordinary skill in the art. Certain of these rationales and reasons to combine are discussed more specifically below. That others are not discussed more specifically should not be interpreted as an admission or concession that they do not apply. To the contrary, the discussion below simply provides more explanation of these specific rationales. Disney may also rely on contemporaneous textbooks, treatises, and/or publications, as well as on the testimony of fact and expert witnesses that bear on these rationales and on the reasons to combine the prior art.

Because the Asserted Patents simply combine old elements, with each performing the same function it had been known to perform, and yield no more than what one would expect from such an arrangement, the combinations of these old elements were obvious at the time of the alleged invention. Further, in the prior art there were well recognized design needs and market pressures to develop the alleged inventions claimed in the Asserted Patents.

Those of ordinary skill in the art would have been (and indeed were) motivated to combine known prior art solutions in the manner claimed in the Asserted Patents. Design needs and market pressures provided ample reason to combine prior art elements in the manner recited in the claims. Moreover, since there were a finite number of predictable solutions, a person of ordinary skill in the art had good reason to pursue the known options. The prior art used those familiar elements for their primary or well-known purposes in a manner well within the ordinary level of skill in the art. As further described below for each of the Asserted Patents, a person of ordinary skill in the art would thus have had a reasonable expectation that the combination would succeed in producing the alleged invention as claimed.

### 1. Description of the Asserted Patents

The ’790 and ’072 patents are continuations of the ’248 patent, which is a continuation of the ’226 patent. According to the common Specification[4] the “invention relates generally to the

[4] All Asserted Patents share a common specification (the “Specification”). For simplicity, all citations are to the ’226 patent.

field of motion capture." '226 patent, 1:32–33. "In a *typical* motion capture session, the motion of a 'performer' is captured and translated to a computer-generated character." *Id.*, 1:43–45 (emphasis added). The Specification describes the alleged invention as "using a random pattern of paint applied to a portion of a performer's face" that is allegedly "[u]nlike any prior motion capture systems . . . ." *Id.*, 1:33–36, 6:4–8; *see also id.* at 6:33–37 ("[T]he efficiency of the motion capture system is improved by using phosphorescent paint and/or by precisely controlling synchronization between the camera's shutters and the illumination of the random pattern.").

The Specification discloses applying a pattern, described as a "random pattern," to the surface to be captured (e.g., a performer's face, body, clothing, or props). *See, e.g.,* '226 patent, Abstract, 3:64-4:4. The pattern is intended to provide visually distinguishable features for downstream image correlation, and may vary in spatial distribution and intensity. Notably, the concept of applying a pattern to a surface and tracking its deformation was not new. The Specification itself acknowledges prior art systems that projected patterns (e.g., grids of lines) onto performers and calculated point clouds from the resulting deformations. *See* '226 patent, 2:63-3:32. The Specification further admits that drawing patterns on deformable surfaces, such as cloth, and capturing the motion of such deformable surfaces had been proposed by Guskov et al. at the University of Michigan. *See Id.* at 3:32-51. The principal disclosed variation in the Specification is the use of phosphorescent paint rather than projected or drawn geometric patterns, which was not a fundamental change to the underlying capture methodology.

The Specification describes a multi-resolution correlation algorithm (illustrated in FIG. 15) that processes image frames from multiple cameras to construct a 3D surface. The algorithm proceeds as follows: (1) frames from two or more cameras are **downsampled** to a lower resolution; (2) the downsampled frames are **warped** (perspective-transformed) to a common virtual viewpoint; (3) a **pixel-wise, normalized cross-correlation** is computed between the warped frames across a range of candidate depth values and the depth value yielding the highest correlation score is stored for each pixel; and (4) the frames are upsampled and the process **iterates at progressively higher resolutions**, refining the depth estimate at each stage. The Specification acknowledges that each of these constituent techniques (downsampling, perspective transformation, normalized cross-

correlation, and upsampling) were known in the art. *See* ’226 patent at *id.* at 12:2-4, 14:23-29, 16:31-34, 16:36-49; Provisional Application No. 60/724,565 (“’565 Provisional”) Specification at 27. The algorithm amounts to an application of these known techniques in sequence, none of which, individually or in combination, was novel at the time of the alleged invention.

### 2. The Claimed Concepts Were Known

Each element of the asserted claims was known in the art. To shed light on how and why the Asserted Claims are anticipated and/or rendered obvious by the cited prior art, Disney reserves the right to provide background concerning the presence of each of their building blocks in the prior art. A person of ordinary skill in the art at the time of the alleged invention would have understood these concepts and would have been capable of implementing them in systems and methods for facial motion capture. The Asserted Claims of the Asserted Patents, including but not limited to their implicit constructions and claim scope used by Rearden in its Infringement Contentions, or the explicit claim constructions provided in Rearden’s Fifth Amended Complaint, purport to cover combinations of basic concepts, all of which were known before the Asserted Patents’ alleged priority date. As demonstrated in **Exhibits 248-A, 248-B, 226-A, 226-B, 072-A, 072-B, 790-A, and 790-B** , all of the limitations of the Asserted Claims, and any claims from which those dependent claims depend, are described in one or more prior art references.

### 3. Admitted Prior Art

All of the claimed features of the Asserted Claims of the Asserted Patents were known in the prior art. Indeed, the Asserted Patents’ shared Specification itself admits that many of the limitations of the claims were known. For example, as described in the “Description of Related Art” section, the patent admits that the core components of the claimed systems and methods, including multi-camera capture of a performer’s face, reconstruction of three-dimensional facial geometry, and tracking of facial motion over time, were already conventional. ’226 patent at 1:40-2:24, 2:63-3:56.

#### a. Figure 15, Cross-Correlation, and Bourke-1996

Rearden has contended that the “correlation” claim limitations are “limited to, and should be construed to require use of, a pixel-wise cross-correlation algorithm for determining the 3D

location of points on the performer's face by correlating a plurality of 2D frames from a plurality of cameras at the same time interval, as set forth in the flowchart of Figure 15 of the '226 patent with its use described in detail at col. 11:25-17:4, together with the alternate embodiments for adjusting the values within the correlation algorithm described at col. 17:5-18 and the alternate correlation embodiments detailed at 17:19-20:31." *See, e.g.,* Fifth Amended Complaint, ¶ 133. However, the Specification explicitly concedes that "***[t]he pixel-wise, normalized cross-correlation is well known in the art.***" *Id.* at 13:46-47. The Specification cites to Bourke-1996 as "[a]n exemplary illustration and discussion of one pixel-wise, normalized cross-correlation." *Id.* at 13:47-51; *id.* at 14:52-56. ("Proceeding to step 1510, a pixel-wise, normalized cross-correlation between VA and VB is performed and stored in C. It is understood in the art that substitutable functions may be performed, such as not normalizing the data before cross-correlation or correlating regions other than pixels."). Bourke-1996 describes cross-correlation as "a standard method of estimating the degree to which two series are correlated." Bourke-1996 at 1. Bourke-1996 provides an algorithm and source code for cross-correlation, and explains that the denominator of the algorithm "serves to normalise the correlation coefficients such that −1 <= r(d) <= 1, the bounds indicating maximum correlation and 0 indicating no correlation." Bourke-1996 at 2. The Specification of the Asserted Patents describes an identical normalization: "In one embodiment of the present invention, the values are normalized to the range of −1 to 1." '226 patent, 13:52-53. Bourke-1996 also describes "2D Pattern Identification using Cross Correlation," in which "[o]ne approach to identifying a pattern within an image uses cross correlation of the image with a suitable mask. Where the mask and the pattern being sought are similar the cross correlation will be high." Bourke-1996 at 6. Bourke-1996 explains that "[t]he peaks in this cross correlation 'surface' are the positions of the best matches in the image of the mask." Bourke-1996 at 7. This is analogous to the Specification's method of correlating random-pattern images by different cameras, where the images are warped to a common reference, and pixel-wise cross-correlation is used to identify matching regions and determine depth. '226 patent at 18:21-54.

The Specification further acknowledges that every other step in Figure 15 was known in the art, including multi-resolution coarse-to-fine correlation techniques using downsampling, warping,

and upsampling. For example, the Specification states that various filters and techniques for downsampling were known in the art. *id.* at 12:2-4 ("Downsampling can be performed using various filters such as a bilinear filter, a bicubic filter, or other filters and/or techniques known in the art."); *id.* at 14:23-29 ("As previously discussed, downsampling is well known in the art and may be performed by various filters and/or techniques including, but not limited to, bilinear filtering and bicubic filtering."). Provisional Application No. 60/724,565 ("'565 Provisional", which is the provisional application for each of the Asserted Patents and has a substantially similar disclosure, concedes that the "perspective warp operation described herein is a common 3D transformation well known to those skilled in the art of 3D computer graphics," and that "[s]tandard perspective warp graphics functions (such as those built into most modern computer 3D graphics libraries) may be used to perform the perspective warps utilized by this invention." '565 Provisional Specification at 27. The Specification also acknowledges that upsampling was well known in the art and could be performed with a variety of filters and/or techniques. *Id.* at 16:31-34 ("As previously stated, upsampling is well known in the art and can be performed with a variety of filters and/or techniques including, but not limited to, bilinear filtering and bicubic filtering. Once Z has been stored, Zest is set equal to Z (the result of upsampling Zest for determining Z)"). The Specification further acknowledges that techniques for coarse-to-fine process loops were known in the art. *Id.* at 16:36-49 ("Visually, at higher resolution, the user will want the imaginary screen 2824 in FIG. 28 to move at smaller intervals between dmin and dmax. Δd may be decreased in any manner known in the art, such as, but not limited to, dividing by a different value or using Δd values defined by a user in an array the size of 1 greater than the number of iterations of step 1522 during flow of the flowchart.").

**b. Tracking**

The Specification also confirms that tracking, to the extent the term can be understood from Rearden's Infringement Contentions, was a known technique in the art. For example, the Specification describes that prior art systems could include a "motion tracking unit 150 [that] generates artificial motion data representing the movement of the performer during the motion capture session." '226 patent at 2:8-14, figure 1.

**c. 3D Modeling/Rendering and Rendered Animated**

**Representation of the Performer on a Display**

The Specification also states that prior art systems could include a "graphics processing unit 152 [that] renders an animated representation of the performer on a computer display 160 (or similar display device) using the motion data." *Id.* at 2:15-17. The Specification further states that the prior art "graphics processing unit 152 may apply the captured motion of the performer to different animated characters and/or to include the animated characters in different computer-generated scenes." *Id.* at 2:17-21. The Specification also describes known 3D modeling/rendering and animation packages capable of linking texture maps and surface treatments to motion capture output were known. The Specification specifically identifies "Maya from Alias Systems Corp. of Toronto, Ontario Canada" as an example.

**d. Markerless Facial Capture**

The Specification recognizes that prior art systems included both marker-based approaches and approaches directed to capturing and reconstructing facial motion without reliance on such markers. For example, the Specification admits that markerless techniques, such as techniques using projected-pattern motion capture were known, stating "[a]nother current approach to accomplishing motion capture is to optically project a pattern or sequence of patterns (typically a grid of lines or other patterns) onto the performer. One or more cameras is then used to capture the resulting deformation of the patterns due to the contours of the performer, and then through subsequent processing a point cloud representative of the surface of the performer is calculated." '226 patent, 2:63-3:6.

The Specification then attributes a series of alleged limitations to projected-pattern motion capture systems, including that: (1) "the projected pattern typically is limited to a fairly small area"; (2) "the projection is only in focus within a given depth of field"; (3) "if an object obstructs the projection . . . then the obstruction region cannot be captured"; and (4) "the motion capture system is not able to track points on the captured surface to see where they moved from frame to frame. It is only able to capture what the new geometry of the surface is after the deformation." *Id.* at 3:6–26. The Specification states that "[m]arkers can be placed on the surface and can be tracked as the surface deforms, but the tracking will be of no higher resolution than that of the markers" and then

cites to Zhang-2004 as an example of "such a system." *Id.* at 3:26–32. ("…For example, such a system is described in the paper 'Spacetime Faces: High Resolution Capture for Modeling and Animation', by Li Zhang, et. al., of University of Washington.").

However, the Specification's characterization of Zhang-2004 is inaccurate and misleading. Zhang-2004 does not merely project patterns and measure their deformation. Rather, Zhang-2004 describes a hybrid, multi-modal capture system in which structured-light projectors cast gray-scale random stripe patterns onto a performer's face to provide artificial texture for binocular stereo matching between pairs of synchronized cameras—not to measure pattern deformation directly as the Specification contends. Zhang-2004 at 2 ("To facilitate depth computation, we use two video projectors that project gray-scale random stripe patterns onto the face."). Moreover, Zhang-2004 is not limited to frames on which patterns are projected. Zhang-2004 explicitly describes a capture scheme in which "[t]he projectors send a 'blank' pattern every three frames, which is used to compute both color texture maps and time correspondence information (optical flow)." Zhang-2004 at 2. Zhang-2004 refers to these as "non-pattern frames" and uses them—together with the pattern frames—to compute optical flow (i.e., pixel-level motion fields between successive color frames) and to perform template tracking that yields point correspondence across the entire captured sequence. Zhang-2004 at 5–6.

Contrary to the Specification's assertion that "the motion capture system is not able to track points on the captured surface to see where they moved from frame to frame" ('226 patent at 3:22–25), Zhang-2004 discloses a template fitting and tracking procedure that does precisely that. Zhang-2004 fits a high-resolution template mesh of "roughly 16K vertices" to the depth maps at the first non-pattern frame and then tracks that mesh through the remainder of the sequence by jointly optimizing shape matching to depth maps and consistency of vertex motion with optical flow. Zhang-2004 at 5-7 ("fitting a template mesh to the pair of depth maps captured in the first non-pattern frame . . . automatically and without the need for putting markers on the subject's face"; "deform it smoothly through the rest of the sequence such that the shape matches the depth maps and the vertex motions match the optical flow"; "optimizing a weighted sum of Eq. (12) and Eq. (13): $Y = E_s + \alpha E_r + \beta E_m$"; "[e]ach face model has roughly 16K vertices"). Zhang-2004 itself

identifies the inability of prior structured-light methods to track motion as a limitation that its system overcomes: "While the aforementioned shape-capture techniques yield spatially and temporally dense depth maps, a key limitation is that they do not capture motion, i.e., point correspondence over time, making it difficult to repose or reanimate the captured faces." Zhang-2004 at 1-2.

**e. Igor Guskow Publications / Tracking Surfaces that Fold or Deform**

The Specification acknowledges there have been a number of prior art efforts to "capture cloth (and similar deformable and foldable surfaces) using motion capture techniques," and identifies multiple prior art references directed to this problem, including several papers by Igor Guskow describing approaches for tracking flexible geometry, extracting animated meshes with adaptive motion estimation, and processing semi-regular triangular surface meshes. '226 patent at 3:32–56. The Specification describes, for example, an approach in which "a regular grid is drawn on cloth and captured," as well as "[m]ore sophisticated approaches" for tracking deformable surfaces through successive frames. *Id.* at 3:39–51. While the Specification asserts that these particular approaches suffer from "production inefficiencies," the Specification does not dispute that, with these approaches, the fundamental concept of tracking points on a deformable surface across successive frames was well known.

**4. Known Prior Art Concepts and Exemplary Prior Art**

The features claimed in the Asserted Claims of the Asserted Patents were well known in the prior art. Certain exemplary concepts that were well known in the prior art are listed below.

**a. Markerless Facial Capture**

As demonstrated in the references cited herein, markerless facial capture was well known in the prior art prior to the alleged priority date of any of the Asserted Patents. Indeed, Disney Animation's Project Gemini system, which was publicly disclosed no later than 2004, employed markerless capture, tracking, and automatic modeling to drive facial animation. *See, e.g.,* Exhibit 248-B2. As another example, Zhang-2004 describes markerless facial capture by "track[ing] the template mesh through other non-pattern frames in the sequence automatically and **without the**

**need for putting markers on the subject's face.**" Zhang-2004 at 5 (emphasis added). Zhang-2004's markerless facial capture used "[a] new template fitting and tracking procedure" to "fill[] in missing data and yield[] point correspondence across the entire sequence **without using markers**." *Id.* at Abstract. Thus, Zhang-2004's "**mesh tracking method [was] fully automatic without requiring markers** to be placed on the subject's face." *Id.* at 7 ("Each face model has roughly 16K vertices and template tracking takes less than 1 minute per frame.") (emphasis added).

In a further example, Wang-2004 published with the title "High Resolution Acquisition, Learning and Transfer of Dynamic 3-D Facial Expressions" in 2004. Wang-2004 describes another markerless facial capture approach. Specifically, Wang-2004 discloses a "data driven approach that consists of four parts: 1) High speed, **high accuracy capture of moving faces without the use of markers**, 2) Very precise tracking of facial motion using a multi-resolution deformable mesh …" Wang-2004 at Abstract (emphasis added).

In yet another example, Bouguet-408, published January 16, 2003, discloses "a system that tracks both 3D pose and shape of a facial image ('face') in front of a single video camera **without using intrusive markers**." Bouguet-408 at [0017]. The disclosed system and method describe that "by building a 3D model using stereo data based on input image sequences, monocular face tracking of pose and deformation of the face can be achieved **without use of invasive markers.**" Bouguet-408 at [0016] (emphasis added); *see also id.* at [0083] ("A method and two-stage system for 3D tracking of pose and deformation, e.g., of the human face in monocular image sequences without the use of invasive special markers, have been described.").

In yet another example, Maurer-231, granted August 7, 2001, discloses "an apparatus, and related method, for sensing a person's facial movements, features or characteristic." Maurer-231 at 1:32-34. Maurer-231 discloses a vision based motion capture system with a "sensing system [that] allows tracking of a person's natural characteristics without any unnatural elements to interfere with the person's natural characteristics." Maurer-231 at 1:26-43.

In yet another example, Kroos-145 discloses an "approach for measuring the motion of a person's face is to extract information quantitatively representing the face motion from sequences of video images. Video image recording requires only a video camera and recorder. Therefore, it is

not physically invasive and can be used anywhere, thus overcoming the restrictions of marker-based measurement systems." Kroos-145 at 1:54-60.

The above references are merely exemplary, and further descriptions of markerless facial capture are described in the attached references. For example, Borshukov-2003 discloses a facial capture system that "did not use any markers on the face to assist feature tracking." Borshukov-2003 at 1. In a further example, Vlasic-2005 discloses a system that "does not require performers to wear visible facial markers or to be recorded by special face-scanning equipment, it is an inexpensive and easy-to-use facial animation system." Vlasic-2005 at 427. In yet another example, MacVicar-2004 discloses "3D model based motion capture data to drive animation … able to capture and extract the motion without the need for the placement of invasive markers on the subject." MacVicar-2004 at 7. In yet another example, Chuang-2002 discloses "a model-based technique that can reliably track a marker-less face." Chuang-2002 at 3. In yet another example, Huang-2004 discloses "3D shape registration algorithms … to establish correspondences based on facial geometry," and that "markers are for validation purpose only and are not used for the tracking." Huang-2004 at 1-2, 6-7. In yet another example, Gordon-333 discloses a method where "instead of affixing markers, physical features of the actors (e.g., shapes of nose or eyes) could be used as natural markers to track motion. Such a feature-based motion capture system would eliminate the task of affixing markers to the actors prior to each performance." Gordon-333 at [0047]. Chiang-2002 discloses a system that uses "feature extraction" to establish a "one-to-one mesh point correspondence" between a 2D facial image and a 3D facial model. Chiang-2002 at 4. In yet another example, Artem Digital discloses a markerless facial motion capture system in its 4D dynamic system. *See, e.g.* 4D_Freeview_demo.mp4 (DISNEY_REARDEN2_00039666). Universal Capture likewise discloses :markerless capture of the complete deforming face geometry." Universal Capture SIGGRAPH Presentation at 2 (DISNEY_REARDEN2_00040196). Project Gemini also discloses a facial performance capture system with "automatic modeling [and] markerless tracking." Disney SIGGRAPH 2004 Facial Performance Capture Presentation at Page 7 (DISNEY_REARDEN2_00040010).

**b. Plurality of Cameras**

As demonstrated in the references cited herein, facial capture using a plurality of cameras was well known in the prior art prior to the alleged priority date of any of the Asserted Patents. For example, Zhang-2004 discloses a "capture system [that] employs synchronized video cameras … to record videos of a moving face from multiple viewpoints[,]" "[o]ur system takes as input 6 synchronized video streams …[,]" and "[t]hree of the cameras capture the left side of the face, and the other three capture the right side." Zhang-2004 at Abstract, 2.

In a further example, Mok-710 discloses a "multiple video camera system … that simultaneously captures the action of a character from multiple viewpoints." Mok-710 at 3:34-35. The disclosed "multiple camera system … films the actor 102 with five … cameras …," and "[e]ach camera … is spaced so as to capture a different viewpoint …" Mok-710 at 3:34-4:3, 5:27-31, *see also id.* Fig. 1, 5:12-13.

In yet another example, Gordon-333 discloses a facial motion capture system using a "plurality of motion cameras [that] are arranged … such that all laterally exposed surfaces of the actor while in motion … are within the field of view of at least one of the plurality of motion cameras at substantially all times." Gordon-333 at [0013], *see also id.* Figs. 2-3, [0014], [0017]-[0018].

In yet another example, Kanade-1997 discloses transcribing "a visual event using many cameras surrounding the scene. We compute the 3D structure of the event for some of these cameras using a multi-camera stereo method." Kanade-1997 at 34.

In yet another example, MacVicar-2004 discloses a 3D Dynamic Capture System that "consists of 16 monochrome cameras and 8 colour cameras, arranged into 8 groups of three (2 mono, 1 colour) each known as a 'pod'" where "[t]he two black and white cameras in each pod give a stereo pair of images (Figure 3.) which are processed to extract depth information" and the "colour camera is used to obtain a photorealistic texture for rendering of the resultant model." MacVicar at 1, 2.

In yet another example, Wang-2004 discloses a "real-time 3-D shape acquisition system" that uses one black and white and one color camera positionally aligned with a beam splitter for image capture. Wang-2004 at 679, 680, Figs. 2, 3.

The above references are merely exemplary, and further descriptions of facial capture using a plurality of cameras are described in the attached references. For example, Eisert-2003 discloses "conferees are captured at each terminal by a multiple camera setup as shown in Fig. 5 and the desired 3-D video representation of the local person is extracted from the images." Eisert-2003 at 4. In a further example, Pighin-1998 discloses a system that takes "several images of the face from different viewpoints (Figure 1a) and a generic face model" where photography "performed using five cameras simultaneously." Pighin-1998 at 2, 8. In yet another example, Borshukov-2003 discloses using "five synchronized cameras that captured the actor's performance …" Borshukov-2003 at 1. In yet another example, Chiang-2002 discloses "generic video sequences with given facial expressions are taken in a controlled lighting environment. Two color video cameras are synchronized to capture left and right frontal views of a human subject." Chiang-2002 at 867. Bouguet-408 discloses stereo images taken with a "left camera" and a "right camera" for "stereo tracking to build [a] data-driven model." Bouguet-408 at [0008], Fig. 3. In yet another example, Maurer-231 describes that a facial model may be generated by "stereo-camera systems." Maurer-231 at 11:46-12:6. In yet another example, Artem Digital discloses a markerless facial motion capture that captures images "by shooting from multiple angles simultaneously." 2006.02.06 Artem Digital - Facial Scanning (DISNEY_REARDEN2_00039624). Universal Capture discloses a facial capture method that uses multiple cameras, shown by its description that the system performs "[p]hotogrammetric reconstruction of camera locations." Universal Capture SIGGRAPH Presentation at 2 (DISNEY_REARDEN2_00040196); *see also id.* at 4 (DISNEY_REARDEN2_00040198). Project Gemini also discloses a facial performance capture system with that captures images with a plurality of cameras, as shown by the camera setup on a slide entitled "Motion and Emotion" in a 2004 SIGGRAPH Presentation. Disney SIGGRAPH 2004 Facial Performance Capture Presentation at Page 7 (DISNEY_REARDEN2_00040010).

**c. Not-Successive Frame**

As demonstrated in the references cited herein, facial capture using non-successive frames was well known in the prior art prior to the alleged priority date of any of the Asserted Patents. For example, Zhang-2004 discloses a system that "takes as input 6 synchronized video streams (4

monochrome and 2 color) running at 60 frames-per-second (fps), and outputs a 20 fps sequence of high-resolution 3D meshes." Zhang–2004 at 2. Zhang-2004 further discloses "[t]he projectors send a 'blank' pattern every three frames, which is used to compute both color texture maps and time correspondence information (optical flow)," and "by fitting a template mesh to the pair of depth maps captured in the first non-pattern frame … We then track the template mesh through other non-pattern frames in the sequence automatically." Zhang–2004 at 2, 5.

In a further example, Mok-710 discloses that by "[u]sing key frame techniques, an animator reduces the number of frames by selecting only those video frames that are necessary to show lifelike motion. The selected video frames are called key frames. Often an animator can reduce a one second video segment from thirty frames to less than ten key frames." Mok–710 at 1:33–35.

In yet another example, Pighin-1998 discloses "[t]his whole process is repeated for the same human subject, with several different facial expressions. To produce facial animations, we interpolate between two or more different 3D models constructed in this way." Pighin-1998 at 2. Pighin-1998 at 2 also discloses a "timeline is used to schedule the different expression blends and the changes in viewing parameters (pose) during the animation." Pighin–1998 at 7.

In yet another example, Kroos-145 discloses a method and apparatus for facial motion capture wherein "[a]lthough the levels are usually processed in strict sequence, starting from the level immediately higher than the lowest level and proceeding one by one to the highest level, levels may be skipped in order to decrease processing time or depending on the characteristics of the object or its motion." Kroos–145 at 3:31–36. Kroos-145 also discloses facial capture wherein "the process may be performed field by field if the image signals are subjected to 'skip-scanning'. Alternatively, one frame may be divided into sub areas and the process described above may be performed on the basis of each sub area. … what is to be used as the unit image may be appropriately determined depending on the application." Kroos–145 at 12:21–30.

The above references are merely exemplary, and further descriptions of facial capture using a plurality of cameras are described in the attached references. For example, Illsley-075 discloses "one can also reduce the number of pictures of the user. Indeed, in a movie, only 25 pictures per second are necessary to give to a watcher the impression of fluent pictures. With the example of a

video signal comprising 50 pictures per second, one can take only one picture every two video pictures." Illsley–075 at [0038]. In a further example, Borshukov-2003 discloses "Optical flow errors can accumulate over time, causing an undesirable drift in the 3-d reconstruction. To minimize the drift we make use of reverse optical flow. On this production the problem was eliminated by introducing a manual keyshaping step: when the flow error becomes unacceptably large the geometry is manually corrected and the correction is then algorithmically propagated to previous frames." Borshukov-2003 at 1. In yet another example, Artem Digital discloses that its captured images can be "sampled at any rate" which allows expressions to be morphed between. 2006.02.10 Artem Digital – Scanning Fact Sheet (DISNEY_REARDEN2_00039626). Universal Capture discloses a facial capture method utilizing optical flow in each camera view that "triangulate[s camera captures] to obtain 3D-motion." Universal Capture SIGGRAPH Presentation at 2 (DISNEY_REARDEN2_00040196).

**d. 3D Meshes / 3D Points / 3D Reconstruction**

As demonstrated in the references cited herein, facial capture systems and methods having 3D meshes, 3D points, and reconstructions of points/meshes in 3D were well known in the prior art prior to the alleged priority date of any of the Asserted Patents. For example, Zhang-2004 discloses a system that takes as inputs 6 synchronized video streams "running at 60 frames-per-second (fps), and outputs a 20 fps sequence of high-resolution 3D meshes that capture face geometry, color, and motion, for our data-driven editing and animation techniques." Zhang–2004 at 2; *id.* at 7 ("Our mesh tracking method is fully automatic without requiring markers to be placed on the subject's face. In Figure 5(f-o), sample results for mesh tracking are shown in gray shaded rendering …. Each face model has roughly 16K vertices and template tracking takes less than 1 minute per frame.").

In a further example, Wang-2004 discloses "a system that accurately captures high speed, high resolution dynamic 3-D data and associated texture" and "a multi-resolution method for intra-frame registration of freely deforming 3-D meshes and captured a small database of 3-D facial expressions from a few different subjects." Wang-2004 at 684. The systems and methods described in Wang-2004 use "high resolution dynamic 3-D shape data that capture very accurate geometry at

speeds that exceed video frame rate," and that when "scanning faces, [the] system returns an average of 75 thousand 3-D measurements per frame, at 40Hz frame rate, with an RMS of 0.05mm." Wang-2004 at 678; *id.* ("At the coarse level, we use a mesh with 1K nodes that is suitable for facial animation. The coarse mesh was first developed for robust face tracking in low quality 2-D images [GVM03] and we extend it to 3-D data.").

In yet another example, Huang-2004 discloses a hierarchical tracking/fitting protocol and tracking facial motion in an expression using "a multi-resolution deformable face model" that "has two resolutions: a coarse-level mesh with 1K nodes and a fine-level mesh with 16K nodes." Huang-2004 at 2. Borshukov-2003 discloses a system and method using five synchronized cameras to capture an actor's performance and track each pixel's motion over time in each camera, which is "combined with a cyberscan model of a neutral expression of the actor and with photogrammetric reconstruction of the camera positions." Borshukov-2003 at 1. Borshukov-2003 further discloses that its system and method "works by projecting a vertex of the model into each of the cameras and then tracking the motion of that vertex in 2-d using the optical flow where at each frame the 3-d position is estimated using triangulation" and "[t]he result is an accurate reconstruction of the path of each vertex though 3-d space over time." Borshukov-2003 at 1. Vlasic-2005 discloses a facial capture system that "estimates performance parameters and detailed 3D geometry from video recordings" and "defines a mapping from performance parameters back to 3D shape" such that the system "can arbitrarily mix pose, identity, expressions, and visemes from two or more videos and render the result back into a target video." Vlasic-2005 at 427. Vlasic-2005 demonstrated its system on "two separate face models: a bilinear model, and a trilinear model" which "were estimated from detailed 3D scans (~ 30K vertices)." Vlasic-2005 at 428.

In a further example, Fedorov-2003 discloses systems and methods for facial animation using "a group of standard-conforming eight objects (skin, eyes, pupils, teeth, tongue) and some additional objects for enhanced realism (hair, glasses, mouth cavity and shoulders): up to 8,000 vertices and 16,000 triangles in total." Fedorov-2003 at 3; *id.* at 4 ("In compliance with MPEG-4 standard face animation is specified by the frame-to-frame varying positions of 3D vertices on the scene object's surfaces and controlled by standard set of FAPs – facial animation parameters. Every

low-level FAP is responsible for prescribing of the pointed facial feature point movement or the scene object transformation."). MacVicar-2004 also discloses a system and method that "produces a sequence of 3D-Models one for each frame of video captured" where "[e]ach model consists of the geometry, and the textures." MacVicar-2004 at 2. MacVicar-2004 further discloses a "conformation process is used to move from the arbitrary per frame mesh structures of scanned data to a unified mesh structure that is suitable for use by an animator" and that "[a] single generic mesh is conformed to each frame of a captured sequence in turn resulting in a new sequence of models with the shape and motion from the scanned data but having the mesh structure of the generic model." MacVicar-2004 at 3-4.

In a further example, Kanade-1997 discloses a system and method that "recovers dense depth maps, with a depth estimate for every pixel in the intensity image" and "convert[s] the 3D points into a surface representation" where the 3D points are treated "as vertices of a triangle mesh, which changes the task to selecting the 3D connectivity of the points." Kanade-1997 at 38-39. Guenter-1998 discloses "a system for capturing human facial expression and replaying it as a highly realistic 3D 'talking head' consisting of a deformable 3D polygonal face model with a changing texture map." Guenter at 1; *id.* at 2 ("fiducials are used to generate a set of 3D points which act as control points to warp the cyberware scan mesh of the actress' head … The 2D location for each dot is computed by finding the two dimensional centroid of each connected component. Correspondence between 2D dots in different camera views is established and potential 3D locations of dots reconstructed by triangulation. We construct a reference set of dots and pair up this reference set with the 3D locations in each frame."). Eisert-2003 discloses "3-D model-based method for the estimation of facial expressions that makes use of an explicit parameterized 3-D human head model describing shape, color, and motion constraints of an individual person" using a "generic triangle mesh which is adapted to the individual." Eisert-2003 at 8-9. Chiang-2002 discloses "3D geometry is built through temporal matching of dense stereo pairs segmented by Delaunay triangulation" and "[m]otion dynamics is captured by comparing coordinates of the matching mesh points temporally." Chiang-2002 at 868, 870; *id.* at 870 ("The ability to automatically track facial movement in a video sequence, and to automatically translate these into

animation control parameters enable not only very realistic facial animation, but also a new level of video teleconferencing, lip-synching, films, user-interface agents, avatars, and facial surgery planning."). In yet another example, Artem Digital discloses facial capture system that is able to "scan heads and objects" using "high-resolution multiple stereoscopic photography." 2006.02.04 Artem Digital - Facial Scanning (DISNEY_REARDEN2_00039618). Universal Capture discloses a facial capture method reconstructs the facial structure of a performer as shown in a slide entitled "Rigid vs. Deformable Motion" in a SIGGRAPH Presentation. Universal Capture SIGGRAPH Presentation at 4 (DISNEY_REARDEN2_00040198). Project Gemini also discloses a facial performance capture system that generates 3D point maps of a performer's face, as shown by models shown in a 2004 SIGGRAPH Presentation. Disney SIGGRAPH 2004 Facial Performance Capture Presentation at Page 1 (DISNEY_REARDEN2_00040004).

**e. Pixel-Wise Cross-Correlation for 3D Surface Reconstruction**

The use of pixel-wise cross-correlation algorithms to determine three-dimensional locations of surface points by correlating 2D frames from multiple cameras was a foundational and well-established technique in the field of computer vision, image processing, and facial capture decades before the Asserted Patents' earliest priority date. As noted above, the Specification concedes that "***pixel-wise, normalized cross-correlation is well known in the art***" and cites to Bourke-1996 as "[a]n exemplary illustration and discussion of one pixel-wise, normalized cross-correlation." '226 patent at 13:46-51.

As early as 1974, Hannah's doctoral thesis at Stanford University, *Computer Matching of Areas in Stereo Images*, described normalized cross-correlation as the preferred "measure of match" for determining corresponding areas between stereo image pairs, including its mathematical formulation, normalization to handle gain and offset variations, and the use of coarse-to-fine resolution strategies to improve both the efficiency and accuracy of the correlation search—the same hierarchical multi-resolution approach described in the Asserted Patents' Figure 15. Hannah-1974 at 5–9, 11–13. Hannah-1974 further described how matched correlation results, combined with camera models, could be used to compute the three-dimensional depth of scene points through triangulation, and discussed techniques for extending individual matches into complete depth maps

through region growing. *Id.* at 13–19, 31–34.

By 1981, Lucas and Kanade's paper, *An Iterative Image Registration Technique with an Application to Stereo Vision*, presented an image registration method applicable to stereo depth recovery that used spatial intensity gradients and correlation-based matching within a coarse-to-fine framework, explicitly describing its application to determining the 3D positions of objects from stereo image pairs. Lucas & Kanade-1981 at 121–126.

By 1987, the DARPA Image Understanding Workshop proceedings documented widespread use of area-based correlation matching for stereo reconstruction, with researchers at SRI International, Carnegie Mellon University, the University of Maryland, and numerous other institutions independently developing and refining correlation-based stereo systems for applications, including autonomous vehicle navigation, cartography, and robotic manipulation. *See, e.g.*, Proceedings of the DARPA Image Understanding Workshop (Feb. 1987). By 1996, Wheeler's doctoral thesis, Automatic Modeling and Localization for Object Recognition, described complete systems for automatically constructing 3D surface models from multiple range images and localizing objects using point-to-point correspondence searches—demonstrating that the integration of correlation-based techniques into end-to-end 3D capture and modeling pipelines was mature and well understood. Wheeler-1996 at 1–8, 53–70.

By 2001, Lewis's paper, *Fast Normalized Cross Correlation*, taught that normalized cross-correlation can be efficiently computed through unnormalized cross-correlation in the transform frequency domain via Fast Fourier Transform (FFT) and subsequently normalizing the cross-correlation using integrals of the image and image$^2$ over the search window. Lewis-2001 at 1-6. This method was developed for, and used in, special effects in the movie *Forrest Gump*, among others. *Id.* at 4-5

These foundational techniques were widely adopted in the facial capture and 3D surface reconstruction references cited herein. Kroos–145 discloses a system for measuring "the detailed motion of an object's surface, such as a human face, accurately and in real time from video image sequences" for "the accurate recovery of three-dimensional object coordinates from two-dimensional images." Kroos–145 at 2:6–15, 2:16–26. Kroos–145 teaches that correspondence

between measurement points is determined "by finding the highest correlation between the texture maps of the subband segments for the two images," and that surface position changes are obtained by "calculating the cross-correlation between the texture maps of the overlay images," "finding the correspondence between each node of the mesh model of the second unit image with each node of the mesh model of the first unit image," and "calculating the relative change in position of each node." Kroos–145 at 3:5–28, 3:49–64. Kroos–145 explains that "[m]otion detection is based on a two-dimensional cross-correlation calculation using the texture map of the face of two consecutive images," and that by this calculation, "correspondence between the nodes is obtained" and "the amount of motion of the central node of the search segment of frame n is determined. This is the motion vector of that node." Kroos–145 at 9:58–67, 10:30–42. Kroos–145 further discloses a hierarchical coarse-to-fine implementation of this cross-correlation process, explaining that "[a]fter the correspondence between the measurement points at the lower level is estimated, correspondence between the measurement points can be determined at the higher level with higher precision" and "[a]s the coarse approximation has been attained at the lower level, complicated computation can be done at the higher level at a relatively high speed." Kroos–145 at 2:50–59; *see also id*. at 9:1–28, 10:64–11:10. The motion vectors obtained at each level are used to deform the mesh model, which is then "three-dimensionally reverse-projected, so that a mesh model of the frame n is obtained." Kroos–145 at 11:44–54, 11:66–12:14.

In another example, Zhang–2004 describes dense stereo reconstruction from multiple camera views based on pixel/window matching and similarity metrics. Zhang–2004 identifies "[t]he key problem" as "comput[ing] correspondences between points in the left and right image, by searching for pixels of similar intensity or color," and explains that "[o]nce the correspondence is known, depth values (i.e., distance from the camera) are readily computed." Zhang–2004 at 2. Zhang–2004 further states that "most stereo algorithms match small windows W0 around (x0, y0)" using "a similarity metric between pixels from two cameras," and generalizes this to spacetime stereo by "searching for the best matching sheared window at each pixel independently," producing depth maps containing "approximately 120K depth points." Zhang–2004 at 3, 5.

In yet another example, Scharstein–2002 expressly identifies "normalized cross-

correlation" as among "[o]ther traditional matching costs," explaining that it "behaves similar to sum-of-squared-differences (SSD)." Scharstein–2002 at 4. Scharstein–2002 explains that "[t]he matching cost values over all pixels and all disparities form the initial disparity space image," that local methods aggregate matching costs over support regions, and that final disparities are computed by choosing "at each pixel the disparity associated with the minimum cost value." Scharstein–2002 at 4–5, 8.

In yet another example, Yang–2003 demonstrates that SSD-based dense stereo was already practical and real time, stating that its algorithm "relies on the traditional sum-of-square-differences (SSD) dissimilarity measure between correlation windows" and "efficiently combines SSD measurements for windows of different sizes" in a multi-resolution approach. Yang–2003 at Abstract, 1. Yang–2003 states that "only correlation-based stereo algorithms are able to provide a dense (per pixel) depth map in real time on standard computer hardware." Yang–2003 at 1. Yang–2003 discloses a plane-sweep approach producing a "reconstructed 3D point cloud" by evaluating "the square difference between the pixel intensities" and selecting the depth with minimum SSD scores, and confirms that combining "SSD scores from different resolutions, from coarse to fine" is "equivalent to using a center weighted filter kernel, which achieves good results close to depth discontinuities as well as on low texture areas." Yang–2003 at 2, 5–6.

In yet another example, Kanade–1997 discloses a multi-baseline stereo method that "recovers dense depth maps, with a depth estimate for every pixel in the intensity image" by comparing "a small window of pixels from one image to corresponding windows in the other image" and computing "the match error—using normalized correlation or sum of squared differences—over the window at each position." Kanade–1997 at 37–38. Kanade–1997 then converts those depth maps into 3D geometry by treating "3D points as vertices of a triangle mesh." Kanade–1997 at 38–39.

Other facial capture references further confirm that correlation, image matching, and stereo correspondence were routinely used for 3D reconstruction. Bouguet–408 discloses maintaining stereo correspondence by minimizing a cost function whose terms include "traditional image matching costs" for temporal tracking and a term "used to maintain correspondence between the

right and left images." Bouguet–408 at [0037]–[0050]. Pighin–1998 discloses refining 3D face mesh annotations "using standard correlation-based search." Pighin–1998 at 7. Borshukov-2003 discloses using "optical flow to track each pixel's motion over time in each camera view," estimating each vertex's 3D position by triangulation to obtain "an accurate reconstruction of the path of each vertex though 3-d space over time." Borshukov-2003 at 1. Eisert–2003 discloses that "the depth of the captured video object is analyzed by disparity matching on the basis of the rectified images" using "a new hybrid block- and pixel-recursive approach." Eisert–2003 at 8–9. Chiang–2002 discloses that "3D geometry is built through temporal matching of dense stereo pairs segmented by Delaunay triangulation." Chiang–2002 at 868, 870. Universal Capture discloses a facial capture method that uses pixel-wise cross-correlation, shown by its description that the system performs "[p]hotogrammetric reconstruction of camera locations." Universal Capture SIGGRAPH Presentation at 2 (DISNEY_REARDEN2_00040196); *see also id.* at 4 (DISNEY_REARDEN2_00040198).

**f. Rendered 3D Animated Face Communication**

As demonstrated in the references cited herein, communicating digital video streams with rendered 3D animated faces was well known in the prior art prior to the alleged priority date of any of the Asserted Patents. For example, Eisert-2003 discloses a 3-D conferencing system that "[i]nstead of transmitting texture and depth information of all conferees for each frame, 3-D models of the participants are created representing their appearance. The models are generated only once in an initial phase, encoded, and transmitted to all devices. During the video conference, motion and facial expressions of the conferees are tracked over time and only a small set of facial animation parameters has to be streamed over the network. … The decoder only has to move and deform the 3-D head-and-shoulder models in the virtual conferencing scene and render it using computer graphics techniques." Eisert-2003 at 8. Eisert-2003 further discloses that "[a]t the end of the processing chain, the virtual conference scene has to be composed and displayed onto the screen as depicted in Fig. 10. The virtual scene is represented by a number of polygons in 3-D space and encoded by the BIFS scene description language of MPEG-4." Eisert-2003 at 7.

In another example, MacVicar-2004 discloses systems and methods of "photogrammetry

based 3D capture systems" that "can be used as an input device for animation." MacVicar-2004 at Abstract. MacVicar-2004 further discloses that its 3D models and movements "can be used as input to a procedural animation package (i.e. CreaToon)." MacVicar-2004 at Abstract. In a further example, Fedorov-2003 discloses a system wherein "the output is a synthetic video sequence showing a 'talking head" and that "[m]odel rendering is the final stage in the pipeline. In the input each frame is a 3D face model deformed in accordance with FAPs while the output is a synthetic video showing a texturized 'talking head', lit and projected on the screen. Visualization functionality is encapsulated in IFAL library and uses OpenGL for 3D model rasterization." Fedorov-2003 at 3-4.

In yet another example, Guenter-1998 discloses a "system for capturing human facial expression and replaying it as a highly realistic 3D 'talking head' consisting of a deformable 3D polygonal face model with a changing texture map." Guenter-1998 at 1. The "facial expression" captured by the system described in Guenter-1998 could be "delivered via CDROM or the internet to a user, and then reconstructed in real time on a user's computer in a virtual 3D environment. The user can select any arbitrary position for the face, any virtual camera viewpoint, and render the result at any size." Guenter-1998 at 1.

In yet another example, Maurer-231 discloses an imaging system that "acquires and digitizes a live video image signal of a person thus generating a stream of digitized video data organized into image frames. … The tracking information may be transmitted via the network to one or more remote sites which receives the information and generates, using a graphics engine, an animated facial image on the avatar display." Maurer-231 at 3:13-30. Maurer-231 also discloses that "[t]o achieve volume morphing, the location of the node positions may be used to drive control points on a mesh. Next, the textures dynamically generated using tags are then mapped onto the mesh to generate a realistic head image." Maurer-231 at 14:9-28.

In yet another example, Gordon-333 discloses a "motion capture system 100 [that] includes three separate networks tied together by a master server 110 that acts as a repository for collected data. … The data network 120 communicates the two-dimensional (2D) data captured during a performance to the master server 110." Gordon-333 at [0048]. Gordon-333 also discloses that "[t]he

reconstruction render network 140 provides high speed data processing computers suitable for performing automated reconstruction of the 2D data files and rendering the 2D data files into three-dimensional (3D) animation files that are stored by the master server 110. … The animators accessing the artists network 130 will also access the 3D animation files in the course of producing the final computer graphics animation." Gordon-333 at [0051].

In yet another example, Mok-710 discloses an "animation sequence [that] is stored in the computer memory of a video game. The video game retrieves each frame of the animation sequence from its memory and displays the frame on a video monitor. When the video game displays each frame of the animation sequence rapidly, a displayed character appears to perform the live action motion in a lifelike manner." Mok-710 at 1:13-16. Mok-710 further discloses that a "graphics processing computer 168 provides files representative of each processed video frame to the animation computer 170," and the "graphics processing computer 168 transfers the scaled frame to the animation computer 170." Mok-710 at 9:29-32, 12:4-7.

The above references are merely exemplary, and further descriptions of communicating digital video streams with rendered 3D animated faces are described in the attached references. For example, Borshukov-2003 discloses producing "a 3-d recording of the real actor's performance and be[ing] able to play it back from different angles and under different lighting conditions," and using image processing outputs which are combined with "image-based skin BRDF estimation, subsurface scattering approximation, and real-world lighting reconstruction for the highly photorealistic human face renderings below." Borshukov-2003 at 1. In yet another example, Vlasic-2005 discloses a system "to generate and drive a detailed 3D textured face mesh for a target identity, which can be seamlessly rendered back into target footage," and methods that "greatly simplify the editing of identity, performance, and facial texture in video, enabling video rewrite applications such as performance animation (puppetry) and actor replacement." Vlasis-2005 at Abstract, 432. Bouguet-408 discloses "[a] machine-readable medium may include a mechanism that provides (i.e., stores and/or transmits) information in a form readable by a machine such as computer or digital processing device. For example, the machine-readable medium may include a read only memory (ROM), random access memory (RAM), magnetic disk storage media, optical

storage media, flash memory devices … The code or instructions can be represented by carrier wave signals, infrared signals, digital signals, and by other like signals." Bouguet-408 at [0025]. In yet another example, the Artem Digital system was used to render 3D animated faces for the Toca Race Drive 3 video game. (DISNEY_REARDEN2_00044910). The Universal Capture system was used to make *The Matrix: Reloaded* film. *See* Universal Capture SIGGRAPH Presentation at 8 (DISNEY_REARDEN2_00040202). Project Gemini also discloses generating animated character faces that can be communicated in videos. Disney SIGGRAPH 2004 Facial Performance Capture Presentation at Page 6 (DISNEY_REARDEN2_00040009).

It was further known that video could be transmitted over the Internet. By 2000, Berger's Chapter, *ATM Networks*, described "Asynchronous Transfer Mode" for "high-speed packet networks…. [that] are well suited for supporting the transport of video." Berger-2000 at 1. The transition from managed networks to the open Internet soon followed. In 2001, Wu published *Streaming Video over the Internet: Approaches and Directions*, observing that "high-speed networks have made it feasible to provide real-time multimedia services over the Internet" and describing "streaming mode" delivery—where video "is being played out while parts of the content are being received and decoded." Wu-2001 at 282.

By 2002, streaming video over networks was described in commercial use. In Apostolopoulos's paper *Video Streaming: Concepts, Algorithms, and Systems*, it was noted that "[t]he growth and popularity of the Internet in the mid-1990's motivated video communication over best-effort packet networks" and described the emergence of streaming media content delivery networks. Apostolopoulos-2002 at 1. Further, Apostolopoulos described that content delivery networks (CDNs) could be employed to stream movies over HTTP/TCP connections. *Id.* at 29-30.

**g. Multi-Resolution Correlation**

As demonstrated in the references cited herein, multi-resolution correlation was well known in the prior art prior to the alleged priority date of any of the Asserted Patents. For example, Kroos-145 discloses a system wherein "[c]orrelation between each node of the image after wavelet transform of frame n and each node of the image after wavelet transform of the frame n-1 is calculated by using a mesh model with low node density, whereby correspondence between the

nodes of the two images can be found. As the node density is low, this process can detect relatively large motion for each region of the face." Kroos-145 at 9:1-10. Kroos-145 also discloses that "based on the motion of each node of the mesh model having low node density detected in the above described manner, the approximate position of each node in a mesh model having higher node density can be determined. Particularly, a node which does not exist in the mesh model of the low node density but existing in the mesh model of higher node density can be estimated by interpolating positions of the nodes in the mesh model of lower node density. The mesh model of higher density thus obtained is superimposed, or overlaid, on the wavelet transform image of the corresponding level. By calculating the correlation of the mesh model and the wavelet transform image of the corresponding level of frame n-1 again, the motion of each node from the previous frame n-1 at this level can be determined." Kroos-145 at 9:11-25. Kroos-145 also discloses "[b]y successively repeating this process from the highest to the lowest level, eventually, the position of each portion of the face can be determined accurately at fine resolution." Kroos-145 at 9:26-28.

In a further example, Yang-2003 discloses a system wherein "[b]y observing correlation curves for a variety of images, one can observe that for large windows the curves mostly only have a single strong minimum corresponding in the neighborhood of the true depth, while for small windows often multiple equivalent minima exist. However, for small windows the minima are typically well localized. Therefore, one would like to combine the global characteristics of the large windows with the well-localized minima of the small windows." Yang-2003 at 3. Yang-2003 further describes that "[s]umming two SSD images obtained for windows differing by only a factor of two (one mipmap-level) is very easy and efficient. It suffices to enable trilinear texture mapping and to enforce the right mipmap-level bias. More SSD images can easily be summed by using multiple texturing units (that can all refer to the same texture data, but using different mipmap-level biases)." Yang-2003 at 3. Yang-2003 further discloses that its "algorithm relies on the traditional sum-of-square-differences (SSD) dissimilarity measure between correlation windows. Unlike conventional approaches, [Yang-2003] combine[s] SSD scores from different resolutions, from coarse to fine. This is, in fact, equivalent to using a center weighted filter kernel, which achieves good results close to depth discontinuities as well as on low texture areas." Yang-2003 at 6.

In yet another example, Maurer-231 discloses "[a] tracking technique based on a Gaussian image pyramid, applied to one dimension, is illustrated in FIG. 10. Instead of using the original image resolution, the image is down sampled 2-4 times to create a Gaussian pyramid of the image. An image pyramid of 4 levels results in a distance of 24 pixels on the finest, original resolution level being represented as only 3 pixels on the coarsest level. Jets may be computed and compared at any level of the pyramid." Maurer-231 at 6:58-65. Maurer-231 discloses "[t]he graph matching process may be formulated as a coarse-to-fine approach that first utilizes graphs with fewer nodes and kernels and then in subsequent steps utilizes more dense graphs. The coarse-to-fine approach is particularly suitable if high precision localization of the feature points in certain areas of the face is desired. Thus, computational effort is saved by adopting a hierarchical approach in which landmark finding is first performed on a coarser resolution, and subsequently the adapted graphs are checked at a higher resolution to analyze certain regions in finer detail." Maurer-231 at 11:1-10.

In yet another example, Zinßer-2004 discloses that "Lucas and Kanade observed that the basin of convergence of their gradient descent algorithm can be increased by suppressing high spatial frequencies. … In order to increase the maximum displacement that can be tolerated by the tracker, we employ a Gaussian image pyramid coupled with a coarse-to-fine strategy for translation estimation. Usually working with three levels of downsampled images, we can considerably extend the basin of convergence." Zinßer-2004 at 3:17-27. Zinßer-2004 further discloses that "[w]e propose to solve the feature drift problem with a two-stage approach. First, pure translation estimation is performed from the last frame to the current frame. Then, the affine motion between the first frame and the current frame is estimated." Zinßer-2004 at 5:44-6:24.

In yet another example, Wang-2004 discloses "a multi-resolution deformable face model. At the coarse level, [Wang-2004] use[s] a mesh with 1K nodes that is suitable for facial animation. The coarse mesh was first developed for robust face tracking in low quality 2-D images [GVM03] and we extend it to 3-D data. This method is fast, and the deformation parameters for each facial motion are few and intuitive. However it cannot capture accurately the large number of local deformations and expression details in our data, so we use it for a coarse-level initial tracking."

Wang-2004 at 678. Wang-2004 further discloses that "[t]he highly local deformations and details in expressions are captured in a second level fitting process. For each frame of the range scan, the resulting mesh from the coarse-level tracking is used to initialize a subdivided refined mesh with 8K nodes. This finer mesh is registered to the frame based on the 3-D extension of a variational algorithm for non-rigid shape registration." Wang-2004 at 678. Wang-2004 further discloses that its "hierarchical tracking and fitting scheme reflects a more accurate model of facial motion. It can not only track global facial motion that is caused by muscle action (coarse level), but fit to subtler expression details that are generated by highly local skin deformations (fine-level)." Wang-2004 at 678.

In yet another example, Huang-2004 discloses "a multi-resolution deformable face model" to "track the facial motion in an expression." Huang-2004 at 2. The disclosed "face model has two resolutions: a coarse-level mesh with 1K nodes and a fine-level mesh with 16K nodes." Huang-2004 at 2. Huang-2004 further discloses that "[a]fter the initial fitting, a hierarchical scheme is adopted to track the intra-frame deformations in an expression. In the coarse level, we use the 1K node face model … In order to fit to expression details, for each frame of the range data, we use the coarse level tracking result to initialize the subdivided 16K node mesh in a higher level. Then this 16K node refined mesh is registered to the frame using the same variational non-rigid shape registration algorithm. This hierarchical tracking/fitting protocol provides a tight coupling between global and local deformations." Huang-2004 at 2-3.

In a further example, Scharstein–2002's taxonomy of dense stereo correspondence algorithms confirms that coarse-to-fine hierarchical strategies were standard for stereo matching. Scharstein–2002 explains that an "alternative approach is to use methods inspired by classic (infinitesimal) optic flow computation" in which "images are successively warped and motion estimates incrementally updated until a satisfactory registration is achieved," and that "[t]hese techniques are most often implemented within a coarse-to-fine hierarchical refinement framework." Scharstein–2002 at 6. Scharstein–2002 further describes how matching cost aggregation can be performed at varying support region sizes—including "square windows or Gaussian convolution (traditional), multiple windows anchored at different points, i.e., shiftable windows," and "windows

with adaptive sizes." Scharstein–2002 at 4.

In yet another example, Zhang–2004 explains that "[g]iven two sequences of images … a time-varying disparity map d(x, y, t) may be computed by applying the above stereo matching procedure to each pair of frames independently," but that "[m]ore accurate and stable results are possible by generalizing stereo matching into the temporal domain." Zhang–2004 at 3. Zhang–2004 further explains that the basic spacetime stereo approach assumes "disparity is nearly constant over a 3D spacetime window W0 × T0 around (x0, y0, t0)," and that to model surfaces more accurately, it approximates "the disparity variation linearly within the space-time window." Zhang–2004 at 3. Zhang–2004 then "reformulate[s] spacetime stereo as a global optimization problem that computes the disparity function, while taking into account gradient constraints between pixels that are adjacent in space and time," and uses the "Gauss-Newton method" with iterative solving until convergence. Zhang–2004 at 3–4.

In yet another example, Kanade–1997 discloses multi-baseline stereo (MBS), which combines matching error estimates from multiple camera pairs at different baselines to improve depth recovery. Kanade–1997 explains that "[a] popular method to compute correspondences between a pair of images compares a small window of pixels from one image to corresponding windows in the other image," computing "the match error—using normalized correlation or sum of squared differences—over the window at each position." Kanade–1997 at 37. Kanade–1997 further explains that "MBS combines the error estimates for each camera pair by computing their sum before finding the minimum error," and that "[t]he inverse depth $\hat{\varsigma}$ for the point is the $\varsigma$ at this minimum." *Id.*

The above references are merely exemplary, and further descriptions of multi-resolution correlation are described in the attached references. For example, Eisert-2003 discloses "a new hybrid block- and pixel-recursive approach, which is able to compute the disparity fields in real-time on a state-of-the-art PC. Apart from a considerable reduction of computational load, the algorithm leads to spatio-temporally consistent depth maps." Eisert-2003 at 6. Eisert-2003 further discloses that "[t]he scheme is embedded in a hierarchical analysis-synthesis framework to avoid error accumulation in the long-term estimation." Eisert-2003 at 8-9. In yet another example, Vlasic-

2005 discloses "[t]o link the parameters of a multilinear model to video data, we use optical flow in conjunction with the weak-perspective camera model. Using the symmetric Kanade-Lucas-Tomasi formulation [Birchfield 1996], we express the frame-to-frame motion of a tracked point with a linear system." Vlasic-2005 at 430. Vlasic-2005 further discloses "[t]aking into account several levels of multi-scale and several passes through the whole video, the tracking process averages at one frame per second." Vlasic-2005 at 431.

**h. Temporal 3D Point Correlation**

As demonstrated in the references cited herein, facial capture using temporal 3D point correlation was well known in the prior art prior to the alleged priority date of any of the Asserted Patents. For example, Wang-2004 discloses "the use of high resolution dynamic 3-D shape data that capture very accurate geometry at speeds that exceed video frame rate. When scanning faces, our system returns an average of 75 thousand 3-D measurements per frame, at 40Hz frame rate, with an RMS of 0.05mm." Wang-2004 at 678. Wang-2004 further discloses using "global 3-D locations of 8K model nodes after precise model fitting to the motion capture data … These 3-D model nodal positions estimate a person's facial geometry and motion style for a given type of expression … Our approach allows us to go beyond traditional morphing between two static faces, to dynamic morphing of geometry and expressions." Wang-2004 at 683.

In a further example, Huang-2004 discloses a "hierarchical framework for high resolution, nonrigid facial expression tracking. The high quality dense point clouds of facial geometry moving at video speeds are acquired using a phase-shifting based structured light ranging technique." Huang-2004 at Abstract. Huang-2004 further discloses that "[t]he face model has two resolutions: a coarse-level mesh with 1K nodes and a fine-level mesh with 16K nodes." Huang-2004 at 2.

In yet another example, Guenter-1998 discloses using "data to reconstruct photorealistic, 3D animations of the captured expressions. The system uses a large set of sampling points on the face to accurately track the three dimensional deformations of the face." Guenter-1998 at Abstract. Guenter-1998 further discloses an "[i]mage quality of 30 frame per second animations, reconstructed at approximately 300 by 400 pixels, is still good at data rates as low as 240 Kbits per second … the accurate 3D tracking of a large number of points on the face results in an accurate

3D model of facial expression." Guenter-1998 at 10.

In yet another example, MacVicar-2004 discloses a "3D Dynamic Capture System … [that] facilitates the capture of 3D models of human subjects at 25 frames per second. The 3D-DCS consists of 16 monochrome cameras and 8 colour cameras," and that a "single generic mesh is conformed to each frame of a captured sequence in turn resulting in a new sequence of models with the shape and motion from the scanned data but having the mesh structure of the generic model." MacVicar-2004 at 1, 3-4.

In a further example, Kroos–145 discloses a system that performs temporal 3D point correlation by tracking the motion of each portion of the facial surface across successive video frames using cross-correlation and then recovering three-dimensional positions. Kroos–145 discloses "frame-by-frame processing (motion tracking)" in which "information representing each portion of one's face in a present frame is represented with respect to the reference frame and stored in memory." Kroos–145 at 6:8–25. At each frame, Kroos–145 performs cross-correlation between the texture maps of successive frames to determine node correspondence and motion vectors, and the results are then "reverse-projected to the three-dimensional value corresponding to the original face area" so that "the three-dimensional position of each portion of the face in frame n is established." Kroos–145 at 8:40–50. Kroos–145 thus disclosed temporal tracking of 3D facial surface points by performing cross-correlation on successive frames and recovering 3D coordinates through reverse projection at each time step.

In yet another example, Bouguet–408 discloses temporal 3D point correlation by tracking facial features in 3D across successive stereo frames. Bouguet–408 discloses that "[a] 3D structure of each face in each frame at time n can be represented as a collection of N points Pni(i=1, . . . , N)." Bouguet–408 at [0034]. Bouguet–408 further discloses stereo tracking from frame n-1 to frame n by "minimizing a cost function Ei" that includes "traditional image matching costs accounting terms for independent left and right temporal tracking" and a term "used to maintain correspondence between the right and left images." Bouguet–408 at [0049]–[0050].

In yet another example, Gordon–333 discloses temporal 3D point correlation through a motion capture system that resolves two-dimensional marker data from multiple cameras into three-

dimensional trajectories over time. Gordon–333 discloses that "[t]he two-dimensional data files are then resolved into a single set of three-dimensional coordinates that are linked together in the form of trajectory files representing movement of individual markers as part of an image processing process." Gordon–333 at [0032].

In yet another example, Kanade–1997 explains that "the extension to dynamic scenes is straightforward" and that the system applies "static scene analysis at each sample of a 3D time-varying event to create the illusion not only of continuous scene motion but also of a continuous user-controlled viewpoint." Kanade–1997 at 42. At each time instant, Kanade–1997 generates a scene description consisting of an image and an aligned depth map, converts depth into "(x, y, z) coordinates," and treats "3D points as vertices of a triangle mesh." Kanade–1997 at 38–39. Kanade–1997 further discloses creating "object-centered models of the scene by merging the scene descriptions" using "a voxel-based approach for the merging, with each scene description voting for the presence or absence of surfaces in the 3D world based on the depth map from that transcription angle." Kanade–1997 at 42–43.

The above references are merely exemplary, and further descriptions of facial capture using temporal 3D point correlation are described in the attached references. For example, Borshukov-2003 discloses using "optical flow to track each pixel's motion over time in each camera view … at each frame the 3-d position is estimated using triangulation. The result is an accurate reconstruction of the path of each vertex though 3-d space over time." Borshukov-2003 at 1. In a further example, Zhang-2004 discloses a system that "takes as input 6 synchronized video streams … running at 60 frames-per-second (fps), and outputs a 20 fps sequence of high-resolution 3D meshes that capture face geometry, color, and motion," and "[e]ach face model has roughly 16K vertices and template tracking takes less than 1 minute per frame." Zhang-2004 at 2, 7. In yet another example, Vlasic-2005 discloses using "detailed 3D scans (~ 30K vertices)" and that by "linking the multilinear model to optical flow, we obtain a tracker that estimates performance parameters and detailed 3D geometry from video recordings … our system tracks approximately a thousand vertices." Vlasic-2005 at 427, 428, 431. In yet another example, Chiang-2002 discloses a "total of 1000 mesh points are inserted and over 2000 triangles are constructed on each 2D frame

of the video acquired … A displacement map D, representing the motion characteristics of a given facial expression, is obtained by grouping all the mesh points' ensemble movement vector." Chiang-2002 at 868. Chiang-2002 further discloses that by "[c]ombining 3D facial model G and the corresponding displacement map D, an animated 3D facial geometry can be constructed." *Id.* In yet another example, Artem Digital that its captured images can be "sampled at any rate". 2006.02.10 Artem Digital – Scanning Fact Sheet (DISNEY_REARDEN2_00039626). Universal Capture discloses a facial capture method utilizing optical flow in each camera view that "triangulate[s camera captures] to obtain 3D-motion." Universal Capture SIGGRAPH Presentation at 2 (DISNEY_REARDEN2_00040196). Project Gemini also discloses a facial performance capture system that temporally correlates points in a 3D mesh by tracking the facial movements over time, as shown by the "Image and model" and "Tracking registration" slides in a 2004 SIGGRAPH Presentation. Disney SIGGRAPH 2004 Facial Performance Capture Presentation at Page 6 (DISNEY_REARDEN2_00040009).

**i. 3D Facial Motion Tracking**

As demonstrated in the references cited herein, 3D facial motion tracking was well known in the prior art prior to the alleged priority date of any of the Asserted Patents. For example, Borshukov-2003 discloses an algorithm that "works by projecting a vertex of the model into each of the cameras and then tracking the motion of that vertex in 2-d using the optical flow where at each frame the 3-d position is estimated using triangulation. The result is an accurate reconstruction of the path of each vertex though 3-d space over time." Borshukov-2003 at 1.

In a further example, Wang-2004 discloses a facial motion tracking system using "high resolution dynamic 3-D shape data that capture very accurate geometry at speeds that exceed video frame rate," with the system returning "an average of 75 thousand 3-D measurements per frame" that "allows for the capture of subtle expressions as well as the temporal study of facial expressions." Wang-2004 at 678. Wang-2004 further discloses that the system uses a data-driven approach that "consists of four parts: 1) High speed, high accuracy capture of moving faces without the use of markers, 2) Very precise tracking of facial motion using a multi-resolution deformable mesh, 3) A unified low dimensional mapping of dynamic facial motion that can separate expression

style, and 4) Synthesis of novel expressions as a combination of expression styles. The accuracy and resolution of our method allows us to capture and track subtle expression details." Wang-2004 at Abstract.

In yet another example, Vlasic-2005 discloses a system that obtains "a tracker that estimates performance parameters and detailed 3D geometry from video recordings: where the "model defines a mapping from performance parameters back to 3D shape, thus we can arbitrarily mix pose, identity, expressions, and visemes from two or more videos and render the result back into a target video." Vlasic-2005 at 427. Vlasic-2005 further discloses a "system on two separate face models: a bilinear model, and a trilinear model" where "[b]oth were estimated from detailed 3D scans (~ 30K vertices) acquired with 3dMD/3Q's structured light scanner." Vlasic-2005 at 428.

The above references are merely exemplary, and further descriptions of 3D facial motion tracking are described in the attached claim charts. For example, Zhang-2004 discloses "an end-to-end system that goes from video sequences to high resolution, editable, dynamically controllable face models. … A novel spacetime stereo algorithm is introduced to compute depth maps accurately … A new template fitting and tracking procedure fills in missing data and yields point correspondence across the entire sequence without using markers." Zhang-2004 at 10. Zhang-2004 further discloses that its "system takes as input 6 synchronized video streams (4 monochrome and 2 color) running at 60 frames-per-second (fps), and outputs a 20 fps sequence of high-resolution 3D meshes that capture face geometry, color, and motion." Zhang-2004 at 2. Bouguet-408 discloses stereo images taken with a "left camera" and a "right camera" for "stereo tracking to build [a] data-driven model" and further describes a "deformable face model" generated from a "3D structure of each face in each frame at time n." Bouguet-408 at [0008], [0034] Figs. 3, 5.

In yet another example, Maurer-231 discloses a "facial sensing process" that "tracks the positions and characteristics of facial features from frame to frame." Maurer-231 at 3:22-24. This process is further described in Figure 9 which shows "robust tracking [of facial features] over long frame sequences by using a tracking correction scheme that detects whether tracking of a feature or node has been lost and reinitializes the tracking process for that node." *Id.* at 6:16-22, Fig. 9.

In a further example, Kroos-145 discloses a "process of facial motion tracking [that] is done

by determining the location changes of small parts of the facial surface between successive frames." Kroos-145 at 7:62-65, Figs. 3, 5.

In yet another example, Chuang-2002 discloses a tracking model that uses pre-warped images "projected onto the basis set of eigenvectors using only the pixel intensity values. Since the eigenvectors of the image database consists of both the pixel intensity values and the feature locations, the facial features of each frame can be obtained." Chuang-2002 at 3.

In yet another example, Artem Digital that its captured images can be "sampled at any rate". 2006.02.10 Artem Digital – Scanning Fact Sheet (DISNEY_REARDEN2_00039626). Universal Capture discloses a facial capture method utilizing optical flow in each camera view that "triangulate[s camera captures] to obtain 3D-motion." Universal Capture SIGGRAPH Presentation at 2 (DISNEY_REARDEN2_00040196). Project Gemini also discloses a facial performance capture system that temporally correlates points in a 3D mesh by tracking the facial movements over time, as shown by the "Image and model" and "Tracking registration" slides in a 2004 SIGGRAPH Presentation. Disney SIGGRAPH 2004 Facial Performance Capture Presentation at Page 6 (DISNEY_REARDEN2_00040009).

**j. Expression Transfer / Retargeting**

As demonstrated in the references cited herein, facial motion capture with expression transfer and/or retargeting was well known in the prior art prior to the alleged priority date of any of the Asserted Patents. For example, Vlasic-2005 discloses that "[f]ace Transfer is a method for mapping videorecorded performances of one individual to facial animations of another. It extracts visemes (speech-related mouth articulations), expressions, and three-dimensional (3D) pose from monocular video or film footage. These parameters are then used to generate and drive a detailed 3D textured face mesh for a target identity, which can be seamlessly rendered back into target footage." Vlasic-2005 at Abstract. Vlasic-2005 also discloses that "Figure 7C shows a post-production example, where a repeat performance is transferred onto the old footage. From left to right, we present the original video frame, a frame from a new video, the new geometry, and the final modified frame (without blending). Here, we combine the pose from the original video with the expression from the new video to modify original expressions." Vlasic-2005 at 431.

In a further example, Noh-2001 discloses that "[o]nce high-quality facial animations are created for any model by any available mechanisms, expression cloning (EC) reuses the dense 3D motion vectors of the vertices of the source model to create similar animations on a new target model. Animations of completely new characters can be based on existing libraries of high-quality animations created for many different models." Noh-2001 at 278. Noh-2001 further discloses that "[a]lthough the models have different geometric proportions and mesh structures, the expressions are well scaled to fit each model. For instance, the smile and nervous expressions are effectively transferred to the woman model … Frown and surprise expressions are shown on the cat model." Noh-2001 at 283.

In yet another example, Wang-2004 discloses a system for facial capture with "two types of synthesis results: morphing of geometry and expression between dynamic expression sequences of different individuals and expression transfer from a source face to a target face, without further changes in facial geometry." Wang-2004 at 679. Wang-2004 further discloses that "[i]n our experiments we analyzed the smiling expressions from three actors. Using our decomposable generative model, we analyzed the motion style factor for each person … Therefore, we can transfer one actor's motion style to another actor regardless of her facial geometry. In Figure 9, we show two different base faces and the generation of new motion styles by combining different style factors." Wang-2004 at 684.

The above references are merely exemplary, and further descriptions of facial motion capture with expression transfer and/or retargeting are described in the attached references. For example, Chuang-2002 discloses a facial motion capture system with "several sample frames from the input video sequence and the corresponding retargeting facial animation" where "the facial expression of the 3D model mirrors that of the input video sequence as desired." Chuang-2002 at 7. Chuang-2007 further discloses "The affine motion extracted during the facial capture stage is used to produce the global head motion in the retargeted sequence." Chuang-2002 at 7. In yet another example, Borshukov-2003 discloses a facial motion capture system wherein the "reconstructed motion contains the global 'rigid' head movement" and "[i]n order to attach facial performances to CG bodies or blend between different performances this movement must be

removed." Borshukov-2003 at 1. In yet another example, Artem Digital's generated facial outputs can differ from the captured input and correspond to completely different characters. *See, e.g.*, 4D_Freeview_demo.mp4 (DISNEY_REARDEN2_00039666). Universal Capture discloses manipulating the facial outputs in generated characters to be different from the input of the performer's face. *See, e.g.*, Universal Capture SIGGRAPH Presentation at 2 (DISNEY_REARDEN2_00040196). Project Gemini discloses that the system can generate a variety of "Output Characters" with different facial features in from a single "Input Actor". Disney SIGGRAPH 2004 Facial Performance Capture Presentation at Page 7 (DISNEY_REARDEN2_00040010).

To the extent Rearden contends that Disney's prior art fails to disclose one or more limitations of the Asserted Claims based on a claim construction or interpretation that is not apparent to Disney at this time (e.g., because of the lack of clarity in Rearden's infringement allegations), Disney reserves the right to identify additional prior art references that, when combined with Disney's asserted prior art, would render the claims obvious despite the allegedly missing limitation.

**5. Exemplary Combinations that Render the '248 Patent Obvious under § 103**

The following exemplary combinations describe the circumstances under which it would have been obvious to combine the references described and categorized above, and the ways in which those combinations would render obvious the Asserted Claims of the '248 patent. These combinations are exemplary and not intended to limit Disney's ability to rely on other combinations of prior art references identified in Section III above, Exhibit 248-A, or elsewhere in these Invalidity Contentions. *See Avago Techs. Gen. IP PTE Ltd. v. Elan Microelectronics Corp.*, No. C04 05385 JW HRL, 2007 WL 951818, at *4 (N.D. Cal. Mar. 28, 2007); *Keithley v. The Homestore.com, Inc.*, 553 F. Supp. 2d 1148, 1150 (N.D. Cal. 2008); *Asia Vital Components Co. v. Asetek Danmark A/S*, No. 16-CV-07160-JST, 2018 WL 4945316, at *4 (N.D. Cal. Oct. 11, 2018).

The categorizations of references used here are defined as follows:

| Categorization | References |
|---|---|
| **Primary References** | Borshukov-2003; Bouguet-408; Chiang-2002; D'Apuzzo-2003; Eisert-2003; Gordon-333; Guenter-1998; Pighin-1998; Wang-2004; Zhang-2004; Universal Capture System; Artem Digital; Project Gemini |
| **"248 Frame Correlation / High-Resolution 3D Mesh Reconstruction"** | Zhang-2004; Wang-2004; Borshukov-2003; Eisert-2003; Chiang-2002; Bouguet-408; Guenter-1998; D'Apuzzo-2003; Huang-2004; MacVicar-2004; Kanade-1997; Bourke-1996; Hannah; Lucas & Kanade; Yang-2003; Kroos-145; Gordon-333; Hawkins-2004; Pighin-1998; Scharstein-2002; Urquhart-1997; Light Stage; Universal Capture System; Artem Digital; Project Gemini |
| **"248 Multi-Camera Capture"** | Zhang-2004; Borshukov-2003; D'Apuzzo-2003; Gordon-333; Wang-2004; Eisert-2003; Chiang-2002; Kanade-1997; MacVicar-2004; Pighin-1998; Bouguet-408; Guenter-1998; Maurer-231; Mok-710; Scharstein-2002; Light Stage; Artem Digital; Urquhart-1997; Hawkins-2004; Universal Capture System; Artem Digital; Project Gemini |
| **"248 Automatic 3D Point Tracking / Fold & Deform"** | Zhang-2004; Borshukov-2003; Wang-2004; Chuang-2002; Chiang-2002; Bouguet-408; Guenter-1998; Eisert-2003; Huang-2004; Vlasic-2005; MacVicar-2004; Kroos-145; Maurer-231; Zinßer-2004; D'Apuzzo-2003; Fedorov-2003; Gordon-333; Noh-2001; Pighin-1998; Scharstein-2002; Light Stage; Artem Digital; Universal Capture System; Project Gemini |
| **"248 Markerless 3D Point Identification"** | Zhang-2004; Wang-2004; Bouguet-408; Borshukov-2003; Chuang-2002; Gordon-333; Chiang-2002; D'Apuzzo-2003; Vlasic-2005; MacVicar-2004; Huang-2004; Kroos-145; Project Gemini; Maurer-231; Scharstein-2002; Urquhart-1997; Artem Digital; Light Stage; Universal Capture System |
| **"248 Facial Feature Tracking (Eyes, Lips, Teeth)"** | Chuang-2002; Eisert-2003; Wang-2004; Zhang-2004; Bouguet-408; Guenter-1998; Pighin-1998; Vlasic-2005; Maurer-231; Fedorov-2003; Artem Digital; Light Stage; Project Gemini |
| **"248 Facial Expression Correspondence"** | Wang-2004; Chuang-2002; Pighin-1998; Eisert-2003; Borshukov-2003; Zhang-2004; Guenter-1998; Chiang-2002; Vlasic-2005; Noh-2001; Fedorov-2003; MacVicar-2004; Bouguet-408; D'Apuzzo-2003; Gordon-333; Huang-2004; Kroos-145; Maurer-231; Mok-710; Zinßer-2004; Light Stage; Artem Digital; Universal Capture System; Project Gemini |
| **"248 Non-Successive Frame** | Zhang-2004; Borshukov-2003; Pighin-1998; Mok-710; |

| **Categorization** | **References** |
|---|---|
| **Times"** | Kroos-145; Illsley-075; Noh-2001; Zinßer-2004; Kanade-1997; Light Stage; Universal Capture System |
| **"248 Multi-Resolution Correlation"** | Wang-2004; Eisert-2003; Zhang-2004; Kroos-145; Yang-2003; Maurer-231; Zinßer-2004; Huang-2004; Hannah; Lucas & Kanade; Vlasic-2005; Scharstein-2002 |

Further, the combinations of categorizations asserted herein as rendering the Asserted Claims of the '248 patent obvious, for which exemplary details are provided in the sections below, include at least the following:

| **Bases for Obviousness under § 103** |
|---|
| Zhang-2004 alone |
| Any Primary Reference in view of one or more of the 248 Frame Correlation / High-Resolution 3D Mesh Reconstruction References |
| Any Primary Reference in view of one or more of the 248 Automatic 3D Point Tracking / Fold & Deform References |
| Any Primary Reference in view of one or more of the 248 Markerless 3D Point Identification References |
| Any Primary Reference in view of one or more of the 248 Multi-Resolution Correlation References |
| Any Primary Reference in view of one or more of the 248 Non-Successive Frame Times References |
| Any Primary Reference in View of One or More of the 248 Facial Feature Tracking (Eyes, Lips, Teeth) References |
| One or more of the 248 Multi-Camera Capture References in view of one or more of the 248 Frame Correlation / High-Resolution 3D Mesh Reconstruction References |
| One or more of the 248 Frame Correlation / High-Resolution 3D Mesh Reconstruction References in view of one or more of the 248 Automatic 3D Point Tracking / Fold & Deform References |
| One or more of the 248 Multi-Resolution Correlation References in view of one or more of the 248 Frame Correlation / High-Resolution 3D Mesh Reconstruction References |
| One or more of the 248 Automatic 3D Point Tracking / Fold & Deform References in view of |

| Bases for Obviousness under § 103 |
| --- |
| one or more of the 248 Facial Expression Correspondence References |

**a. Zhang-2004 Alone**

The asserted claims of the ’248 patent are obvious in view of Zhang-2004 alone, at least under Rearden’s apparent infringement theory, and/or in combination with the knowledge of one of ordinary skill in the art.

As described in Exhibit 248-A27 and above, Zhang-2004 discloses an end-to-end facial capture system that discloses every claim limitation of the ’248 patent: Zhang-2004 discloses markerless multi-camera facial capture, stereo depth computation, 3D mesh reconstruction, temporal tracking, non-successive/non-pattern frame processing, optical flow, and point correspondence across a captured sequence. For example, Zhang-2004 discloses a “capture system [that] employs synchronized video cameras … to record videos of a moving face from multiple viewpoints,” taking “as input 6 synchronized video streams (4 monochrome and 2 color) running at 60 frames-per-second (fps).” Zhang-2004 at Abstract, 2. Zhang-2004 also discloses correlating those multi-camera frames to create high-resolution 3D meshes, as its system “outputs a 20 fps sequence of high-resolution 3D meshes that capture face geometry, color, and motion,” using structured-light patterns to “facilitate depth computation” through binocular stereo matching between camera pairs. Zhang-2004 at 2. Zhang-2004 further discloses automatic tracking of 3D points as the face folds and deforms, through a “template fitting and tracking procedure [that] fills in missing data and yields point correspondence across the entire sequence without using markers,” where each face model has “roughly 16K vertices” and the template mesh is deformed “smoothly through the rest of the sequence such that the shape matches the depth maps and the vertex motions match the optical flow.” Zhang-2004 at Abstract, 5–7.

Zhang-2004 therefore discloses, or at minimum renders obvious, the core subject matter that Rearden appears to attribute to the ’248 patent: capturing images of a performer’s face from multiple viewpoints over time; using image-based techniques to determine 3D surface geometry; generating a sequence of 3D meshes; and tracking facial motion over successive captured frames

without facial markers. To the extent Rearden contends that Zhang-2004 does not disclose or alone render obvious a particular implementation detail—such as Rearden's asserted "correlation" construction, a particular multi-resolution correlation loop, the use of non-successive frames in the precise manner accused, or rendering/retargeting output—such limitations would have been obvious to a person of ordinary skill in view of Zhang-2004's teachings and the state of the art. Zhang-2004 addresses the same problem as the '248 patent, e.g., capturing detailed, temporally varying facial geometry for animation, and uses the same general solution path: multi-view image capture, stereo reconstruction, dense 3D modeling, and temporal tracking.

**b. Any Primary Reference in View of One or More of the 248 Frame Correlation / High-Resolution 3D Mesh Reconstruction References**

The asserted claims of the '248 patent are obvious in view of any Primary Reference in combination with any one or more of the 248 Frame Correlation / High-Resolution 3D Mesh Reconstruction References.

Certain claim limitations require correlating frames from a plurality of cameras to create a high-resolution 3D mesh corresponding to the performer's facial shape. To the extent Rearden contends that any Primary Reference does not disclose or alone render obvious the particular correlation or 3D mesh reconstruction technique required by this limitation—whether under Rearden's asserted construction of "correlation" as requiring pixel-wise cross-correlation, or under any other construction—it would have been obvious to a person of ordinary skill in the art to implement the depth computation or 3D reconstruction step using known correlation-based techniques disclosed in the 248 Frame Correlation / High-Resolution 3D Mesh Reconstruction References.

The motivation to combine is particularly strong because the Specification admits that "pixel-wise, normalized cross-correlation is well known in the art" and identifies Bourke-1996 as an exemplary discussion. '226 patent at 13:46–51. A person of ordinary skill seeking to reconstruct 3D facial geometry from multi-camera image data would naturally have looked to conventional stereo correspondence techniques, including normalized cross-correlation, sum-of-square-

differences, iterative image registration, multi-camera stereo, disparity estimation, stereo tracking, and multi-scale block matching. The Primary References that disclose multi-camera facial capture provide the image inputs; the 248 Frame Correlation / High-Resolution 3D Mesh Reconstruction References provide known algorithms for determining image correspondence and generating 3D meshes from those inputs.

A person of ordinary skill would have had a reasonable expectation of success because correlation-based stereo matching, triangulation, and 3D mesh reconstruction from multi-view images were well-established techniques long before the Asserted Patents' priority date. The combination would have involved no more than the predictable use of known reconstruction algorithms with known multi-camera facial image data.

**c. Any Primary Reference in View of One or More of the 248 Automatic 3D Point Tracking / Fold & Deform References**

The asserted claims of the '248 patent are obvious in view of any Primary Reference in combination with any one or more of the 248 Automatic 3D Point Tracking / Fold & Deform References.

Certain claim limitations require that a first plurality of 3D points in the high-resolution 3D mesh automatically track a second plurality of 3D points within regions of the performer's face as they fold or deform. To the extent Rearden contends any Primary Reference does not disclose or alone render obvious automatic tracking of 3D mesh points through facial deformation, the 248 Automatic 3D Point Tracking / Fold & Deform References disclose that feature.

A person of ordinary skill would have been motivated to combine any Primary Reference with any one or more of the 248 Automatic 3D Point Tracking / Fold & Deform References because a static or per-frame 3D reconstruction provides shape at an instant in time, but facial performance capture requires tracking how that shape changes over time as the face folds and deforms. The 248 Automatic 3D Point Tracking / Fold & Deform References disclose precisely those tracking techniques. Zhang-2004 fits a template mesh to depth maps and tracks it through the sequence using optical flow. Zhang-2004 at 5–6. Borshukov-2003 tracks each vertex's motion in 2D using optical flow and estimates the 3D position at each frame using triangulation, producing "an accurate

reconstruction of the path of each vertex though 3-d space over time." Borshukov-2003 at 1. Wang-2004 and Huang-2004 use multi-resolution deformable meshes to track facial motion through expressions. Chiang-2002 captures "motion dynamics … by comparing coordinates of the matching mesh points temporally." Chiang-2002 at 868. MacVicar-2004 conforms a generic mesh to each captured frame. MacVicar-2004 at 3-4. Kroos-145 determines "location changes of small parts of the facial surface between successive frames." Kroos-145 at 7:62–65. Artem Digital, Universal Capture, and Project Gemini also disclose automatically tracking facial motion.

A person of ordinary skill would have had a reasonable expectation of success because temporal tracking of deformable meshes was a standard technique in the facial capture field. Applying known mesh-tracking, optical-flow, or deformable-model techniques to a 3D mesh generated by any Primary Reference would have involved routine implementation choices, not inventive experimentation.

**d. Any Primary Reference in View of One or More of the 248 Markerless 3D Point Identification References**

The Asserted Claims of the '248 patent are obvious in view of any Primary Reference in combination with any one or more of the 248 Markerless 3D Point Identification References.

Certain claim limitations require that the tracked 3D points on the performer's face are not identified by markers. To the extent Rearden contends any Primary Reference does not disclose or alone render obvious markerless 3D point identification and tracking, it would have been obvious to a person of ordinary skill to implement the same facial capture and tracking functionality without markers, using the markerless techniques disclosed in the 248 Markerless 3D Point Identification References.

A person of ordinary skill would have been motivated to combine these references because the limitations of marker-based capture were well recognized: markers can be intrusive, limit resolution to the density of applied markers, and require manual application. The 248 Markerless 3D Point Identification References disclose markerless alternatives that overcome these limitations. Zhang-2004's "mesh tracking method is fully automatic without requiring markers to be placed on the subject's face." Zhang-2004 at 7. Wang-2004 discloses "high speed, high accuracy capture of

moving faces without the use of markers." Wang-2004 at Abstract. Bouguet-408 describes "3D tracking of pose and deformation … without the use of invasive special markers." Bouguet-408 at [0083]. Borshukov-2003 "did not use any markers on the face to assist feature tracking." Borshukov-2003 at 1. Gordon-333 discloses that "physical features of the actors (e.g., shapes of nose or eyes) could be used as natural markers to track motion." Gordon-333 at [0047]. Chuang-2002 discloses "a model-based technique that can reliably track a marker-less face." Chuang-2002 at 3. Artem Digital, Universal Capture, and Project Gemini also disclose markerless facial motion capture systems.

A person of ordinary skill would have had a reasonable expectation of success because marker-based and markerless approaches were known alternatives in the same field. Substituting markerless tracking for marker-based tracking in a multi-camera facial capture system would have been a predictable design choice yielding predictable results.

**e. Any Primary Reference in View of One or More of the 248 Multi-Resolution Correlation References**

The asserted claims of the '248 patent are obvious in view of any Primary Reference in combination with any one or more of the 248 Multi-Resolution Correlation References.

Certain claim limitations require correlating 2D frames at a first resolution and then correlating at a second, higher resolution. To the extent Rearden contends any Primary Reference does not disclose or alone render obvious multi-resolution correlation, the 248 Multi-Resolution Correlation References disclose that technique.

The Specification acknowledges that downsampling, upsampling, perspective warping, and coarse-to-fine iterative loops were known in the art. '226 patent at 12:2–4, 14:23–29, 16:31–34, 16:36–49; '565 Provisional at 27. The 248 Multi-Resolution Correlation References confirm this. Kroos-145 discloses correlating at low node density to detect large motion, then refining at higher density. Kroos-145 at 9:1–28. Yang-2003 discloses combining SSD scores "from different resolutions, from coarse to fine." Yang-2003 at 6. Maurer-231 discloses Gaussian image pyramids and "a coarse-to-fine approach that first utilizes graphs with fewer nodes … and then in subsequent steps utilizes more dense graphs." Maurer-231 at 11:1–10. Wang-2004 and Huang-2004 disclose

multi-resolution deformable face models with coarse-level (1K node) and fine-level (8K–16K node) meshes. Zinßer-2004 discloses Gaussian image pyramids coupled with coarse-to-fine translation estimation. Hannah and Lucas & Kanade disclose foundational hierarchical image-matching and image-registration techniques.

A person of ordinary skill would have been motivated to apply multi-resolution processing to correlation-based reconstruction because it improves computational efficiency, increases robustness to large displacements, and yields finer detail at higher resolutions—the same tradeoffs the ’248 patent’s own Figure 15 algorithm addresses. A person of ordinary skill would have had a reasonable expectation of success because multi-resolution correlation was a standard, well-validated approach in stereo vision, optical flow, and facial tracking.

**f. Any Primary Reference in View of One or More of the 248 Non-Successive Frame Times References**

The asserted claims of the ’248 patent are obvious in view of any Primary Reference in combination with any one or more of the 248 Non-Successive Frame Times References.

Certain claim limitations require that at least some of the time intervals at which the system operates are not successive frame times. To the extent Rearden contends any Primary Reference does not disclose or alone render obvious non-successive frame processing, the 248 Non-Successive Frame Times References disclose that feature.

Zhang-2004 already discloses non-successive frame processing: its projectors “send a ‘blank’ pattern every three frames,” and the system processes only the non-pattern frames for color texture and optical flow, producing a 20 fps output from a 60 fps input. Zhang-2004 at 2. Borshukov-2003 discloses keyshaping—manually correcting geometry when optical-flow drift becomes unacceptable and propagating those corrections to previous frames. Borshukov-2003 at 1. Pighin-1998 discloses constructing 3D models for selected facial expressions and interpolating between them. Mok-710 discloses key-frame techniques in which “an animator reduces the number of frames by selecting only those video frames that are necessary to show lifelike motion.” Mok-710 at 1:33–35. Kroos-145 discloses skipping levels “in order to decrease processing time.” Kroos-145 at 3:31–36. Illsley-075 discloses “tak[ing] only one picture every two video pictures.”

Illsley-075 at [0038]. Artem Digital discloses that its captured images can be "sampled at any rate" which allows expressions to be morphed between. DISNEY_REARDEN2_00039626. Universal Capture discloses a facial capture method utilizing optical flow in each camera view that "triangulate[s camera captures] to obtain 3D-motion." DISNEY_REARDEN2_00040196.

A person of ordinary skill would have been motivated to use non-successive frames to reduce computational burden, manage frame rates, address drift, or select frames that provide the most useful information for geometry reconstruction, texture capture, or optical flow. A person of ordinary skill would have had a reasonable expectation of success because frame selection, keyframing, and interpolation were routine and predictable techniques in video processing, computer graphics, and motion capture.

**g. Any Primary Reference in View of One or More of the 248 Facial Feature Tracking (Eyes, Lips, Teeth) References**

The asserted claims of the '248 patent are obvious in view of any Primary Reference in combination with any one or more of the 248 Facial Feature Tracking (Eyes, Lips, Teeth) References.

Certain claim limitations require that the automatically tracked 3D points include some or all parts of the eyes, lips, or teeth. To the extent Rearden contends any Primary Reference does not disclose or alone render obvious tracking of these specific facial features, the 248 Facial Feature Tracking (Eyes, Lips, Teeth) References disclose that feature.

A person of ordinary skill would have been motivated to ensure that automatically tracked 3D points encompass the eyes, lips, and teeth because these are the most expressive and communicatively important regions of the face. Chuang-2002 discloses a model-based tracker that captures "facial features of each frame" including the mouth and eye regions. Chuang-2002 at 3. Eisert-2003 discloses a parameterized 3D head model that tracks facial expressions including mouth and eye movements. Eisert-2003 at 8–9. Wang-2004 captures "subtle expressions" and "expression details" using a multi-resolution deformable mesh encompassing the full face. Wang-2004 at Abstract, 678. Guenter-1998 tracks a "large set of sampling points on the face" covering all facial regions including eyes, mouth, and surrounding areas. Guenter-1998 at Abstract.

Fedorov-2003 explicitly models "skin, eyes, pupils, teeth, tongue" as separate objects in its facial animation system. Fedorov-2003 at 3.

A person of ordinary skill would have had a reasonable expectation of success because tracking of facial features including eyes, lips, and teeth was a fundamental objective of facial motion capture systems, and the referenced tracking algorithms were designed to capture precisely these regions.

#### h. One or More of the 248 Multi-Camera Capture References in View of One or More of the 248 Frame Correlation / High-Resolution 3D Mesh Reconstruction References

The asserted claims of the '248 patent are obvious in view of any one or more of the 248 Multi-Camera 2D Frame Capture References in combination with any one or more of the 248 Frame Correlation / High-Resolution 3D Mesh Reconstruction References.

This combination addresses the two core elements of the '248 patent's independent claims: the capture hardware and the reconstruction processing. The 248 Multi-Camera 2D Frame Capture References disclose multi-camera systems that capture 2D frames of a performer's face from multiple viewpoints over time. The 248 Frame Correlation / High-Resolution 3D Mesh Reconstruction References disclose algorithms and techniques for correlating those multi-view images and reconstructing a high-resolution 3D mesh of the performer's face.

A person of ordinary skill would have been motivated to combine these categories because they are complementary stages of the same pipeline: multi-camera systems generate the image data, and correlation and reconstruction algorithms process that data into 3D geometry. For example, a person implementing the multi-camera facial capture systems disclosed in Gordon-333 (plurality of motion cameras), Pighin-1998 (five cameras simultaneously), or Eisert-2003 (multiple camera setup) would have been motivated to apply known stereo-matching and 3D reconstruction techniques—such as normalized cross-correlation (Bourke-1996; Hannah), stereo depth computation (Zhang-2004; Kanade-1997; Bouguet-408), disparity estimation (Eisert-2003), or triangulation from tracked features (Guenter-1998; Borshukov-2003)—to compute 3D facial geometry from the captured multi-view images.

A person of ordinary skill would have had a reasonable expectation of success because multi-camera stereo reconstruction was a mature and well-validated technique. Using correlation-based matching to identify corresponding image regions across camera views and then triangulating to recover 3D geometry was the standard approach to multi-view 3D reconstruction.

**i. One or More of the 248 Frame Correlation / High-Resolution 3D Mesh Reconstruction References in View of One or More of the 248 Automatic 3D Point Tracking / Fold & Deform References**

The asserted claims of the ’248 patent are obvious in view of any one or more of the 248 Frame Correlation / High-Resolution 3D Mesh Reconstruction References in combination with any one or more of the 248 Automatic 3D Point Tracking / Fold & Deform References.

This combination addresses the relationship between the correlation-based 3D mesh reconstruction and the automatic temporal tracking of 3D points through deformation. A reference that discloses reconstructing a high-resolution 3D mesh from correlated multi-camera frames at individual time intervals may not expressly disclose tracking how the 3D points in that mesh move as the face folds and deforms over time. The 248 Automatic 3D Point Tracking / Fold & Deform References supply the temporal tracking component.

A person of ordinary skill would have been motivated to combine these references to establish correspondence between points across frames to track how the face moves and deforms. Zhang-2004 demonstrates this by fitting a template mesh to reconstructed depth maps and then tracking it through the sequence using optical flow. Zhang-2004 at 5–6. Borshukov-2003 tracks vertex motion in 2D across camera views and estimates the 3D position at each frame via triangulation. Borshukov-2003 at 1. Wang-2004 and Huang-2004 track intra-frame deformations using multi-resolution deformable meshes. Chiang-2002 captures “motion dynamics … by comparing coordinates of the matching mesh points temporally.” Chiang-2002 at 868.

A person of ordinary skill would have had a reasonable expectation of success because the combination reflects the ordinary design of facial capture pipelines: reconstruct 3D geometry per frame and then establish temporal correspondence to track motion. The same mesh representations

and optical-flow or registration techniques used in the prior art would predictably support tracking reconstructed facial geometry over time.

**j. One or More of the 248 Multi-Resolution Correlation References in View of One or More of the 248 Frame Correlation / High-Resolution 3D Mesh Reconstruction References**

The asserted claims of the ’248 patent are obvious in view of any one or more of the 248 Multi-Resolution Correlation References in combination with any one or more of the 248 Frame Correlation / High-Resolution 3D Mesh Reconstruction References.

This combination addresses the relationship between the multi-resolution processing and the correlation-based reconstruction. The Specification’s Figure 15 algorithm, as Rearden appears to characterize it, is itself a combination of these two ideas. The Specification admits that the constituent steps—pixel-wise normalized cross-correlation, downsampling, upsampling, perspective warping, and coarse-to-fine iterative loops—were all known techniques. ’226 patent at 12:2–4, 13:46–51, 14:23–29, 16:31–49.

The motivation to combine was well established. Correlation-based stereo matching can be computationally expensive and sensitive to large displacements or local minima at fine resolutions. Multi-resolution processing addresses those issues by first estimating correspondence at a coarse scale and then refining at finer scales. Yang-2003 expressly describes combining SSD scores “from different resolutions, from coarse to fine,” noting this “achieves good results close to depth discontinuities as well as on low texture areas.” Yang-2003 at 3, 6. Kroos-145 discloses correlating at low node density to detect large motion and refining at higher density. Kroos-145 at 9:1–28. Maurer-231 discloses Gaussian pyramids and coarse-to-fine graph matching. Maurer-231 at 6:58–65, 11:1–10. Zinßer-2004 discloses Gaussian image pyramids coupled with coarse-to-fine strategies. Zinßer-2004 at 3:17–27.

A person of ordinary skill would have had a reasonable expectation of success because multi-resolution correlation was a standard approach in stereo vision, optical flow, image

registration, and facial tracking. Applying multi-resolution refinement to correlation-based 3D facial mesh reconstruction would have yielded predictable benefits—reduced computation, improved robustness to larger displacements, and finer detail at higher resolutions—without inventive experimentation.

**k. One or More of the 248 Automatic 3D Point Tracking / Fold & Deform References in View of One or More of the 248 Facial Expression Correspondence References**

The asserted claims of the ’248 patent are obvious in view of any one or more of the 248 Automatic 3D Point Tracking / Fold & Deform References in combination with any one or more of the 248 Facial Expression Correspondence References.

This combination addresses the relationship between the automatic tracking of 3D points through facial deformation and the requirement that the resulting 3D mesh corresponds to a facial expression. To the extent Rearden contends a 248 Automatic 3D Point Tracking reference does not disclose or alone render obvious that the tracked 3D mesh corresponds to a recognized facial expression, the 248 Facial Expression Correspondence References supply that additional feature.

A person of ordinary skill would have been motivated to combine these references because tracking 3D points through facial deformation inherently captures the geometric changes that constitute facial expressions—a smile, a frown, or a raised eyebrow. Wang-2004 explicitly captures “dynamic 3-D facial expressions” and discloses “expression transfer from a source face to a target face.” Wang-2004 at 679, Abstract. Chuang-2002 discloses that “the facial expression of the 3D model mirrors that of the input video sequence as desired.” Chuang-2002 at 7. Pighin-1998 constructs 3D models for “several different facial expressions” and interpolates between them. Pighin-1998 at 2. Eisert-2003 discloses estimation of “facial expressions” using a parameterized 3D head model. Eisert-2003 at 8–9. Guenter-1998 captures “human facial expression and replay[s] it as a highly realistic 3D ‘talking head.’” Guenter-1998 at 1.

A person of ordinary skill would have had a reasonable expectation of success because associating tracked 3D mesh deformations with facial expressions was a natural and well-understood step in facial animation pipelines. The tracked geometry is the expression; labeling,

classifying, or using the tracked mesh as a facial expression would have been routine.

### 6. Exemplary Combinations that Render the '226 Patent Obvious under § 103

The following exemplary combinations describe the circumstances under which it would have been obvious to combine the references described and categorized above, and the ways in which those combinations would render obvious the asserted claims of the '226 patent. These combinations are exemplary and are not intended to limit Disney's ability to rely on other combinations of prior art references identified in Section III above, Exhibit 248-A, or elsewhere in these Invalidity Contentions. *See Avago Techs. Gen. IP PTE Ltd. v. Elan Microelectronics Corp.*, No. C04 05385 JW HRL, 2007 WL 951818, at *4 (N.D. Cal. Mar. 28, 2007); *Keithley v. The Homestore.com, Inc.*, 553 F. Supp. 2d 1148, 1150 (N.D. Cal. 2008); *Asia Vital Components Co. v. Asetek Danmark A/S*, No. 16-CV-07160-JST, 2018 WL 4945316, at *4 (N.D. Cal. Oct. 11, 2018).

The categorizations of references used here are defined as follows:

| Categorization | References |
|---|---|
| **Primary References** | Abrantes–1999; Borshukov-2003; Eisert-2003; Vlasic-2005; Wang-2004; Zhang-2004; Universal Capture System; Artem Digital; Project Gemini |
| **"226 Digital Video Stream / Rendered 3D Animated Face"** | Abrantes–1999; Eisert-2003; Vlasic-2005; Borshukov-2003; Fedorov-2003; Guenter-1998; Maurer-231; Gordon-333; Mok-710; MacVicar-2004; Chuang-2002; Bouguet-408; Noh-2001; Wang-2004; Hawkins-2004; Kanade-1997; Pighin-1998; D'Apuzzo-2003; Huang-2004; Light Stage; Artem Digital; Universal Capture System; Project Gemini |
| **"226 High-Resolution 3D Facial Surface Shape Correlation / First Performance Motion Tracking"** | Abrantes–1999; Zhang-2004; Wang-2004; Borshukov-2003; Eisert-2003; Vlasic-2005; Huang-2004; Chiang-2002; Bouguet-408; Guenter-1998; MacVicar-2004; Kanade-1997; Kroos-145; D'Apuzzo-2003; Bourke-1996; Hannah; Lucas & Kanade; Yang-2003; Chuang-2002; Pighin-1998; Gordon-333; Hawkins-2004; Kanade-1997; Noh-2001; Scharstein-2002; Light Stage; Artem Digital; Universal Capture System; Project Gemini |
| **"226 Expression Correspondence / Second** | Abrantes–1999; Vlasic-2005; Wang-2004; Noh-2001; Chuang-2002; Borshukov-2003; Zhang-2004; Eisert-2003; |

| Categorization | References |
|---|---|
| **Facial Performance”** | Guenter-1998; Pighin-1998; Fedorov-2003; MacVicar-2004; Maurer-231; Chiang-2002; Light Stage; Artem Digital; Urquhart-1997; Universal Capture System; Project Gemini |
| **“226 Movie with Computer-Generated Characters”** | Abrantes–1999; Borshukov-2003; Gordon-333; Mok-710; Vlasic-2005; MacVicar-2004; Guenter-1998; Noh-2001; Wang-2004; Chuang-2002; Fedorov-2003; Eisert-2003; Chiang-2002; Zhang-2004; Light Stage; Artem Digital; Universal Capture System; Project Gemini |
| **“226 Scene with Other Computer-Generated Characters”** | Abrantes–1999; Gordon-333; Mok-710; Borshukov-2003; Vlasic-2005; MacVicar-2004; Guenter-1998; Noh-2001; Wang-2004; Eisert-2003; Fedorov-2003; Maurer-231; Pighin-1998; Light Stage; Artem Digital; Universal Capture System; Project Gemini |
| **“226 Different Number of Cameras”** | Zhang-2004; Borshukov-2003; Bouguet-408; Chiang-2002; D’Apuzzo-2003; Eisert-2003; Gordon-333; Kanade-1997; MacVicar-2004; Maurer-231; Mok-710; Pighin-1998; Wang-2004; Scharstein-2002; Light Stage; Artem Digital; Universal Capture System |
| **“226 Markers Applied to Performer’s Face”** | Guenter-1998; Gordon-333; Hawkins-2004; Maurer-231; Pighin-1998; Light Stage |

Further, the combinations of categorizations asserted herein as rendering the asserted claims of the ’226 patent obvious, for which exemplary details are provided in the sections below, include at least the following:

| **Bases for Obviousness under § 103** |
|---|
| Vlasic-2005 alone |
| Wang-2004 alone |
| Zhang-2004 alone |
| Any Primary Reference in view of one or more of the 226 Digital Video Stream / Rendered 3D Animated Face References |
| Any Primary Reference in view of one or more of the 226 High-Resolution 3D Facial Surface Shape Correlation / First Performance Motion Tracking References |
| Any Primary Reference in view of one or more of the 226 Expression Correspondence / Second |

| Bases for Obviousness under § 103 |
|---|
| Facial Performance References |
| Any Primary Reference in view of one or more of the 226 Movie with Computer-Generated Characters References and/or the 226 Scene with Other Computer-Generated Characters References |
| Any Primary Reference in view of one or more of the 226 Different Number of Cameras References |
| Any Primary Reference in view of one or more of the 226 Markers Applied to Performer's Face References |
| One or more of the 226 High-Resolution 3D Facial Surface Shape Correlation / First Performance Motion Tracking References in view of one or more of the 226 Expression Correspondence / Second Facial Performance References |
| One or more of the 226 Expression Correspondence / Second Facial Performance References in view of one or more of the 226 Digital Video Stream / Rendered 3D Animated Face References |
| One or more of the 226 Digital Video Stream / Rendered 3D Animated Face References in view of one or more of the 226 Movie with Computer-Generated Characters References and/or the 226 Scene with Other Computer-Generated Characters References |

**a. Vlasic-2005 Alone**

The asserted claims of the '226 patent are obvious in view of Vlasic-2005 alone, at least under Rearden's apparent infringement theory, and/or in combination with the knowledge of one of ordinary skill in the art.

As described in Exhibit 226-A23 and above, Vlasic-2005 discloses a facial animation and face-transfer system that estimates performance parameters and detailed 3D geometry from video recordings and uses those parameters to generate, modify, and render a 3D textured face mesh for a target identity. Vlasic-2005 describes extracting facial expressions and pose from video footage, transferring facial performance parameters from one identity or performance to another, editing identity and performance, and rendering the resulting modified 3D face back into target footage. For example, Vlasic-2005 discloses generating "a detailed 3D textured face mesh for a target identity, which can be seamlessly rendered back into target footage," and methods that "greatly simplify the editing of identity, performance, and facial texture in video, enabling video rewrite

applications such as performance animation (puppetry) and actor replacement." Vlasic-2005 at Abstract, 432. Vlasic-2005 "estimates performance parameters and detailed 3D geometry from video recordings" using "detailed 3D scans (~ 30K vertices)," and obtains "a tracker that estimates performance parameters and detailed 3D geometry from video recordings" that "tracks approximately a thousand vertices." Vlasic-2005 at 427, 428, 431. Vlasic-2005 expressly discloses that "Face Transfer is a method for mapping videorecorded performances of one individual to facial animations of another. It extracts visemes (speech-related mouth articulations), expressions, and three-dimensional (3D) pose from monocular video or film footage. These parameters are then used to generate and drive a detailed 3D textured face mesh for a target identity, which can be seamlessly rendered back into target footage." Vlasic-2005 at Abstract. Vlasic-2005 further discloses "a post-production example, where a repeat performance is transferred onto the old footage. … Here, we combine the pose from the original video with the expression from the new video to modify original expressions." Vlasic-2005 at 431. Vlasic-2005 further discloses "video rewrite applications such as performance animation (puppetry) and actor replacement," including rendering modified facial performances "back into target footage." Vlasic-2005 at Abstract, 432. Vlasic-2005's system renders 3D textured face meshes for viewing. Vlasic-2005 describes that different source performances may be captured under different conditions, and it would have been obvious to a person of ordinary skill that first and second performances could be captured with different numbers of cameras given the range of known capture configurations. At least under Rearden's apparent infringement theory, these disclosures teach or render obvious the asserted claim limitations directed to using captured 3D facial performance data, corresponding expressions or facial shapes, and a rendered 3D animated face.

To the extent Rearden contends that Vlasic-2005 does not to disclose or alone render obvious a particular limitation of the Asserted Claims, such features would have been obvious to a person of ordinary skill in view of Vlasic-2005's teachings and the state of the art. Vlasic-2005 addresses the same general problem as the '226 patent: using captured facial performance information from one performance to generate corresponding facial animation based on expressions from another performance, rendered as a 3D animated face. A person of ordinary skill would have

had a reasonable expectation of success because Vlasic-2005 describes a working system for linking video data to 3D facial models, estimating facial performance parameters, transferring expressions between performances, and rendering modified video output.

A person of ordinary skill would have been motivated to implement the asserted claim features in Vlasic-2005 because Vlasic-2005 addresses the same general problem as the ’226 patent: using captured facial performance information to generate corresponding facial animations on a target face or identity. The use of captured facial geometry, expression parameters, performance transfer, and rendering would have constituted the use of known facial-animation techniques for their known purpose. Further, one of ordinary skill would have had a reasonable expectation of success because Vlasic-2005 describes a working system for linking video data to 3D facial models, estimating facial performance information, transferring facial expressions or performance parameters, and rendering modified video output.

**b. Wang-2004 Alone**

The asserted claims of the ’226 patent are obvious in view of Wang-2004 alone, at least under Rearden’s apparent infringement theory, and/or in combination with the knowledge of one of ordinary skill in the art.

As described in Exhibit 226-A25 and above, Wang-2004 discloses high-speed, high-accuracy capture of moving faces without markers, tracking of facial motion using a multi-resolution deformable mesh, and synthesis of novel facial expressions through a model of dynamic facial motion. Wang-2004 discloses “high resolution dynamic 3-D shape data that capture very accurate geometry at speeds that exceed video frame rate,” returning “an average of 75 thousand 3-D measurements per frame, at 40Hz frame rate, with an RMS of 0.05mm.” Wang-2004 at 678. Wang-2004 further discloses “[v]ery precise tracking of facial motion using a multi-resolution deformable mesh” with a “hierarchical tracking and fitting scheme” that “can not only track global facial motion that is caused by muscle action (coarse level), but fit to subtler expression details that are generated by highly local skin deformations (fine-level).” Wang-2004 at Abstract, 678. Wang-2004 discloses “two types of synthesis results: morphing of geometry and expression between dynamic expression sequences of different individuals and expression transfer from a

source face to a target face, without further changes in facial geometry." Wang-2004 at 679. Wang-2004 further discloses "transfer[ring] one actor's motion style to another actor regardless of her facial geometry. In Figure 9, we show two different base faces and the generation of new motion styles by combining different style factors." Wang-2004 at 684.

To the extent Rearden contends that Wang-2004 does not to disclose or alone render obvious communicating, transmitting, or displaying the resulting rendered 3D animated face as part of a digital video stream, it would have been obvious to a person of ordinary skill in the art to incorporate conventional rendering, display, and video-output functionality into the systems and methods of Wang-2004. Wang-2004's facial animation and expression-synthesis outputs are the type of animation-ready data that a person of ordinary skill would have rendered for display, included in a video stream, or communicated for incorporation into animated content.

A person of ordinary skill would have been motivated to do so because Wang-2004's captured and tracked facial expression data has value precisely because it can be used to synthesize, animate, and display facial performances. Further, one of ordinary skill would have had a reasonable expectation of success because Wang-2004 describes a working dynamic facial capture and expression-transfer system, and combining that system with known rendering, video-output, or display techniques would have involved applying known computer-graphics methods to known facial animation data to yield predictable results.

**c. Zhang-2004 Alone**

The asserted claims of the '226 patent are obvious in view of Zhang-2004 alone, at least under Rearden's apparent infringement theory, and/or in combination with the knowledge of one of ordinary skill in the art.

As described in Exhibit 226-A27 and above, Zhang-2004 discloses an end-to-end system for capturing high-resolution facial geometry and motion from synchronized video streams and outputting high-resolution 3D meshes that capture facial geometry, color, and motion. Zhang-2004 discloses a system that takes "as input 6 synchronized video streams (4 monochrome and 2 color) running at 60 frames-per-second (fps), and outputs a 20 fps sequence of high-resolution 3D meshes that capture face geometry, color, and motion." Zhang-2004 at 2. Zhang-2004 further discloses a

"template fitting and tracking procedure [that] fills in missing data and yields point correspondence across the entire sequence without using markers," where "[e]ach face model has roughly 16K vertices and template tracking takes less than 1 minute per frame." Zhang-2004 at Abstract, 7.

To the extent Rearden contends that Zhang-2004 does not to disclose or alone render obvious all aspects of expression transfer, corresponding expressions from a second facial performance, or communicating a digital video stream including a rendered 3D animated face, such limitations would have been obvious to a person of ordinary skill in view of Zhang-2004's teachings and the state of the art. Zhang-2004 is directed to high-resolution capture "for modeling and animation," and supplies high-resolution captured and tracked 3D facial geometry. It was well known to use facial geometry and facial motion for retargeting, animation, rendering, and video output. A person of ordinary skill seeking to use Zhang-2004's tracked high-resolution facial meshes would naturally have looked to known rendering, expression-transfer, and video-communication techniques to display, animate, transfer, or communicate the captured performance.

A person of ordinary skill would have been motivated to do so because Zhang-2004's output—temporally corresponding 3D face geometry—is the type of input used by expression-transfer, rendering, and animation systems. Further, one of ordinary skill would have had a reasonable expectation of success because tracked 3D facial meshes, point correspondences, and facial motion data were known inputs to facial animation, retargeting, rendering, and video-output systems. The combination would have used known facial capture outputs for their established purpose: generating and rendering animated facial performances.

**d. Any Primary Reference in View of One or More of the 226 Digital Video Stream / Rendered 3D Animated Face References**

The asserted claims of the '226 patent are obvious in view of any Primary Reference in combination with any one or more of the 226 Digital Video Stream / Rendered 3D Animated Face References.

Certain limitations require communicating a digital video stream with at least part of a rendered 3D animated face which includes 3D facial shapes. To the extent Rearden contends any Primary Reference does not disclose or alone render obvious communicating a digital video stream

with a rendered 3D animated face, the 226 Digital Video Stream / Rendered 3D Animated Face References disclose those additional features.

A person of ordinary skill would have been motivated to combine any Primary Reference with the 226 Digital Video Stream / Rendered 3D Animated Face References because facial capture and expression-transfer systems are designed to produce data useful for rendering, display, communication, and distribution. Communicating a digital video stream with a rendered 3D animated face is the natural downstream use of captured and processed facial data. Eisert-2003 discloses a 3D conferencing system in which "3-D models of the participants are created representing their appearance. The models are generated only once in an initial phase, encoded, and transmitted to all devices. During the video conference, motion and facial expressions of the conferees are tracked over time and only a small set of facial animation parameters has to be streamed over the network. … The decoder only has to move and deform the 3-D head-and-shoulder models in the virtual conferencing scene and render it using computer graphics techniques." Eisert-2003 at 8. Guenter-1998 discloses capturing facial expression and "replaying it as a highly realistic 3D 'talking head' consisting of a deformable 3D polygonal face model with a changing texture map," which could be "delivered via CDROM or the internet to a user, and then reconstructed in real time on a user's computer in a virtual 3D environment." Guenter-1998 at 1. Fedorov-2003 discloses that "the output is a synthetic video sequence showing a 'talking head'" and that "[m]odel rendering is the final stage in the pipeline. In the input each frame is a 3D face model deformed in accordance with FAPs while the output is a synthetic video showing a texturized 'talking head', lit and projected on the screen. Visualization functionality is encapsulated in IFAL library and uses OpenGL for 3D model rasterization." Fedorov-2003 at 3–4. Maurer-231 discloses that "tracking information may be transmitted via the network to one or more remote sites which receives the information and generates, using a graphics engine, an animated facial image on the avatar display." Maurer-231 at 3:13–30. Gordon-333 discloses "rendering the 2D data files into three-dimensional (3D) animation files that are stored by the master server 110. … The animators accessing the artists network 130 will also access the 3D animation files in the course of producing the final computer graphics animation." Gordon-333 at [0051]. Mok-710 discloses an "animation

sequence [that] is stored in the computer memory of a video game. The video game retrieves each frame of the animation sequence from its memory and displays the frame on a video monitor." Mok-710 at 1:13–16. Bouguet-408 discloses "[a] machine-readable medium may include a mechanism that provides (i.e., stores and/or transmits) information in a form readable by a machine such as computer or digital processing device." Bouguet-408 at [0025]. The Artem Digital, Universal Capture, and Project Gemini systems were also used for facial motion capture and rendering 3D animated faces.

A person of ordinary skill would have had a reasonable expectation of success because rendering 3D facial meshes, communicating animation data in video streams, and displaying rendered 3D animated faces were conventional computer graphics and video-processing operations. The combination would have involved no more than the predictable use of known rendering, communication, and display techniques with known captured or processed facial data.

**e. Any Primary Reference in View of One or More of the 226 High-Resolution 3D Facial Surface Shape Correlation / First Performance Motion Tracking References**

The asserted claims of the '226 patent are obvious in view of any Primary Reference in combination with any one or more of the 226 High-Resolution 3D Facial Surface Shape Correlation / First Performance Motion Tracking References.

Certain claim limitations require that the 3D facial shapes in the rendered animated face are correlated to a plurality of high-resolution 3D facial surface shapes that track the high-resolution 3D motion of a performer's face from a first facial performance. This limitation encompasses both the correlation-based reconstruction of high-resolution 3D facial geometry and the temporal tracking of that geometry through the first performance. To the extent Rearden contends that any Primary Reference does not disclose or alone render obvious the particular correlation or high-resolution 3D reconstruction and motion-tracking technique required by this limitation, the 226 High-Resolution 3D Facial Surface Shape Correlation / First Performance Motion Tracking References disclose those features.

The motivation to combine is particularly strong because the Asserted Patents'

Specification admits that the constituent techniques—including "pixel-wise, normalized cross-correlation" ('226 patent at 13:46–47), downsampling ('226 patent at 12:2–4, 14:23–29), upsampling ('226 patent at 16:31–34), perspective warping ('565 Provisional at 27), and coarse-to-fine iterative loops ('226 patent at 16:36–49)—were all well known in the art. Zhang-2004 outputs "a 20 fps sequence of high-resolution 3D meshes that capture face geometry, color, and motion" with "roughly 16K vertices," using a "template fitting and tracking procedure [that] fills in missing data and yields point correspondence across the entire sequence without using markers." Zhang-2004 at 2, 7, Abstract. Wang-2004 returns "an average of 75 thousand 3-D measurements per frame, at 40Hz frame rate" and tracks facial motion using "a multi-resolution deformable mesh" with "a hierarchical tracking and fitting scheme" that captures both "global facial motion" and "subtler expression details." Wang-2004 at 678, Abstract. Borshukov-2003 "works by projecting a vertex of the model into each of the cameras and then tracking the motion of that vertex in 2-d using the optical flow where at each frame the 3-d position is estimated using triangulation. The result is an accurate reconstruction of the path of each vertex though 3-d space over time." Borshukov-2003 at 1.

A person of ordinary skill would have been motivated to combine any Primary Reference with the 226 High-Resolution 3D Facial Surface Shape Correlation / First Performance Motion Tracking References to obtain the high-resolution 3D facial surface shapes and temporal motion tracking that the '226 patent claims require. A person of ordinary skill would have had a reasonable expectation of success because high-resolution 3D facial reconstruction, stereo correlation, and temporal motion tracking were well-established techniques in facial capture long before the Asserted Patents' priority date.

#### f. Any Primary Reference in View of One or More of the 226 Expression Correspondence / Second Facial Performance References

The Asserted Claims of the '226 patent are obvious in view of any Primary Reference in combination with any one or more of the 226 Expression Correspondence / Second Facial Performance References.

Certain claim limitations require that the 3D facial shapes in the rendered animated face correspond to similar facial expressions of a performer's face from a second facial performance. This limitation requires establishing a correspondence between expressions captured from one performance and expressions from a different performance—i.e., expression transfer, expression cloning, retargeting, or expression correspondence. To the extent Rearden contends any Primary Reference does not disclose or alone render obvious generating corresponding expressions from a second performance, the 226 Expression Correspondence / Second Facial Performance References disclose that feature.

A person of ordinary skill would have been motivated to combine any Primary Reference with the 226 Expression Correspondence / Second Facial Performance References because expression transfer and correspondence between different facial performances is one of the principal uses of captured facial motion data. Vlasic-2005 discloses that "Face Transfer is a method for mapping videorecorded performances of one individual to facial animations of another. It extracts visemes (speech-related mouth articulations), expressions, and three-dimensional (3D) pose from monocular video or film footage. These parameters are then used to generate and drive a detailed 3D textured face mesh for a target identity, which can be seamlessly rendered back into target footage." Vlasic-2005 at Abstract. Wang-2004 discloses "expression transfer from a source face to a target face, without further changes in facial geometry" and "transfer[ring] one actor's motion style to another actor regardless of her facial geometry." Wang-2004 at 679, 684. Noh-2001 discloses that "expression cloning (EC) reuses the dense 3D motion vectors of the vertices of the source model to create similar animations on a new target model. Animations of completely new characters can be based on existing libraries of high-quality animations created for many different models." Noh-2001 at 278. Chuang-2002 discloses "several sample frames from the input video sequence and the corresponding retargeting facial animation" where "the facial expression of the 3D model mirrors that of the input video sequence as desired." Chuang-2002 at 7. Borshukov-2003 discloses that "[i]n order to attach facial performances to CG bodies or blend between different performances this movement must be removed." Borshukov-2003 at 1. Eisert-2003 discloses a 3D model-based method for estimation of facial expressions using a parameterized 3D head model,

where tracked facial animation parameters could be applied to different face models. Eisert-2003 at 8–9. Pighin-1998 discloses constructing 3D models for "several different facial expressions" and that "[t]o produce facial animations, we interpolate between two or more different 3D models constructed in this way." Pighin-1998 at 2.

A person of ordinary skill would have had a reasonable expectation of success because expression transfer, retargeting, and correspondence between captured facial performances were well-established techniques. Combining any Primary Reference's captured and tracked 3D facial data with known expression-correspondence or expression-transfer algorithms would have involved applying known capture outputs to known expression-mapping techniques for their established purpose: generating a rendered animated face whose expressions correspond to expressions from a different performance.

**g. Any Primary Reference in View of One or More of the 226 Movie with Computer-Generated Characters References and/or the 226 Scene with Other Computer-Generated Characters References**

The asserted claims of the '226 patent are obvious in view of any Primary Reference in combination with any one or more of the 226 Movie with Computer-Generated Characters References and/or the 226 Scene with Other Computer-Generated Characters References.

Certain claim limitations require that the digital video stream is a movie that includes computer-generated characters, including the rendered 3D animated face in a scene in the digital video stream with other computer-generated characters. To the extent Rearden contends any Primary Reference does not disclose or alone render obvious placing the rendered animated face into a movie or scene with other computer-generated characters, the 226 Movie with Computer-Generated Characters References and/or the 226 Scene with Other Computer-Generated Characters References disclose those additional features.

A person of ordinary skill would have been motivated to combine any Primary Reference with the 226 Movie with Computer-Generated Characters References and/or the 226 Scene with Other Computer-Generated Characters References because rendered 3D animated faces are

commonly used as components of larger computer-generated scenes, movies, games, and animated environments. Gordon-333 discloses "rendering the 2D data files into three-dimensional (3D) animation files that are stored by the master server 110. … The animators accessing the artists network 130 will also access the 3D animation files in the course of producing the final computer graphics animation." Gordon-333 at [0051]. Mok-710 discloses an "animation sequence [that] is stored in the computer memory of a video game" where "a displayed character appears to perform the live action motion in a lifelike manner." Mok-710 at 1:13–16. Borshukov-2003 discloses producing "a 3-d recording of the real actor's performance and be[ing] able to play it back from different angles and under different lighting conditions," using outputs combined with "image-based skin BRDF estimation, subsurface scattering approximation, and real-world lighting reconstruction for the highly photorealistic human face renderings." Borshukov-2003 at 1. Vlasic-2005 discloses "video rewrite applications such as performance animation (puppetry) and actor replacement." Vlasic-2005 at Abstract. MacVicar-2004 discloses that its 3D models and movements "can be used as input to a procedural animation package (i.e. CreaToon)." MacVicar-2004 at Abstract.

A person of ordinary skill would have had a reasonable expectation of success because the prior art disclosed rendering animated 3D faces and incorporating motion capture or facial animation data into computer-generated characters and scenes. Combining a rendered animated face with other computer-generated content would have required routine graphics composition, animation, and rendering techniques, and would have yielded predictable results.

**h. Any Primary Reference in View of One or More of the 226 Different Number of Cameras References**

The asserted claims of the '226 patent are obvious in view of any Primary Reference in combination with any one or more of the 226 Different Number of Cameras References.

Certain claim limitations require capturing each of the first and second facial performances with a different number of cameras. To the extent Rearden contends any Primary Reference does not disclose or alone render obvious that the first and second performances were each captured with a different number of cameras, the 226 Different Number of Cameras References disclose that

feature.

A person of ordinary skill would have been motivated to combine any Primary Reference with the 226 Different Number of Cameras References because different camera arrangements were known ways to improve coverage, reduce occlusions, obtain stereo depth information, capture different viewpoints, and accommodate different production conditions. Facial capture systems used a range of camera configurations, including single cameras, stereo camera pairs, multiple synchronized cameras, and larger camera arrays, depending on desired accuracy, coverage, cost, complexity, and production workflow. The prior art demonstrates a wide range of camera counts: Zhang-2004 uses six synchronized cameras; Borshukov-2003 uses "five synchronized cameras that captured the actor's performance." Borshukov-2003 at 1; Pighin-1998 uses "five cameras simultaneously." Pighin-1998 at 8; MacVicar-2004 uses "16 monochrome cameras and 8 colour cameras." MacVicar-2004 at 1; Chiang-2002 uses "[t]wo color video cameras." Chiang-2002 at 867; Bouguet-408 uses a "left camera" and a "right camera." Bouguet-408 at [0008]; and Eisert-2003 uses "a multiple camera setup." Eisert-2003 at 4. The limitation requiring that each of the first and second performances be captured with a different number of cameras is, at most, a routine implementation choice in a field where varying camera configurations were known alternatives for different production needs. Artem Digital, Universal Capture, and Project Gemini disclose markerless facial motion capture that captures images with a plurality of cameras.

A person of ordinary skill would have had a reasonable expectation of success because the prior art demonstrated facial capture using a range of camera configurations. Modifying a facial capture or expression-transfer system to use different numbers of cameras for different performances would have involved predictable substitution or variation among known capture setups to achieve predictable facial capture results.

**i. Any Primary Reference in View of One or More of the 226 Markers Applied to Performer's Face References**

The asserted claims of the '226 patent are obvious in view of any Primary Reference in combination with any one or more of the 226 Markers Applied to Performer's Face References.

Certain claim limitations require that markers are applied to the face of the performer of the

first or second facial performance. To the extent Rearden contends any Primary Reference discloses markerless facial capture for both performances, the 226 Markers Applied to Performer's Face References disclose the alternative of applying markers to the face of the performer for at least one of the performances.

A person of ordinary skill would have been motivated to combine any Primary Reference with the 226 Markers Applied to Performer's Face References because marker-based facial capture was well known before the alleged priority date and was routinely used to track facial motion, establish correspondences, calibrate performance data, aid reconstruction of 3D facial animation, or improve tracking robustness. Guenter-1998 discloses that "fiducials are used to generate a set of 3D points which act as control points to warp the cyberware scan mesh of the actress' head … The 2D location for each dot is computed by finding the two dimensional centroid of each connected component. Correspondence between 2D dots in different camera views is established and potential 3D locations of dots reconstructed by triangulation." Guenter-1998 at 2. Gordon-333 discloses a motion capture system using "a plurality of motion cameras" and markers placed on the performer. Gordon-333 at [0013]. Pighin-1998 discloses using manually identified feature points in photographs. Maurer-231 discloses tracking using facial feature nodes.

A person of ordinary skill would have recognized that markers could provide control points, simplify correspondence, validate reconstructed geometry, or increase reliability under challenging lighting, texture, or motion conditions. Marker-based and markerless approaches were known alternatives or supplements that could be selected depending on accuracy, production workflow, and intrusiveness considerations. Applying markers to a performer's face for one of two performances and using the resulting trackable points in a facial capture or expression-transfer pipeline would have been a routine implementation choice using established techniques.

A person of ordinary skill would have had a reasonable expectation of success because marker-based facial capture systems were known and used to drive facial animation. The combination would have been straightforward: capture source facial motion using markers for one performance, capture or use markerless techniques for the other, and render the resulting 3D animated face with expressions corresponding between the two performances.

### j. One or More of the 226 High-Resolution 3D Facial Surface Shape Correlation / First Performance Motion Tracking References in View of One or More of the 226 Expression Correspondence / Second Facial Performance References

The asserted claims of the ’226 patent are obvious in view of any one or more of the 226 High-Resolution 3D Facial Surface Shape Correlation / First Performance Motion Tracking References in combination with any one or more of the 226 Expression Correspondence / Second Facial Performance References.

This combination addresses the capture and tracking of high-resolution 3D facial surface shapes from a first performance and the correspondence of those shapes to similar facial expressions from a second performance). The 226 High-Resolution 3D Facial Surface Shape Correlation / First Performance Motion Tracking References disclose techniques for capturing, correlating, and tracking high-resolution 3D facial geometry through a performance. The 226 Expression Correspondence / Second Facial Performance References disclose techniques for establishing expression correspondence, transferring expressions, or retargeting captured facial motion between different performances.

A person of ordinary skill would have been motivated to combine these categories because they represent naturally related stages of a facial animation pipeline. The 226 High-Resolution 3D Facial Surface Shape Correlation / First Performance Motion Tracking References supply the high-resolution 3D facial surface shapes and motion data from a source performance; the 226 Expression Correspondence / Second Facial Performance References supply known methods for using that data to generate corresponding expressions on a target face or from a different performance. For example, Zhang-2004, Wang-2004, and Borshukov-2003 disclose high-resolution capture and tracking systems that produce temporally corresponding 3D meshes. Vlasic-2005, Noh-2001, Wang-2004, and Chuang-2002 disclose expression-transfer and retargeting systems that use captured 3D facial data to generate corresponding expressions on target faces or from different performances.

A person of ordinary skill would have had a reasonable expectation of success because the

prior art already disclosed successful 3D facial capture, mesh tracking, expression cloning, face transfer, and performance retargeting. Combining captured high-resolution facial shapes with known expression-correspondence algorithms would have involved applying known methods to known data types to achieve predictable facial animation results. The claimed relationship between a first facial performance and similar or corresponding expressions from a second facial performance would have been no more than the predictable use of known captured facial motion data in known expression-transfer systems.

**k. One or More of the 226 Expression Correspondence / Second Facial Performance References in View of One or More of the 226 Digital Video Stream / Rendered 3D Animated Face References**

The Asserted claims of the '226 patent are obvious in view of any one or more of the 226 Expression Correspondence / Second Facial Performance References in combination with any one or more of the 226 Digital Video Stream / Rendered 3D Animated Face References.

This combination addresses the relationship between the expression-correspondence limitation and the digital-video-stream-communication limitation. A reference that discloses generating facial animation or corresponding expressions between performances may not expressly disclose communicating or displaying that output as a digital video stream including a rendered 3D animated face. The 226 Digital Video Stream / Rendered 3D Animated Face References supply those additional rendering, communication, and display features.

A person of ordinary skill would have been motivated to combine these categories because the ordinary use of expression-transfer and expression-correspondence output is to create viewable animated content. Once an expression-transfer system generates a target 3D facial animation whose expressions correspond to expressions from another performance, a person of ordinary skill would have naturally rendered that animation, included it in a video stream, displayed it on a computer monitor, transmitted it over a network, or incorporated it into a larger animation sequence. Eisert-2003 discloses streaming facial animation parameters over a network and rendering deformed 3D head models "using computer graphics techniques." Eisert-2003 at 8. Guenter-1998

discloses delivering captured facial expression "via CDROM or the internet to a user, and then reconstructed in real time on a user's computer in a virtual 3D environment." Guenter-1998 at 1. Fedorov-2003 discloses that "the output is a synthetic video sequence showing a 'talking head.'" Fedorov-2003 at 3–4. Maurer-231 discloses transmitting tracking information "via the network to one or more remote sites which receives the information and generates, using a graphics engine, an animated facial image on the avatar display." Maurer-231 at 3:13–30.

A person of ordinary skill would have had a reasonable expectation of success because rendering, displaying, transmitting, and communicating animated 3D faces in video form were conventional computer graphics and video-processing operations. The combination would have yielded predictable results: a digital video stream including a rendered 3D animated face whose expressions derive from captured or transferred facial motion corresponding to expressions from a different performance.

### l. One or More of the 226 Digital Video Stream / Rendered 3D Animated Face References in View of One or More of the 226 Movie with Computer-Generated Characters References and/or the 226 Scene with Other Computer-Generated Characters References

The asserted claims of the '226 patent are obvious in view of any one or more of the 226 Digital Video Stream / Rendered 3D Animated Face References in combination with any one or more of the 226 Movie with Computer-Generated Characters References and/or the 226 Scene with Other Computer-Generated Characters References.

This combination addresses the relationship between the communicating a digital video stream with a rendered 3D animated face and that the digital video stream be a movie with computer-generated characters or include the rendered face in a scene with other computer-generated characters. A reference that discloses communicating a digital video stream with a rendered 3D animated face may not expressly disclose placing that face into a movie or scene with other computer-generated characters. The 226 Movie with Computer-Generated Characters References and/or the 226 Scene with Other Computer-Generated Characters References supply

those additional features.

A person of ordinary skill would have been motivated to combine these categories because rendered 3D animated faces are commonly used as components of larger computer-generated scenes, movies, games, and animated environments. The claims reciting a movie that includes computer-generated characters, or a scene with other computer-generated characters, merely place the rendered face output into conventional downstream content formats. Gordon-333 discloses "rendering the 2D data files into three-dimensional (3D) animation files" for "producing the final computer graphics animation." Gordon-333 at [0051]. Mok-710 discloses that "a displayed character appears to perform the live action motion in a lifelike manner" in a video game. Mok-710 at 1:13–16. Borshukov-2003 discloses producing photorealistic human face renderings for film production using "image-based skin BRDF estimation, subsurface scattering approximation, and real-world lighting reconstruction." Borshukov-2003 at 1. Vlasic-2005 discloses "video rewrite applications such as performance animation (puppetry) and actor replacement." Vlasic-2005 at Abstract.

A person of ordinary skill would have had a reasonable expectation of success because the prior art disclosed rendering animated 3D faces and using motion-capture or facial-animation data in computer-generated characters and scenes. Combining a rendered animated face with other computer-generated content in a movie or scene would have required routine graphics composition, animation, and rendering techniques, and would have yielded predictable results.

**7. Exemplary Combinations that Render the '072 and 790 Patents Obvious under § 103**

The following exemplary combinations describe the circumstances under which it would have been obvious to combine the references described and categorized above, and the ways in which those combinations would render obvious the asserted claims of the '072 and '790 patents. These combinations are exemplary and not intended to limit Disney's ability to rely on other combinations of prior art references identified in Section III above, Exhibit 248-A, or elsewhere in these Invalidity Contentions. *See Avago Techs. Gen. IP PTE Ltd. v. Elan Microelectronics Corp.*, No. C04 05385 JW HRL, 2007 WL 951818, at *4 (N.D. Cal. Mar. 28, 2007); *Keithley v. The*

*Homestore.com, Inc.*, 553 F. Supp. 2d 1148, 1150 (N.D. Cal. 2008); *Asia Vital Components Co. v. Asetek Danmark A/S*, No. 16-CV-07160-JST, 2018 WL 4945316, at *4 (N.D. Cal. Oct. 11, 2018).

The categorizations of references used here are defined as follows:

| Categorization | References |
|---|---|
| **Primary References** | Borshukov-2003; Chiang-2002; D'Apuzzo-2003; Eisert-2003; Fedorov-2003; Gordon-333; Huang-2004; Kanade-1997; Kroos-145; MacVicar-2004; Vlasic-2005; Wang-2004; Zhang-2004; Universal Capture System; Artem Digital; Project Gemini |
| **"072/790 Rendered Animated 3D Face / Machine-Readable Medium / Communication"** | Abrantes–1999; Eisert-2003; Fedorov-2003; Borshukov-2003; Gordon-333; MacVicar-2004; Vlasic-2005; Wang-2004; Chuang-2002; Guenter-1998; Pighin-1998; Bouguet-408; Maurer-231; Mok-710; Noh-2001; D'Apuzzo-2003; Huang-2004; Kanade-1997; Light Stage; Artem Digital; Hawkins-2004; Universal Capture System; Project Gemini |
| **"072/790 High-Resolution 3D Point Correlation"** | Abrantes–1999; Zhang-2004; Wang-2004; Borshukov-2003; Eisert-2003; Chiang-2002; D'Apuzzo-2003; Huang-2004; Kanade-1997; MacVicar-2004; Kroos-145; Bouguet-408; Guenter-1998; Bourke-1996; Hannah; Lucas & Kanade; Yang-2003; Fedorov-2003; Gordon-333; Hawkins-2004; Kanade-1997; Scharstein-2002; Light Stage; Artem Digital; Universal Capture System; Project Gemini |
| **"072/790 Markerless 3D Point Identification"** | Abrantes–1999; Zhang-2004; Wang-2004; Borshukov-2003; Chuang-2002; Gordon-333; Chiang-2002; D'Apuzzo-2003; Vlasic-2005; MacVicar-2004; Huang-2004; Kroos-145; Bouguet-408; Project Gemini; Eisert-2003; Fedorov-2003; Maurer-231; Pighin-1998; Scharstein-2002; Artem Digital; Urquhart-1997; Universal Capture System |
| **"072/790 Automatic 3D Point Tracking"** | Abrantes–1999; Zhang-2004; Borshukov-2003; Wang-2004; Chuang-2002; Chiang-2002; Eisert-2003; Huang-2004; Vlasic-2005; MacVicar-2004; Kroos-145; Bouguet-408; Guenter-1998; Maurer-231; Zinßer-2004; Fedorov-2003; Kanade-1997; Scharstein-2002; Gordon-333; Noh-2001; D'Apuzzo-2003; Hawkins-2004; Light Stage; Artem Digital; Universal Capture System; Project Gemini |
| **"072/790 Multi-Camera Capture"** | Zhang-2004; Borshukov-2003; D'Apuzzo-2003; Gordon-333; Wang-2004; Eisert-2003; Chiang-2002; Kanade-1997; MacVicar-2004; Pighin-1998; Bouguet-408; Guenter-1998; Maurer-231; Mok-710; Scharstein-2002; Urquhart-1997; Hawkins-2004; Light Stage; Artem Digital; Universal Capture |

| Categorization | References |
|---|---|
| | System; Project Gemini |
| **"072/790 Fold & Deform Tracking"** | Zhang-2004; Borshukov-2003; Wang-2004; Chuang-2002; Chiang-2002; Eisert-2003; Huang-2004; Vlasic-2005; MacVicar-2004; Kroos-145; Guenter-1998; Maurer-231; Zinßer-2004; D'Apuzzo-2003; Fedorov-2003; Gordon-333; Noh-2001; Pighin-1998; Artem Digital; Light Stage Universal Capture System; Project Gemini |
| **"072/790 Facial Feature Tracking (Eyes, Lips, Teeth)"** | Abrantes–1999; Chuang-2002; Eisert-2003; Wang-2004; Zhang-2004; Vlasic-2005; Huang-2004; Fedorov-2003; Guenter-1998; Bouguet-408; Pighin-1998; Maurer-231; Artem Digital; Light Stage; Project Gemini |
| **"072/790 Facial Expression Correspondence"** | Abrantes–1999; Wang-2004; Chuang-2002; Eisert-2003; Borshukov-2003; Zhang-2004; Chiang-2002; Vlasic-2005; Fedorov-2003; MacVicar-2004; Pighin-1998; Guenter-1998; Noh-2001; Bouguet-408; D'Apuzzo-2003; Gordon-333; Huang-2004; Kroos-145; Maurer-231; Mok-710; Zinßer-2004; Light Stage; Artem Digital; Universal Capture System; Project Gemini |
| **"072/790 Non-Successive Frame Times"** | Zhang-2004; Borshukov-2003; Kroos-145; Pighin-1998; Mok-710; Illsley-075; Noh-2001; Zinßer-2004; Kanade-1997; Light Stage; Universal Capture System |
| **"072/790 Character Face Different from Performer / Expression Transfer"** | Abrantes–1999; Vlasic-2005; Wang-2004; Chuang-2002; Borshukov-2003; Eisert-2003; Fedorov-2003; Gordon-333; MacVicar-2004; Noh-2001; Guenter-1998; Pighin-1998; Mok-710; Chiang-2002; Kroos-145; Maurer-231; Artem Digital; Universal Capture System; Project Gemini |

Further, the combinations of categorizations asserted herein as rendering the Asserted claims of the '072 and '790 patents obvious, for which exemplary details are provided in the sections below, include at least the following:

| **Bases for Obviousness under § 103** |
|---|
| Zhang-2004 alone |
| Wang-2004 alone |
| Vlasic-2005 alone |

| Bases for Obviousness under § 103 |
|---|
| Any Primary Reference in view of one or more of the 072/790 Rendered Animated 3D Face / Machine-Readable Medium / Communication References |
| Any Primary Reference in view of one or more of the 072/790 High-Resolution 3D Point Correlation References |
| Any Primary Reference in view of one or more of the 072/790 Markerless 3D Point Identification References |
| Any Primary Reference in view of one or more of the 072/790 Automatic 3D Point Tracking References |
| Any Primary Reference in view of one or more of the 072/790 Non-Successive Frame Times References |
| Any Primary Reference in view of one or more of the 072/790 Character Face Different from Performer / Expression Transfer References |
| One or more of the 072/790 Multi-Camera Capture References in view of one or more of the 072/790 High-Resolution 3D Point Correlation References |
| One or more of the 072/790 High-Resolution 3D Point Correlation References in view of one or more of the 072/790 Rendered Animated 3D Face / Machine-Readable Medium / Communication References |
| One or more of the 072/790 Automatic 3D Point Tracking References in view of one or more of the 072/790 Facial Expression Correspondence References |
| One or more of the 072/790 Fold & Deform Tracking References in view of one or more of the 072/790 Character Face Different from Performer / Expression Transfer References |
| Any Primary Reference in View of One or More of the 072/790 Facial Feature Tracking (Eyes, Lips, Teeth) References |

**a. Zhang-2004 Alone**

The Asserted claims of the ’072 and ’790 patents are obvious in view of Zhang-2004 alone, at least under Rearden’s apparent infringement theory, and/or in combination with the knowledge of one of ordinary skill in the art.

As described in Exhibits 072-A27 and 790-A27 and above, Zhang-2004 discloses an end-to-end facial capture system that addresses every independent claim limitation of the ’072 and ’790 patents: Zhang-2004 discloses markerless multi-camera facial capture, stereo depth computation,

3D mesh reconstruction, temporal tracking, non-successive/non-pattern frame processing, optical flow, and point correspondence across a captured sequence. For example, Zhang-2004 discloses a system that takes "as input 6 synchronized video streams (4 monochrome and 2 color) running at 60 frames-per-second (fps), and outputs a 20 fps sequence of high-resolution 3D meshes that capture face geometry, color, and motion," using structured-light patterns to "facilitate depth computation" through binocular stereo matching between camera pairs. Zhang-2004 at 2. Each face model has "roughly 16K vertices." Zhang-2004 at 7. Zhang-2004's "mesh tracking method is fully automatic without requiring markers to be placed on the subject's face." Zhang-2004 at 7. Zhang-2004 further discloses a "template fitting and tracking procedure [that] fills in missing data and yields point correspondence across the entire sequence without using markers," automatically tracking the template mesh "through other non-pattern frames in the sequence." Zhang-2004 at Abstract, 5. Zhang-2004's template fitting tracks facial deformation by jointly optimizing "shape matching to depth maps and vertex motions match[ing] the optical flow," and the tracked mesh deforms "smoothly through the rest of the sequence." Zhang-2004 at 5–6. Zhang-2004 also captures "face geometry, color, and motion" suitable for "data-driven editing and animation techniques." Zhang-2004 at 2. Zhang-2004 processes both successive video frames at 60 fps and non-successive non-pattern frames at 20 fps, as "[t]he projectors send a 'blank' pattern every three frames." Zhang-2004 at 2. Zhang-2004 is directed to high-resolution capture "for modeling and animation," and its outputs—high-resolution 3D meshes capturing geometry, color, and motion—are naturally suited for rendering as an animated 3D face and storage on or communication through machine-readable media. To the extent Rearden contends Zhang-2004 does not disclose or alone render obvious a rendered animated 3D face, or videos of rendered animated 3D faces, stored on a machine-readable medium or communicated, such features would have been obvious to a person of ordinary skill because rendering and storing 3D facial animation were conventional uses of the type of high-resolution mesh data Zhang-2004 produces. Similarly, it would have been obvious to use Zhang-2004's tracked facial performance data to animate a character different from the performer, as expression transfer and retargeting were well known in the art.

A person of ordinary skill would have been motivated to implement the asserted claim

features in Zhang-2004 because Zhang-2004 addresses the same technical problem as the ’072 and ’790 patents: capturing detailed, temporally varying facial geometry and motion for use in facial animation. The claimed features, as apparently construed by Rearden, reflect known components of facial capture and animation pipelines. A person of ordinary skill would have had a reasonable expectation of success because Zhang-2004 itself describes a working system that combines multi-camera capture, stereo depth computation, template fitting, optical flow, temporal tracking, and high-resolution mesh output.

**b. Wang-2004 Alone**

The Asserted claims of the ’072 and ’790 patents are obvious in view of Wang-2004 alone, at least under Rearden’s apparent infringement theory, and/or in combination with the knowledge of one of ordinary skill in the art.

As described in Exhibits 072-A25 and 790-A25 and above, Wang-2004 discloses high-speed, high-accuracy capture of moving faces without markers, precise tracking of facial motion using a multi-resolution deformable mesh, and synthesis of novel dynamic facial expressions. Wang-2004 describes a system that captures high-resolution dynamic 3D shape data at video-rate or greater speed, tracks facial motion with coarse and fine mesh models, and uses captured facial expression data for expression transfer, dynamic morphing, and synthesis of new expressions. For example, Wang-2004 discloses “high resolution dynamic 3-D shape data that capture very accurate geometry at speeds that exceed video frame rate,” returning “an average of 75 thousand 3-D measurements per frame, at 40Hz frame rate.” Wang-2004 at 678. Wang-2004 discloses “high speed, high accuracy capture of moving faces without the use of markers.” Wang-2004 at Abstract. Wang-2004 discloses “[v]ery precise tracking of facial motion using a multi-resolution deformable mesh.” Wang-2004 at Abstract. Wang-2004’s hierarchical tracking captures both “global facial motion that is caused by muscle action (coarse level)” and “subtler expression details that are generated by highly local skin deformations (fine-level).” Wang-2004 at 678. Wang-2004 captures dynamic facial expressions and discloses “expression transfer from a source face to a target face.” Wang-2004 at 679. Wang-2004 discloses “transfer[ring] one actor’s motion style to another actor regardless of her facial geometry.” Wang-2004 at 684.

Wang-2004 therefore discloses, or at minimum renders obvious, claim limitations directed to high-resolution 3D facial surface shapes, facial motion tracking, temporal correspondence, multi-resolution mesh processing, expression transfer, and generating facial animation based on captured facial performance data. To the extent Rearden contends that Wang-2004 does not disclose or alone render obvious every claimed implementation detail, a person of ordinary skill would have been motivated to combine Wang-2004 with other facial capture, rendering, stereo-matching, or communication references identified herein because Wang-2004 produces the same type of facial geometry and motion data used by those references. For example, to the extent Rearden contends that Wang-2004 does not disclose or alone render obvious rendering the captured facial motion as an animated 3D face on a machine-readable medium or communicating such data, it would have been obvious to a person of ordinary skill to incorporate conventional rendering, storage, and communication functionality. Wang-2004's facial animation and expression-synthesis outputs are the type of animation-ready data that a person of ordinary skill would have rendered for display, stored on computer media, or communicated for downstream use.

A person of ordinary skill would have been motivated to do so because Wang-2004's captured and tracked facial expression data has value precisely because it can be used to synthesize, animate, render, and display facial performances. A person of ordinary skill would have had a reasonable expectation of success because Wang-2004 describes a working dynamic facial capture and expression-transfer system, and combining that system with known rendering or storage techniques would have involved applying known computer-graphics methods to known facial animation data to yield predictable results.

**c. Vlasic-2005 Alone**

The asserted claims of the '072 and '790 patents are obvious in view of Vlasic-2005 alone, at least under Rearden's apparent infringement theory, and/or in combination with the knowledge of one of ordinary skill in the art.

As described in Exhibits 072-A23 and 790-A23 and above, Vlasic-2005 discloses a facial animation and face-transfer system that addresses the core claim limitations. Vlasic-2005 discloses generating "a detailed 3D textured face mesh for a target identity, which can be seamlessly rendered

back into target footage," and methods that "greatly simplify the editing of identity, performance, and facial texture in video, enabling video rewrite applications such as performance animation (puppetry) and actor replacement." Vlasic-2005 at Abstract, 432. Vlasic-2005 "estimates performance parameters and detailed 3D geometry from video recordings" using "detailed 3D scans (~ 30K vertices)." Vlasic-2005 at 427, 428. Vlasic-2005 obtains "a tracker that estimates performance parameters and detailed 3D geometry from video recordings" and "tracks approximately a thousand vertices." Vlasic-2005 at 427, 431. Vlasic-2005 expressly discloses expression transfer: "Face Transfer is a method for mapping videorecorded performances of one individual to facial animations of another." Vlasic-2005 at Abstract.

To the extent Rearden contends that Vlasic-2005 does not disclose or alone render obvious a specific multi-camera arrangement, markerless identification, or multi-resolution processing, those features would have been obvious in view of the other references identified in the categories above. Vlasic-2005 addresses the same general problem as the '072 and '790 patents: using captured facial performance information to generate a rendered animated 3D face representing a character's performance. A person of ordinary skill would have had a reasonable expectation of success because Vlasic-2005 describes a working system for linking video data to 3D facial models, tracking facial performance, transferring expressions, and rendering modified video output.

**d. Any Primary Reference in View of One or More of the 072/790 Rendered Animated 3D Face / Machine-Readable Medium / Communication References**

The asserted claims of the '072 and '790 patents are obvious in view of any Primary Reference in combination with any one or more of the 072/790 Rendered Animated 3D Face / Machine-Readable Medium / Communication References.

Certain claim limitations require, respectively, a machine-readable medium having data stored thereon representing a rendered animated 3D face and communicating data/video representing a rendered animated 3D face. To the extent Rearden contends that any Primary Reference does not disclose or alone render obvious rendering that geometry as an animated 3D face, storing it on a machine-readable medium, or communicating it, the 072/790 Rendered

Animated 3D Face / Machine-Readable Medium / Communication References disclose those additional features.

A person of ordinary skill would have been motivated to combine any Primary Reference with the 072/790 Rendered Animated 3D Face / Machine-Readable Medium / Communication References because facial capture systems are designed to produce data useful for animation, rendering, display, and communication. Rendering captured facial geometry as an animated 3D face and storing or communicating that rendered output are the natural downstream uses of captured facial data. Guenter-1998 discloses capturing human facial expression and "replaying it as a highly realistic 3D 'talking head'" that could be "delivered via CDROM or the internet to a user, and then reconstructed in real time." Guenter-1998 at 1. Eisert-2003 discloses transmitting "a small set of facial animation parameters" over a network and rendering deformed 3D head-and-shoulder models "using computer graphics techniques." Eisert-2003 at 8. Gordon-333 discloses "rendering the 2D data files into three-dimensional (3D) animation files." Gordon-333 at [0051]. Mok-710 discloses an "animation sequence [that] is stored in the computer memory of a video game" and displayed "on a video monitor." Mok-710 at 1:13–16. Fedorov-2003 discloses "model rendering" as "the final stage in the pipeline" where "the output is a synthetic video sequence showing a 'talking head.'" Fedorov-2003 at 3–4. Bouguet-408 discloses a "machine-readable medium" that "provides (i.e., stores and/or transmits) information in a form readable by a machine." Bouguet-408 at [0025]. The Artem Digital, Universal Capture, and Project Gemini systems were also used for facial motion capture and rendering 3D animated faces.

A person of ordinary skill would have had a reasonable expectation of success because rendering 3D meshes as animated faces, storing animation data on computer-readable media, and communicating animation data were conventional computer graphics and video-processing operations. The combination would have involved no more than the predictable use of known rendering, storage, and communication techniques with known captured facial data.

**e. Any Primary Reference in View of One or More of the 072/790 High-Resolution 3D Point Correlation References**

The asserted claims of the '072 and '790 patents are obvious in view of any Primary

Reference in combination with any one or more of the 072/790 High-Resolution 3D Point Correlation References.

Certain claim limitations require that the rendered animated 3D face data include a rendering of 3D points correlated to a high-resolution second plurality of 3D points on the performer's face. To the extent Rearden contends that any Primary Reference does not disclose or alone render obvious the particular correlation or high-resolution 3D reconstruction technique required by this limitation—whether under Rearden's asserted construction of "correlation" or under any other construction—it would have been obvious to a person of ordinary skill to implement the depth computation or 3D reconstruction step using known techniques from the 072/790 High-Resolution 3D Point Correlation References.

The motivation to combine is particularly strong because the Asserted Patents' shared specification admits that "pixel-wise, normalized cross-correlation is well known in the art" and identifies Bourke-1996 as "[a]n exemplary illustration and discussion of one pixel-wise, normalized cross-correlation." '226 patent at 13:46–51. A person of ordinary skill seeking to reconstruct high-resolution 3D facial geometry from multi-camera image data would naturally have looked to conventional stereo correspondence techniques, including normalized cross-correlation (Bourke-1996; Hannah), sum-of-square-differences (Yang-2003), iterative image registration (Lucas & Kanade), multi-camera stereo (Kanade-1997), disparity estimation (Eisert-2003), and stereo tracking (Bouguet-408). The Primary References that disclose multi-camera facial capture provide the image inputs; the 072/790 High-Resolution 3D Point Correlation References provide known algorithms for determining image correspondence and generating high-resolution 3D points.

A person of ordinary skill would have had a reasonable expectation of success because correlation-based stereo matching, triangulation, and 3D reconstruction from multi-view images were well-established techniques long before the Asserted Patents' priority date. The combination would have involved no more than the predictable use of known reconstruction algorithms with known multi-camera facial image data.

**f. Any Primary Reference in View of One or More of the 072/790 Markerless 3D Point Identification References**

The asserted claims of the ’072 and ’790 patents are obvious in view of any Primary Reference in combination with any one or more of the 072/790 Markerless 3D Point Identification References.

Certain claim limitations require that the 3D points on the surface of the performer’s face were not identified by markers applied to the performer’s face. To the extent Rearden contends any Primary Reference relies on markers for identifying facial surface points, it would have been obvious to a person of ordinary skill to implement the same facial capture and tracking functionality without markers, using the markerless techniques disclosed in the 072/790 Markerless 3D Point Identification References.

A person of ordinary skill would have been motivated to combine these references because the limitations of marker-based capture were well recognized: markers are intrusive, limit resolution to the density of applied markers, and require manual application before each capture session. The 072/790 Markerless 3D Point Identification References disclose markerless alternatives that overcome these limitations. Zhang-2004’s “mesh tracking method is fully automatic without requiring markers to be placed on the subject’s face.” Zhang-2004 at 7. Wang-2004 discloses “high speed, high accuracy capture of moving faces without the use of markers.” Wang-2004 at Abstract. Bouguet-408 describes “3D tracking of pose and deformation … without the use of invasive special markers.” Bouguet-408 at [0083]. Borshukov-2003 “did not use any markers on the face to assist feature tracking.” Borshukov-2003 at 1. Gordon-333 discloses that “physical features of the actors (e.g., shapes of nose or eyes) could be used as natural markers to track motion.” Gordon-333 at [0047]. Chuang-2002 discloses “a model-based technique that can reliably track a marker-less face.” Chuang-2002 at 3. Chiang-2002 discloses “feature extraction” to establish “one-to-one mesh point correspondence” without markers. Chiang-2002 at 4. Artem Digital, Universal Capture, and Project Gemini also disclose markerless facial motion capture systems.

A person of ordinary skill would have had a reasonable expectation of success because marker-based and markerless approaches were known alternatives in the same field. Substituting markerless tracking for marker-based tracking in a facial capture system would have been a

predictable design choice yielding predictable results.

**g. Any Primary Reference in View of One or More of the 072/790 Automatic 3D Point Tracking References**

The asserted claims of the ’072 and ’790 patents are obvious in view of any Primary Reference in combination with any one or more of the 072/790 Automatic 3D Point Tracking References.

Certain claim limitations require automatic tracking of the second plurality of 3D points. To the extent Rearden contends that any Primary Reference does not disclose or alone render obvious automatic tracking of those 3D points over time, the 072/790 Automatic 3D Point Tracking References disclose that feature.

A person of ordinary skill would have been motivated to combine any Primary Reference with the 072/790 Automatic 3D Point Tracking References because automatic tracking is necessary to convert per-frame or static 3D reconstructions into temporally coherent facial motion suitable for animation. The 072/790 Automatic 3D Point Tracking References disclose known techniques for establishing automatic temporal correspondence. Zhang-2004 discloses a template fitting and tracking procedure that automatically tracks a mesh “through other non-pattern frames in the sequence.” Zhang-2004 at 5. Borshukov-2003 discloses tracking “each pixel’s motion over time in each camera view” using optical flow, where “at each frame the 3-d position is estimated using triangulation” and “[t]he result is an accurate reconstruction of the path of each vertex though 3-d space over time.” Borshukov-2003 at 1. Wang-2004 and Huang-2004 use multi-resolution deformable meshes to automatically track facial motion. Kroos-145 discloses “facial motion tracking [that] is done by determining the location changes of small parts of the facial surface between successive frames.” Kroos-145 at 7:62–65. Maurer-231 discloses a “facial sensing process” that “tracks the positions and characteristics of facial features from frame to frame.” Maurer-231 at 3:22–24. Artem Digital, Universal Capture, and Project Gemini also disclose automatically tracking facial motion.

A person of ordinary skill would have had a reasonable expectation of success because automatic temporal tracking of facial 3D points was a standard technique in the facial capture field,

using optical flow, deformable models, template fitting, or feature-based registration.

**h. Any Primary Reference in View of One or More of the 072/790 Non-Successive Frame Times References**

The asserted claims of the ’072 and ’790 patents are obvious in view of any Primary Reference in combination with any one or more of the 072/790 Non-Successive Frame Times References.

Certain claim limitations require that, at least some of the time, intervals are not successive frame times. To the extent Rearden contends that any Primary Reference does not disclose or alone render obvious non-successive frame processing, the 072/790 Non-Successive Frame Times References disclose that feature.

Zhang-2004 already discloses non-successive frame processing: its projectors “send a ‘blank’ pattern every three frames,” and the system processes only the non-pattern frames for color texture and optical flow, producing a 20 fps output from a 60 fps input. Zhang-2004 at 2. Borshukov-2003 discloses keyshaping—manually correcting geometry when optical-flow drift becomes unacceptable and propagating corrections to previous frames. Borshukov-2003 at 1. Pighin-1998 discloses constructing 3D models for selected facial expressions and interpolating between them. Pighin-1998 at 2. Mok-710 discloses key-frame techniques in which “an animator reduces the number of frames by selecting only those video frames that are necessary to show lifelike motion.” Mok-710 at 1:33–35. Kroos-145 discloses skipping levels “in order to decrease processing time.” Kroos-145 at 3:31–36. Illsley-075 discloses “tak[ing] only one picture every two video pictures.” Illsley-075 at [0038]. Artem Digital discloses that its captured images can be “sampled at any rate” which allows expressions to be morphed between. DISNEY_REARDEN2_00039626. Universal Capture discloses a facial capture method utilizing optical flow in each camera view that “triangulate[s camera captures] to obtain 3D-motion.” DISNEY_REARDEN2_00040196.

A person of ordinary skill would have been motivated to use non-successive frames to reduce computational burden, manage frame rates, address optical-flow drift, or select frames that provide the most useful information for geometry reconstruction, texture capture, or temporal

correspondence. A person of ordinary skill would have had a reasonable expectation of success because frame selection, keyframing, and interpolation were routine and predictable techniques in video processing, computer graphics, and motion capture.

**i. Any Primary Reference in View of One or More of the 072/790 Character Face Different from Performer / Expression Transfer References**

The asserted claims of the ’072 and ’790 patents are obvious in view of any Primary Reference in combination with any one or more of the 072/790 Character Face Different from Performer / Expression Transfer References.

Certain claim limitations require that the first plurality of 3D points represent at least part of a character’s face different from the performer’s face. This limitation requires that the captured facial performance be applied to, transferred to, or used to animate a different character—i.e., expression transfer or retargeting. To the extent Rearden contends that any Primary Reference does not disclose or alone render obvious applying that captured motion to a different character’s face, the 072/790 Character Face Different from Performer / Expression Transfer References disclose that feature.

A person of ordinary skill would have been motivated to combine any Primary Reference with the 072/790 Character Face Different from Performer / Expression Transfer References because applying captured facial performance to a different character is one of the principal uses of facial motion capture, particularly in entertainment, film, and gaming. Vlasic-2005 discloses “Face Transfer … a method for mapping videorecorded performances of one individual to facial animations of another.” Vlasic-2005 at Abstract. Noh-2001 discloses “expression cloning (EC) [that] reuses the dense 3D motion vectors of the vertices of the source model to create similar animations on a new target model.” Noh-2001 at 278. Wang-2004 discloses “expression transfer from a source face to a target face, without further changes in facial geometry” and “transfer[ring] one actor’s motion style to another actor regardless of her facial geometry.” Wang-2004 at 679, 684. Chuang-2002 discloses “retargeting facial animation” where “the facial expression of the 3D model mirrors that of the input video sequence.” Chuang-2002 at 7. Gordon-333 discloses

rendering captured motion data into "three-dimensional (3D) animation files" for use in "producing the final computer graphics animation." Gordon-333 at [0051]. Mok-710 discloses that captured motion drives animation of a "displayed character" that "appears to perform the live action motion in a lifelike manner." Mok-710 at 1:13–16.

A person of ordinary skill would have had a reasonable expectation of success because expression transfer, retargeting, and applying captured performance data to a different character were well-established techniques in facial animation. Combining any Primary Reference's captured and tracked 3D facial data with known expression-transfer or retargeting algorithms would have involved applying known capture outputs to known animation techniques for their established purpose.

**j. One or More of the 072/790 Multi-Camera Capture References in View of One or More of the 072/790 High-Resolution 3D Point Correlation References**

The asserted claims of the '072 and '790 patents are obvious in view of any one or more of the 072/790 Multi-Camera Capture References in combination with any one or more of the 072/790 High-Resolution 3D Point Correlation References.

This combination addresses the relationship between the multi-camera capture requirement and requirement that the 3D points on the animated face be correlated to high-resolution 3D points on the performer's face. The 072/790 Multi-Camera Capture References disclose multi-camera systems that capture images of a performer's face from multiple viewpoints. The 072/790 High-Resolution 3D Point Correlation References disclose algorithms and techniques for correlating those multi-view images and reconstructing high-resolution 3D points on the performer's face.

A person of ordinary skill would have been motivated to combine these categories because they are complementary stages of the same pipeline. Multi-camera systems generate the image data; correlation and reconstruction algorithms process that data into high-resolution 3D geometry. For example, a person implementing the multi-camera systems disclosed in Gordon-333 (plurality of motion cameras), Pighin-1998 (five cameras simultaneously), D'Apuzzo-2003 (multi-camera setup), or Eisert-2003 (multiple camera setup) would have been motivated to apply known stereo-

matching and 3D reconstruction techniques—such as normalized cross-correlation (Bourke-1996; Hannah), stereo depth computation (Zhang-2004; Kanade-1997; Bouguet-408), disparity estimation (Eisert-2003), or triangulation from tracked features (Guenter-1998; Borshukov-2003)—to compute high-resolution 3D facial geometry from the captured multi-view images.

A person of ordinary skill would have had a reasonable expectation of success because multi-camera stereo reconstruction was a mature and well-validated technique. Using correlation-based matching to identify corresponding image regions across camera views and then triangulating to recover 3D geometry was the standard approach to multi-view 3D reconstruction.

**k. One or More of the 072/790 High-Resolution 3D Point Correlation References in View of One or More of the 072/790 Rendered Animated 3D Face / Machine-Readable Medium / Communication References**

The asserted claims of the ’072 and ’790 patents are obvious in view of any one or more of the 072/790 High-Resolution 3D Point Correlation References in combination with any one or more of the 072/790 Rendered Animated 3D Face / Machine-Readable Medium / Communication References.

This combination addresses the relationship between the high-resolution 3D reconstruction and the rendering, storage, and communication of the resulting animated 3D face. To the extent Rearden contends that a 072/790 High-Resolution 3D Point Correlation Reference does not expressly disclose rendering that geometry as an animated 3D face, storing it on a machine-readable medium, or communicating it, the 072/790 Rendered Animated 3D Face / Machine-Readable Medium / Communication References supply those additional features.

A person of ordinary skill would have been motivated to combine these categories because the natural downstream use of reconstructed high-resolution 3D facial data is to render it as an animated 3D face and to store or communicate the result. The 072/790 Rendered Animated 3D Face / Machine-Readable Medium / Communication References disclose precisely those downstream uses. Guenter-1998 discloses replaying captured facial expression “as a highly realistic

3D 'talking head'" deliverable "via CDROM or the internet." Guenter-1998 at 1. Eisert-2003 discloses encoding facial animation parameters and transmitting them over a network, where "[t]he decoder only has to move and deform the 3-D head-and-shoulder models in the virtual conferencing scene and render it using computer graphics techniques." Eisert-2003 at 8. Fedorov-2003 discloses that "the output is a synthetic video sequence showing a 'talking head'" using "OpenGL for 3D model rasterization." Fedorov-2003 at 3–4. Maurer-231 discloses that "tracking information may be transmitted via the network to one or more remote sites which receives the information and generates, using a graphics engine, an animated facial image on the avatar display." Maurer-231 at 3:13–30.

A person of ordinary skill would have had a reasonable expectation of success because rendering 3D meshes, storing animation data, and communicating animation parameters were conventional computer graphics operations. The combination would have yielded predictable results: a rendered animated 3D face, stored or communicated, whose geometry derives from high-resolution 3D point correlation of a performer's captured facial surface.

**l. One or More of the 072/790 Automatic 3D Point Tracking References in View of One or More of the 072/790 Facial Expression Correspondence References**

The asserted claims of the '072 and '790 patents are obvious in view of any one or more of the 072/790 Automatic 3D Point Tracking References in combination with any one or more of the 072/790 Facial Expression Correspondence References.

This combination addresses the relationship between the automatic tracking of 3D points and the requirement that the tracked 3D points at one or more time intervals correspond to a facial expression. To the extent Rearden contends a 072/790 Automatic 3D Point Tracking reference discloses automatic 3D point tracking but Rearden contends the reference does not disclose or alone render obvious that the tracked 3D points correspond to a recognized facial expression, the 072/790 Facial Expression Correspondence References supply that additional feature.

A person of ordinary skill would have been motivated to combine these references because tracking 3D points on a performer's face over time inherently captures the geometric changes that

constitute facial expressions. Wang-2004 explicitly captures “dynamic 3-D facial expressions” and discloses “expression transfer from a source face to a target face.” Wang-2004 at 679, Abstract. Chuang-2002 discloses that “the facial expression of the 3D model mirrors that of the input video sequence as desired.” Chuang-2002 at 7. Pighin-1998 constructs 3D models for “several different facial expressions” and interpolates between them. Pighin-1998 at 2. Eisert-2003 discloses estimation of “facial expressions” using a parameterized 3D head model. Eisert-2003 at 8–9. Guenter-1998 captures “human facial expression and replay[s] it as a highly realistic 3D ‘talking head.’” Guenter-1998 at 1. Vlasic-2005 extracts “visemes (speech-related mouth articulations), expressions, and three-dimensional (3D) pose from monocular video or film footage.” Vlasic-2005 at Abstract.

A person of ordinary skill would have had a reasonable expectation of success because associating tracked 3D mesh deformations with facial expressions was a natural and well-understood step in facial animation pipelines. The tracked geometry is the expression; recognizing, classifying, or using the tracked mesh as representing a facial expression would have been routine.

**m. One or More of the 072/790 Fold & Deform Tracking References in View of One or More of the 072/790 Character Face Different from Performer / Expression Transfer References**

The asserted claims of the ’072 and ’790 patents are obvious in view of any one or more of the 072/790 Fold & Deform Tracking References in combination with any one or more of the 072/790 Character Face Different from Performer / Expression Transfer References.

This combination addresses the relationship between the tracking of facial deformation (folding and deforming regions) and the requirement that the captured performance animate a character’s face different from the performer. A reference that discloses tracking how a performer’s face folds and deforms may not expressly disclose applying that tracked deformation to animate a different character’s face. The 072/790 Character Face Different from Performer / Expression Transfer References supply that additional feature.

A person of ordinary skill would have been motivated to combine these references because

the detailed deformation data captured by the 072/790 Fold & Deform Tracking References—vertex trajectories, mesh deformations, optical flow through folding and deforming facial regions—is precisely the type of input used by expression-transfer and retargeting systems to drive a different character's animation. Vlasic-2005 discloses "mapping videorecorded performances of one individual to facial animations of another." Vlasic-2005 at Abstract. Noh-2001 discloses "expression cloning (EC) [that] reuses the dense 3D motion vectors of the vertices of the source model to create similar animations on a new target model." Noh-2001 at 278. Wang-2004 discloses transferring "one actor's motion style to another actor regardless of her facial geometry." Wang-2004 at 684. Chuang-2002 discloses "retargeting facial animation" where captured performance drives a 3D model. Chuang-2002 at 7. Borshukov-2003 discloses that "[i]n order to attach facial performances to CG bodies or blend between different performances this movement must be removed," indicating use of captured performance for character animation distinct from the performer. Borshukov-2003 at 1.

A person of ordinary skill would have had a reasonable expectation of success because applying tracked facial deformation data to a target character was a well-established technique. The combination would merely use known tracked facial-deformation outputs as inputs to known expression-transfer or retargeting systems, yielding predictable facial animation results for a character different from the performer.

**n. Any Primary Reference in View of One or More of the 072/790 Facial Feature Tracking (Eyes, Lips, Teeth) References**

The asserted claims of the '072 and '790 patents are obvious in view of any Primary Reference in combination with any one or more of the 072/790 Facial Feature Tracking (Eyes, Lips, Teeth) References.

Certain claim limitations require that the tracked 3D points include some or all parts of eyes, lips, or teeth of the performer. To the extent Rearden contends any Primary Reference does not disclose or alone render obvious tracking of the eyes, lips, or teeth of the performer, the 072/790 Facial Feature Tracking (Eyes, Lips, Teeth) References disclose that feature.

A person of ordinary skill would have been motivated to ensure that tracked 3D points

encompass the eyes, lips, and teeth because these are the most expressive and communicatively important regions of the face. Chuang-2002 discloses a model-based tracker that captures "facial features of each frame" including mouth and eye regions. Chuang-2002 at 3. Eisert-2003 discloses a parameterized 3D head model that tracks facial expressions including mouth and eye movements. Eisert-2003 at 8–9. Wang-2004 captures "subtle expressions" and "expression details" using a multi-resolution deformable mesh encompassing the full face. Wang-2004 at Abstract, 678. Guenter-1998 tracks a "large set of sampling points on the face" covering all facial regions including eyes, mouth, and surrounding areas. Guenter-1998 at Abstract. Fedorov-2003 explicitly models "skin, eyes, pupils, teeth, tongue" as separate objects in its facial animation system. Fedorov-2003 at 3.

A person of ordinary skill would have had a reasonable expectation of success because tracking of facial features including eyes, lips, and teeth was a fundamental objective of facial motion capture systems, and the referenced tracking algorithms were designed to capture precisely these regions.

### 8. Secondary Indicia of Non-Obviousness

There are no objective indicia of non-obviousness for any of the Asserted Claims. Plaintiffs bear the burden of coming forward with evidence regarding objective indicia of non-obviousness and its purported nexus to the Asserted Claims. *ZUP, LLC v. Nash Mfg., Inc.*, 896 F.3d 1365, 1373 (Fed. Cir. 2018). Patent L.R. 3-3 does not require any contentions regarding secondary indicia of non-obviousness as part of this disclosure.

## V. CLAIM CHARTS PURSUANT TO PATENT L.R. 3-3(C)

Individual claim charts that specify where and how in each alleged item of prior art each limitation of each Asserted Claim is found are attached to these Invalidity Contentions:

**Exhibits 248-A** and **248-B** provide claim charts for the asserted claims of the '248 patent:

| Reference | Claim Charts |
|---|---|
| Abrantes-1999 | 248-A1 |
| Borshukov–2003 | 248-A2 |

| Reference | Claim Charts |
|---|---|
| Bouguet–408 | 248-A3 |
| Chiang–2002 | 248-A4 |
| Chuang–2002 | 248-A5 |
| Chuang-2004 | 248-A6 |
| D'Apuzzo–2003 | 248-A7 |
| Eisert–2003 | 248-A8 |
| Fedorov–2003 | 248-A9 |
| Gordon–333 | 248-A10 |
| Guenter-1998 | 248-A11 |
| Hawkins-2004 | 248-A12 |
| Huang–2004 | 248-A13 |
| Illsley–075 | 248-A14 |
| Kanade–1997 | 248-A15 |
| Kroos-145 | 248-A16 |
| MacVicar–2004 | 248-A17 |
| Maurer–231 | 248-A18 |
| Mok–710 | 248-A19 |
| Noh–2001 | 248-A20 |
| Pighin–1998 | 248-A21 |
| Scharstein–2002 | 248-A22 |
| Vlasic–2005 | 248-A23 |
| Urquhart–1997 | 248-A24 |
| Wang–2004 | 248-A25 |
| Yang–2003 | 248-A26 |

| Reference | Claim Charts |
|---|---|
| Zhang–2004 | 248-A27 |
| Zinßer–2004 | 248-A28 |
| Artem Digital System Art | 248-B1 |
| Project Gemini System Art | 248-B2 |
| Image Metrics System Art | 248-B3 |
| Universal Capture System Art | 248-B4 |
| Virtual Clones (DI4D) | 248-B5 |
| Light Stage | 248-B6 |

**Exhibits 226-A** and **226-B** provide claim charts for the asserted claims of the ’226 patent:

| Reference | Claim Charts |
|---|---|
| Abrantes-1999 | 226-A1 |
| Borshukov–2003 | 226-A2 |
| Bouguet–408 | 226-A3 |
| Chiang–2002 | 226-A4 |
| Chuang–2002 | 226-A5 |
| Chuang-2004 | 226-A6 |
| D’Apuzzo–2003 | 226-A7 |
| Eisert–2003 | 226-A8 |
| Fedorov–2003 | 226-A9 |
| Gordon–333 | 226-A10 |
| Guenter-1998 | 226-A11 |
| Hawkins-2004 | 226-A12 |
| Huang–2004 | 226-A13 |

| Reference | Claim Charts |
|---|---|
| Illsley–075 | 226-A14 |
| Kanade–1997 | 226-A15 |
| Kroos-145 | 226-A16 |
| MacVicar–2004 | 226-A17 |
| Maurer–231 | 226-A18 |
| Mok–710 | 226-A19 |
| Noh–2001 | 226-A20 |
| Pighin–1998 | 226-A21 |
| Scharstein–2002 | 226-A22 |
| Vlasic–2005 | 226-A23 |
| Urquhart–1997 | 226-A24 |
| Wang–2004 | 226-A25 |
| Yang–2003 | 226-A26 |
| Zhang–2004 | 226-A27 |
| Zinßer–2004 | 226-A28 |
| Artem Digital System Art | 226-B1 |
| Project Gemini System Art | 226-B2 |
| Image Metrics System Art | 226-B3 |
| Universal Capture System Art | 226-B4 |
| Virtual Clones (DI4D) | 226-B5 |
| Light Stage | 226-B6 |

**Exhibits 072-A** and **072-B** provide claim charts for the asserted claims of the ’072 patent.

| **Reference** | **Claim Charts** |
|---|---|
| Abrantes-1999 | 072-A1 |
| Borshukov–2003 | 072-A2 |
| Bouguet–408 | 072-A3 |
| Chiang–2002 | 072-A4 |
| Chuang–2002 | 072-A5 |
| Chuang-2004 | 072-A6 |
| D'Apuzzo–2003 | 072-A7 |
| Eisert–2003 | 072-A8 |
| Fedorov–2003 | 072-A9 |
| Gordon–333 | 072-A10 |
| Guenter-1998 | 072-A11 |
| Hawkins-2004 | 072-A12 |
| Huang–2004 | 072-A13 |
| Illsley–075 | 072-A14 |
| Kanade–1997 | 072-A15 |
| Kroos-145 | 072-A16 |
| MacVicar–2004 | 072-A17 |
| Maurer–231 | 072-A18 |
| Mok–710 | 072-A19 |
| Noh–2001 | 072-A20 |
| Pighin–1998 | 072-A21 |
| Scharstein–2002 | 072-A22 |
| Vlasic–2005 | 072-A23 |
| Urquhart–1997 | 072-A24 |

| Reference | Claim Charts |
|---|---|
| Wang–2004 | 072-A25 |
| Yang–2003 | 072-A26 |
| Zhang–2004 | 072-A27 |
| Zinßer–2004 | 072-A28 |
| Artem Digital System Art | 072-B1 |
| Project Gemini System Art | 072-B2 |
| Image Metrics System Art | 072-B3 |
| Universal Capture System Art | 072-B4 |
| Virtual Clones (DI4D) | 072-B5 |
| Light Stage | 072-B6 |

**Exhibits 790-A** and **790-B** provide claim charts for the asserted claims of the ’790 patent:

| Reference | Claim Charts |
|---|---|
| Abrantes-1999 | 790-A1 |
| Borshukov–2003 | 790-A2 |
| Bouguet–408 | 790-A3 |
| Chiang–2002 | 790-A4 |
| Chuang–2002 | 790-A5 |
| Chuang-2004 | 790-A6 |
| D’Apuzzo–2003 | 790-A7 |
| Eisert–2003 | 790-A8 |
| Fedorov–2003 | 790-A9 |
| Gordon–333 | 790-A10 |
| Guenter-1998 | 790-A11 |

| Reference | Claim Charts |
|---|---|
| Hawkins-2004 | 790-A12 |
| Huang–2004 | 790-A13 |
| Illsley–075 | 790-A14 |
| Kanade–1997 | 790-A15 |
| Kroos-145 | 790-A16 |
| MacVicar–2004 | 790-A17 |
| Maurer–231 | 790-A18 |
| Mok–710 | 790-A19 |
| Noh–2001 | 790-A20 |
| Pighin–1998 | 790-A21 |
| Scharstein–2002 | 790-A22 |
| Vlasic–2005 | 790-A23 |
| Urquhart–1997 | 790-A24 |
| Wang–2004 | 790-A25 |
| Yang–2003 | 790-A26 |
| Zhang–2004 | 790-A27 |
| Zinßer–2004 | 790-A28 |
| Artem Digital System Art | 790-B1 |
| Project Gemini System Art | 790-B2 |
| Image Metrics System Art | 790-B3 |
| Universal Capture System Art | 790-B4 |
| Virtual Clones (DI4D) | 790-B5 |
| Light Stage | 790-B6 |

This identification is intended to be exemplary in nature rather than exhaustive. Disney has

endeavored to identify the most relevant portions of the references. The references, however, may contain additional support for a particular claim limitation. Disney may rely on uncited portions of the prior art references, other documents, fact witness testimony, Rearden's testimony, and expert testimony to provide context or to aid in understanding the cited portions of the references. Where Disney cites to a particular figure in a reference, the citation should be understood to encompass the caption, related description of the figure, and any text relating to the figure. Conversely, where Disney cites to particular text referring to a figure, the citation should be understood to include the figure as well. Disney reserves the right to rely on any portion of each reference in this chart, cited or not, to show that the asserted claims are invalid.

Disney's attached charts provide citations to certain prior art references where information that anticipates and/or renders obvious the claimed inventions may be found, either expressly or inherently. There may, however, be additional support in the cited references or other grounds for Disney's contentions that such prior art meets a particular claim element, and Disney reserves the right to supplement these Invalidity Contentions with such information. For example, persons of ordinary skill in the art at the time of the filing of the Asserted Patents knew to read prior art references as a whole (as opposed to excerpts in isolation) and in the context of other publications and literature, and the general knowledge in the field. Disney may rely on all such information, including uncited portions of the prior art references listed herein, as well as other publications and testimony, to provide context and aid in to understanding and interpreting the listed references, or to establish that a person of ordinary skill in the art would have been motivated to modify or combine any of the cited references so as to render the claims obvious.

Some of the references on which Disney relies are prior art systems and devices that were known, sold, and/or used prior to the priority date of the Asserted Patents. Disney is continuing to collect documentation, software, and source code regarding these prior art systems and devices, including through third-party discovery. Disney reserves the right to supplement its contentions to include any further information obtained in discovery, including any documents and information received in response to Disney's subpoenas.

## VI. CONTENTIONS PURSUANT TO PATENT L.R. 3-3(D)

Disney identifies the following additional grounds for invalidity of the Asserted Claims based on 35 U.S.C. §§ 101 and/or 112. Disney notes that its investigation is ongoing and that discovery is in its earliest stages. Disney therefore is identifying those issues under 35 U.S.C. §§ 101 and/or 112 of which it is currently aware. Disney reserves the right to supplement and/or amend its contentions after the Court's claim construction rulings or if Rearden supplements its Infringement Contentions or changes its allegations in any way.

Disney's Invalidity Contentions regarding 35 U.S.C. §§ 101 and/or 112 shall not be construed as an admission that any claim construction advanced by Disney in this case is in any way inconsistent, flawed, or erroneous. Nor should these contentions prevent Disney from advancing any claim construction and/or noninfringement positions. Further, these contentions shall not be construed as an admission of, or acquiescence to, Rearden's apparent claim constructions or interpretations, or other positions advanced by Rearden during the course of this litigation.

### A. 35 U.S.C. § 101

In accordance with Patent L.R. 3-3(d), Disney contends that every Asserted Claim is invalid for failure to meet the requirements of 35 U.S.C. § 101. The Court has treated claim 1 of the '226 patent, claim 1 of the '248 patent, claim 9 of the '072 patent, and claim 9 of the '790 patent as representative of the eligibility of their respective patents, *see* Dkt. 54 at 7-15, and Disney identifies those claims as representative here. Rearden has also treated these claims as representative. Dkt. 47 at 13 ("In addressing Defendant's Section 101 challenge, Rearden accordingly first provides a detailed explanation of the ***representative claims*** of the patents-in-suit, before addressing the application of the *Alice* two-part test.") (emphasis added). Each remaining Asserted Claim is substantially similar to, and linked to the same abstract idea as, the representative claim of the patent in which it appears, and recites only conventional or field-of-use limitations that do not alter the analysis.

The Asserted Claims are directed to patent-ineligible concepts. *See Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). As the Court found, "the claims fail to recite specific means of

implementing the abstract concept of markerless facial motion capture, the Court holds that the patents are directed to abstract ideas." *See* Dkt. 54 at 14.

Second, there are no elements of the Asserted Claims that transform the nature of the claims into a patent-eligible application of the abstract idea or provide the necessary inventive concept. *See id.* at 2357. In addition, all of the elements of the Asserted Claims merely involve well-understood, routine, conventional activity and implementations previously used by those in the field at the time of the alleged inventions of the Asserted Patents. *See Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 132 S. Ct. 1289, 1294 (2012). The alleged inventions described in the Asserted Claims entail nothing of patentable significance, and are therefore invalid for failure to meet the requirements of 35 U.S.C. § 101.

And even if the Court adopts Rearden's constructions—limiting "correlates" and "correlated" to the pixel-wise, normalized cross-correlation algorithm in Figure 15, and limiting "track" and "automatically tracked" to the frame-to-frame methodology described at 20:32-21:34 and illustrated in Figures 26A, 26B, and 27—the claims still fail under § 101. So construed, they recite a mathematical algorithm bracketed by conventional pre-solution activity, i.e., capturing 2D frames using a plurality of cameras, and conventional post-solution activity, i.e., rendering and communicating the resulting animated face. That is not enough. Limiting claims to a particular algorithm narrows their scope; it does not transform result-oriented facial-motion-capture claims into a technological improvement

Disney incorporates by reference, in their entireties, Disney's briefing in support of its Motion to Dismiss First Amended Complaint (Dkt. 34), Motion to Dismiss Second Amended Complaint (Dkt. 42), Motion to Dismiss Third Amended Complaint (Dkt. 68), and related Court rulings, which provide exemplary reasons why the Asserted Patents are patent-ineligible.

**B. 35 U.S.C. § 112**

In accordance with Patent L.R. 3-3(d), Disney includes the below grounds on which Disney contends the Asserted Claims are invalid for failure to meet the requirements of the first two paragraphs of 35 U.S.C. § 112.

Rearden has not yet provided a claim construction for many of the terms and phrases that

Disney anticipates will be in dispute. Disney, therefore, cannot provide a complete list of its § 112 defenses because Disney does not know whether Rearden will proffer a construction or Asserted Claim scope for certain terms and phrases that is broader than, or inconsistent with, the construction that would be supportable by the disclosure set forth in the Specification.

To the extent these Invalidity Contentions reflect constructions of claim limitations or claim scope consistent with or implicit in Rearden's Infringement Contentions, no inference is intended nor should any be drawn that Disney agrees with Rearden's claim constructions or Asserted Claim scope, and Disney expressly reserves the right to contest such claim constructions or Asserted Claim scope. Disney offers these contentions in response to Rearden's Infringement Contentions and without prejudice to any position it may ultimately take as to any claim construction or claim scope issues.

Accordingly, Disney reserves the right to supplement, amend, and/or modify these contentions under § 112 as discovery progresses.

**1. Legal Standards**

**a. Legal Standards for Written Description**

To satisfy the written description requirement, the specification must demonstrate that the patentee possessed the full scope of the claimed invention as of the filing date of the patent. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1376-79 (Fed. Cir. 2009); *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1344-47 (Fed. Cir. 2005). If the specification demonstrates that the patentee possessed only some, but not all, embodiments encompassed by a claim, the claim is invalid under the written description requirement. *ICU*, 558 F.3d at 1376-79 (affirming summary judgment that claims to medical valves were invalid where claims encompassed both spiked and spikeless valves but Specification described only spiked valves); *LizardTech*, 424 F.3d at 1337-39 (affirming summary judgment that broad claims to seamless image compression were invalid, where Specification described only one method of seamless image compression).

"[T]he hallmark of written description is disclosure." *Ariad*, 598 F.3d at 1351. Thus, the written description test requires "an objective inquiry into the four corners of the Specification from

the perspective of a person of ordinary skill in the art." *Id*. A specification that merely renders obvious the full scope of the claimed invention does not satisfy the written-description requirement. *Id*.; *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) ("It is not sufficient for purposes of the written description requirement of § 112 that the disclosure, when combined with the knowledge in the art, would lead one to speculate as to modifications that the inventor might have envisioned, but failed to disclose.").

"While the written description requirement does not require that the specification recite the claimed invention in any particular way, pointing to an 'amalgam of disclosures' from which an artisan could have created the claimed invention does not satisfy this requirement." *Flash-Control, LLC v. Intel Corp.*, No. 2020-2141, 2021 WL 2944592, at *3 (Fed. Cir. July 14, 2021) (citations omitted). Instead, for a claim to be valid, the specification must present the elements of that claim as an "integrated whole." *Id.*

**b. Legal Standard for Enablement**

To satisfy the enablement requirement, the specification of a patent must enable a person of skill in the art, as of the filing date, to practice the full scope of the claimed invention without undue experimentation. *Alza Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 941-42 (Fed. Cir. 2010); *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008). "Enabling the full scope of each claim is 'part of the quid pro quo of the patent bargain.'" *Sitrick*, 516 F.3d at 999 (quoting *AK Steel Corp. v. Sollac,* 344 F.3d 1234, 1244 (Fed. Cir. 2003)). If a patent enables some embodiments within the scope of a claim, but not others, then the claim is invalid. *Alza*, 603 F.3d at 939-43 (affirming judgment that claims encompassing medicinal tablets in both osmotic and non-osmotic dosage forms were invalid where specification taught only osmotic dosage forms); *Sitrick*, 516 F.3d at 999-1001 (affirming summary judgment that claims encompassing both video games and movies held invalid where specification only taught use of invention in video games); *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1281-85 (Fed. Cir. 2007) (affirming summary judgment that claims encompassing both mechanical and electronic side-impact sensors were invalid where specification taught only mechanical sensors).

The focus of an enablement inquiry is on the teachings in the specification. *See* 35 U.S.C.

§ 112 ("The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same. . . ."). To satisfy the plain language of 35 U.S.C. § 112, the patentee is "required to provide an adequate enabling disclosure in the specification; it cannot simply rely on the knowledge of a person of ordinary skill to serve as a substitute for the missing information in the specification." *Alza*, 603 F.3d at 941; *see also Auto. Techs.*, 501 F.3d at 1283-84 (claims encompassing electronic sensors held invalid because the specification did not teach electronic sensors, despite the fact that known technologies could be used to create the electronic sensors). In addition, the Supreme Court has recently held that "[i]f a patent claims an entire class of processes, machines, manufactures, or compositions of matter, the patent's specification must enable a person skilled in the art to make and use the entire class. . . . The more one claims, the more one must enable." *Amgen Inc. v. Sanofi,* 143 S. Ct. 1243, 1254 (2023).

The Federal Circuit has identified several factors that a court may consider when deciding whether the Specification requires undue experimentation: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *Alza*, 603 F.3d at 940. The Federal Circuit has made clear, however, that "when there is no disclosure of any specific starting material or of any of the condition under which a process can be carried out, undue experimentation is required." *Id*. at 941 (quoting *Auto. Techs.*, 501 F.3d at 1283-84).

**c. Legal Standard for Indefiniteness**

A patent claim must "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as [the] invention." Pre-AIA 35 U.S.C. § 112, ¶ 2. A "patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014); *see also*

*In re Packard*, 751 F.3d 1307, 1314 (Fed. Cir. 2014). Eliminating the "zone of uncertainty" is the responsibility of the patentee: "[A]bsent a meaningful definiteness check . . . patent applicants face powerful incentives to inject ambiguity into their claims. Eliminating that temptation is in order, and 'the patent drafter is in the best position to resolve the ambiguity in . . . patent claims.'" *Nautilus*, 134 S. Ct. at 2129 (citations omitted) (quoting *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008)).

**2. The '248 Patent**

**a. Claims Lacking Written Description and/or Enablement**

Disney contends that the asserted claims of the '248 patent are invalid under 35 U.S.C. § 112 because they lack written description and/or enablement, at least under the implicit claim constructions or Asserted Claim scope relied upon in Rearden's Infringement Contentions or the explicit claim constructions provided in Rearden's Fifth Amended Complaint.

**i. "automatically track" / "automatically tracking"**

Claims 1, 2, 3, 9, 10, 11, 16, 18, 24, and 26 of the '248 patent recite "automatically track" or "automatically tracking." Claim 1 recites "a first plurality of 3D points in the high-resolution 3D mesh **automatically track** a second plurality of 3D points on the surface of the performer's face." Claims 9 and 24 recite "a first plurality of 3D points in the high-resolution 3D mesh **automatically tracking** a second plurality of 3D points on the surface of the performer's face." Claims 2, 10, 16, and 24 recite **automatically track or automatically tracking** a second plurality of 3D points "within regions of the performer's face as they fold or deform" or "within regions of the performer's face that fold or deform." Claims 3, 11, 18, and 26 recite the first plurality of 3D points **automatically track** or **automatically tracking** the second plurality of 3D points that include some or all parts of the eyes, lips, or teeth.

Rearden contends in its Fifth Amended Complaint that the term "automatically track" "refers to, is limited to, and should be construed to require use of, the frame-to-frame high-resolution tracking of 3D points within regions of the performer's face set forth in detailed embodiments in [the Specification at] 20:32-21:34 and illustrated in Figures 26A, 26B and 27 in which the present invention tracks successive time interval captures to determine 3D points on the

performer's face as they fold or deform." 5AC at ¶165. Even under this construction, the Specification, including the embodiments cited by Rearden, does not convey possession of the concept for "automatically" tracking 3D points. Rearden also states "the frame-to-frame tracking algorithms of the '248 Patent are specific and inventive technological processes that are necessary to enable the creation of high-resolution 3D facial shapes from a series of images of an actor that track the high-resolution 3D motion of the performer's face." 5AC at ¶166. There is, however, no algorithm disclosed in the Specification for frame-to-frame tracking, let alone an algorithm for 3D points in a 3D mesh automatically tracking a second plurality of 3D points on the surface of the performer's face.

Additionally, the claims purport to cover tracking in all markerless facial capture contexts. Yet, the Specification proposes a method only comprising tracking when "applying a random pattern to specified regions of a performer's face." *Id.* at 3:64-66. There is no written description support for tracking 3D points on the surface of the performer's face that fold or deform without applying a random pattern to specified regions of a performer's face. Indeed, as the Specification concedes, it "would be very difficult to achieve" "precise frame-to-frame surface region tracking" without applying a random pattern to specified regions of a performer's face. *Id.* at 21:15-18. However, the claims are not so limited and instead cover all markerless systems—for example, systems that do not use a random pattern.

In addition, there is also no written description support for a first plurality of 3D points automatically tracking a second plurality of 3D points. Specifically, the Specification fails to recite a second plurality of 3D points on the surface of the performer's face and 3D points tracking other 3D points, and thus there is no disclosure of a first plurality of 3D points tracking a second plurality of 3D points.

For at least these reasons, the Specification does not provide written description of "automatically track" or "automatically tracking" such that the Specification demonstrates that the patentee possessed "automatically track" or "automatically tracking" within the scope of the claims. Moreover, a person of skill in the art would not be able to implement "automatically track" or "automatically tracking" without undue experimentation in view of the Specification. A person of

skill in the art would also not be able to implement markerless tracking without randomly applied phosphorescent paint on a performer's face without undue experimentation in view of the Specification, which provides no explanation or guidance on how to implement frame-to-frame tracking without the application of random patterns of phosphorescent paint. Further, each claim that depends from a claim that lacks written description or is not enabled as a result of these terms also lacks written description and is not enabled for the same reason.

**ii. "correlates" / "correlating"**

Claims 1, 9, 16, and 24 of the '248 patent recite "correlate" or "correlating." Claims 1 and 16 of the '248 patent recite "a processor that **correlates** the plurality of 2D frames from the plurality of cameras at the plurality of time intervals to create a high-resolution [three-dimensional (3D) / 3D] mesh corresponding to a 3D shape of some or all of the surface of the performer's face at some or all of the time intervals." Claim 9 recites "**correlating** 2D frames from a plurality of cameras at a plurality of time intervals, each camera capturing a plurality of 2D frames of some or all of a surface of a performer's face as the performer's face changes in some or all of the plurality of time intervals." Claim 24 recites "**correlating** frames from a plurality of cameras at a plurality of time intervals, each camera capturing a plurality of 2D frames of some or all of a surface of a performer's face as the performer's face changes in some or all of the plurality of time intervals."

Rearden contends in its Fifth Amended Complaint that the terms "correlates" and "correlating" are "limited to, and should be construed to require use of, a pixel-wise cross-correlation algorithm for determining the 3D location of points on the performer's face by correlating a plurality of 2D frames from a plurality of cameras at the same time interval, as set forth in the flowchart of Figure 15 of the '248 Patent with its use described in detail at col. 11:28-17:4, together with the alternate embodiments for adjusting the values within the correlation algorithm described at col. 17:5-18 and the alternate correlation embodiments detailed at 17:19-20:31." 5AC at ¶164. Even under Rearden's proposed construction, the Specification does not provide adequate written description or enablement for the full scope of these claim limitations. The Specification describes Figure 15 as "one specific embodiment of a method for correlating two frame captures from two different perspectives," ('248 patent at 11:50-2) and explains that the

method involves two camera frames, PA and PB, captured at the same time, downsampling those frames, warping them to an imaginary plane, performing "a pixel-wise, normalized cross-correlation between VA and VB," and iterating over depths and resolutions to determine a Z matrix used to render a 3D surface.

The claims, however, are not limited to that particular two-camera, same-time, depth-sweep, downsample/upsample, virtual-camera implementation. Instead, the independent claims broadly recite correlating a "plurality" of 2D frames from a "plurality" of cameras at a "plurality" of time intervals to create a high-resolution 3D mesh for some, or all of, the surface of the performer's face. The Specification's Figure 15 embodiment is tied to "two frame captures from two different perspectives," where Camera 2801 captures frame PA and Camera 2802 captures frame PB "at the same time frame PA is captured," and the resulting correlated frame is from the perspective of an imaginary or "virtual" camera. The Specification also expressly states that "FIG. 15 illustrates only one embodiment of the present invention," and that "not all of the steps and processes illustrated in FIG. 15 must be followed," which confirms that the disclosure is not a clear description of the full metes and bounds of any broader genus of "correlating" covered by the claims.

For written description, the Specification does not demonstrate possession of the full claimed scope of "correlates" or "correlating." The only correlation algorithm disclosed is a specific pixel-wise, normalized cross-correlation process between two warped image matrices, VA and VB, generated from two downsampled 2D camera frames, SA and SB. The Specification does not describe correlating a "plurality" set of frames across "plurality" time intervals, does not identify which operations are required versus optional, and does not disclose how to implement the claimed correlation across all systems and circumstances encompassed by the claims. The Specification also describes the invention as using a random pattern of phosphorescent paint applied to the performer's face or other surface, and states that correlation of the motion capture data from at least two cameras is performed "to create a 3D surface of regions of the performer." But several Asserted Claims cover embodiments in which the 3D points on the performer's face "are not identified by markers applied to the performer's face," while the Specification's detailed correlation disclosure depends on visually correlating random pattern regions applied to the surface. The Specification

therefore does not show possession of the broad claimed concept of correlating 2D frames to create a high-resolution 3D mesh across the full scope of markerless facial capture systems covered by the claims.

For enablement, a person of ordinary skill in the art would not be able to practice the full scope of the claimed "correlates" and "correlating" limitations without undue experimentation. The Specification provides a detailed example for a particular correlation pipeline, but it does not teach how to implement all claimed forms of correlating frames from plural cameras at plural time intervals to create a high-resolution 3D facial mesh. The Figure 15 disclosure requires numerous implementation choices—including downsampling factor r, dmin, dmax, Δd, range of acceptance, Z and Zest matrices, warping to an imaginary plane, and iterative resolution refinement—but the claims do not recite these features, and the Specification does not explain how to generalize the disclosed example to the full claim scope. Moreover, the Specification states that Figure 15 is only a "guideline" for implementing one embodiment and that alternate embodiments may use different steps, different depth increments, curve regression, more than two cameras, or different combinations of correlations. That disclosure leaves a person of skill in the art to determine, without adequate guidance, which correlation operations are necessary to achieve the claimed high-resolution 3D mesh across the full scope of the claims.

For at least these reasons, the Specification does not provide written description of "correlates" or "correlating" such that the Specification demonstrates that the patentee possessed "correlates" or "correlating" within the scope of the claims. Moreover, a person of skill in the art would not be able to implement the claimed correlation to create a high-resolution 3D mesh without undue experimentation in view of the Specification, which provides no explanation or guidance on this subject. Further each claim that depends from a claim that lacks written description or is not enabled as a result of these terms also lacks written description and is not enabled for the same reason.

**iii. "not identified by markers applied to the performer's face"**

Claims, 1, 9, 17, and 25 of the '248 patent recite "wherein the second plurality of 3D points

on the surface of the performer's face are **not identified by markers[,] applied to the performer's face**." This negative limitation creates a genus (all non-marker identification methods), but only one species (random applied pattern) is disclosed in the Specification. The Specification repeatedly describes identifying facial regions using a "random pattern" applied to the face (typically phosphorescent paint) and tracking that pattern across frames, but never describes or suggests any other markerless approaches and never identifies any common structural features shared across a broader class of "non-marker" techniques. Thus, the inventors only possessed a single paint-based approach, yet the claims impermissibly sweep in all alternatives that do not use "markers." This mismatch is compounded by the Specification's express statement that the random pattern may be used concurrently with conventional marker systems, which undermines any assertion that the inventors possessed an invention defined by exclusion of markers. The Specification also never defines what counts as a "marker," while simultaneously relying on discrete applied paint features to enable tracking, leaving the boundary between excluded "markers" and included painted features unclear and further highlighting that the Specification does not demonstrate possession of the full scope of the negative limitation.

For at least these reasons, the Specification does not provide written description of "not identified by markers applied to the performer's face" such that the Specification demonstrates that the patentee possessed "not identified by markers applied to the performer's face" within the scope of the claims. Moreover, a person of skill in the art would not be able to implement the claimed "not identified by markers applied to the performer's face" without undue experimentation in view of the Specification, which provides no explanation or guidance on how to implement facial capture without the application of random patterns of phosphorescent paint. Further each claim that depends from a claim that lacks written description or is not enabled as a result of these terms also lacks written description and is not enabled for the same reason.

**iv. "all parts of the eye's lips, or teeth"**

Claims 3, 11, 18, and 26 of the '248 patent recite tracking 3D points that "include some or **all parts of the eyes, lips, or teeth**." Claims 3 and 11 depend from independent claims 1 and 9, respectively, which require a "high-resolution three-dimensional (3D) mesh" and "automatically

track[ing]" 3D points on the surface of the performer's face. Claims 18 and 26 depend from independent claims 16 and 24, respectively, which require the same. Thus, the claims purport to cover systems and methods in which 3D points in a high-resolution 3D mesh automatically track 3D points that include some or all parts of the eyes, lips, or teeth.

The Specification does not demonstrate possession of the full scope of this limitation. The Specification acknowledges that the eyes, lips, and teeth present unique challenges for the disclosed motion capture system. With respect to the disclosed random-pattern system, the Specification states that "[p]arts of the performer that are typically screened from the paint application are the inside of the mouth and the eyeballs." *Id.* at 11:1-3. For the eyes, the Specification discloses only two limited techniques: (1) "a random pattern of phosphorescent paint is applied to a contact lens, which is then placed over the performer's eyeball," and (2) tracking the performer's "irises and/or pupils (which are smooth and geometric) … during lit interval 1115 using visible light." *Id.* at 11:4–7, 11:10–14. Neither technique supports tracking 3D points including "all parts" of the eyes. The Specification provides no description of any technique for tracking "all parts" of the eyes, and no description of how the disclosed correlation algorithm of Figure 15 (which depends on correlating random patterns of phosphorescent paint) would operate on the smooth, specular, and largely unpainted surfaces of the eyes. For the teeth, the Specification discloses only that "tooth caps embedded with a random pattern of phosphorescent pigments are placed over the teeth of the performer." *Id.* at 11:7–9. This single-sentence disclosure does not describe tracking "all" parts of the teeth. The Specification provides no guidance whatsoever on how to track "all" parts of the teeth—including, for example, the rear molars, the lingual (tongue-facing) surfaces of the teeth, or the gumline—which would be largely or entirely occluded from the cameras during a motion capture session. For the lips, the Specification provides no specific technique at all for applying the random pattern to or tracking the lips. The Specification identifies the lips as an area where markers are problematic due to "extreme deformations of the skin (e.g., pursing the lips 212)" and secretions such as saliva, yet the Specification does not address how the random pattern would be applied to or maintained on the lips, let alone how the system would track "all" parts of the lips, including the inner mucosal surfaces, the vermillion border, and the commissures as they fold, compress, and

deform during facial expressions and speech.

Tracking “all parts” of the eyes would require capturing and tracking every surface of the eye region—including the sclera, the iris, the pupil, the eyelids, and the periorbital region—as 3D points in a high-resolution 3D mesh. Tracking “all parts” of the lips would require capturing and tracking every surface of the lips—including interior surfaces that are occluded when the mouth is closed. Tracking “all parts” of the teeth would require capturing and tracking every surface of every tooth—including teeth that are never visible to the cameras. The Specification does not describe, or even suggest, how to accomplish any of these things. The disclosed techniques—a painted contact lens for the eyeball, tooth caps for the teeth, and no specific technique at all for the lips—are, at most, narrow species that do not support the broad genus of tracking “all” parts of these anatomical features. Moreover, the Specification’s own correlation methodology (Figure 15) depends on the presence of a random pattern of phosphorescent paint on the captured surface, yet the Specification concedes that the very areas identified in these claims—the eyes, the mouth interior, and the teeth—are areas where the paint either cannot be applied in the ordinary manner or requires specialized workarounds that are described only in passing and without meaningful detail.

For at least these reasons, the Specification does not provide written description of “all parts of the eyes, lips, or teeth” such that the Specification demonstrates that the patentee possessed tracking 3D points that include “some or all parts of the eyes, lips, or teeth” within the scope of the claims. Moreover, a person of skill in the art would not be able to implement tracking of “all parts” of the eyes, lips, or teeth without undue experimentation in view of the Specification, which provides only a single sentence describing contact lenses for the eyeballs, a single sentence describing tooth caps for the teeth, no specific technique for the lips, and no explanation of how the disclosed correlation algorithm would be adapted to operate on any of these surfaces. Further, each claim that depends from a claim that lacks written description or is not enabled as a result of these terms also lacks written description and is not enabled for the same reason.

**v. “three-dimensional (3D) mesh” / “3D mesh”**

Independent claims 1, 9, 16, and 24 of the ’248 patent recite a “three-dimensional (3D)

mesh" or "3D mesh." For example, claims 1 and 9 recite "a high-resolution **three-dimensional (3D) mesh** corresponding to a 3D shape [of some or all of the surface of / of the surface of some or all of] the performer's face at some or all of the time intervals." Claims 16 and 24 recite "a high-resolution **3D mesh** corresponding to a 3D shape [of the surface] of some or all of the performer's face at some or all of the time intervals."

The Specification does not use the term "mesh" to describe the output of the disclosed system and does not provide any guidance as to the meaning of "mesh." Instead, the Specification consistently describes the output as a "3D surface" or, at most, a "3D point cloud." There is no discussion or description of any mesh topology, demonstrating that the inventors did not possess the broad class of "3D meshes," but instead only disclosed generating and rendering point-based surface data.

For at least these reasons, the Specification does not provide written description of "three-dimensional (3D) mesh" or "3D mesh" such that the Specification demonstrates that the patentee possessed "three-dimensional (3D) mesh" or "3D mesh" within the scope of the claims. Moreover, a person of skill in the art would not be able to implement the claimed three-dimensional (3D) mesh without undue experimentation in view of the Specification, which provides no explanation or guidance on how to generate or output 3D meshes. Further each claim that depends from a claim that lacks written description or is not enabled as a result of these terms also lacks written description and is not enabled for the same reason.

**b. Indefiniteness**

Disney contends that the asserted claims of the '248 patent are invalid under 35 U.S.C. § 112, at least because they are vague and indefinite. All dependent claims asserted are invalid for indefiniteness at least because they incorporate the indefinite elements of the independent claim from which they depend. The following terms of the asserted claims of the '248 patent, when read in light of the Specification and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

**i. "automatically track" / "automatically tracking"**

Independent claims 1 and 16 of the '248 patent recite "a first plurality of 3D points in the

high-resolution 3D mesh **automatically track** a second plurality of 3D points on the surface of the performer's face," and their dependent claims 2, 3, and 18 recite "the first plurality of 3D points **automatically track** the second plurality of 3D points." Independent claims 9 and 24 recite "a first plurality of 3D points in the high-resolution 3D mesh **automatically tracking** a second plurality of 3D points on the surface of the performer's face" and their dependent claims 10, 11, and 26 recite "the first plurality of 3D points **automatically tracking** the second plurality of 3D points." The Specification never discusses or defines "automatically track," "automatically tracking," or what methods fall within or outside the scope of these terms. The Specification also provides no guidance on what constitutes automatic versus non-automatic.

For at least these reasons, a person of skill in the art would lack reasonable certainty as to the scope of these terms. Accordingly, these claim terms fail to distinctly point out the scope of the claim and are thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

Additionally, as noted above, Rearden contends that the term "automatically track" "refers to, is limited to, and should be construed to require use of, the frame-to-frame high-resolution tracking of 3D points within regions of the performer's face set forth in detailed embodiments in 20:32-21:34 and illustrated in Figures 26A, 26B and 27 in which the present invention tracks successive time interval captures to determine 3D points on the performer's face as they fold or deform." 5AC at ¶165. Even under Rearden's own proposed construction, the term remains indefinite. The cited passage describes correlating regions of a 2D random pattern across successive 2D frame captures to detect movement, but does not define what constitutes successful "tracking" of a 3D point, i.e., it provides no threshold for correlation confidence, no minimum spatial precision, and no criteria for determining when a point has been "tracked" versus lost. Nor does the passage specify how 2D frame-to-frame correlation translates into tracking of points in three-dimensional space. The passage Rearden cites never bridges the gap between 2D motion detection and 3D point tracking. A person of ordinary skill in the art reading the passage would not understand with reasonable certainty what operations a system must perform, or to what degree of accuracy or completeness, to satisfy the "automatically track" limitation. The term is therefore

indefinite even under Rearden's proposed construction.

For at least these reasons, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**ii. "correlates" / "correlating"**

Claims 1, 9, 16, and 24 of the '248 patent recite "correlate" or "correlating." Claims 1 and 16 of the '248 patent recite "a processor that **correlates** the plurality of 2D frames from the plurality of cameras at the plurality of time intervals to create a high-resolution [three-dimensional (3D) / 3D] mesh corresponding to a 3D shape of some or all of the surface of the performer's face at some or all of the time intervals." Claim 9 recites "**correlating** 2D frames from a plurality of cameras at a plurality of time intervals, each camera capturing a plurality of 2D frames of some or all of a surface of a performer's face as the performer's face changes in some or all of the plurality of time intervals." Claim 24 recites "**correlating** frames from a plurality of cameras at a plurality of time intervals, each camera capturing a plurality of 2D frames of some or all of a surface of a performer's face as the performer's face changes in some or all of the plurality of time intervals."

Rearden contends in its Fifth Amended Complaint that the terms "correlates" and "correlating" are "limited to, and should be construed to require use of, a pixel-wise cross-correlation algorithm for determining the 3D location of points on the performer's face by correlating a plurality of 2D frames from a plurality of cameras at the same time interval, as set forth in the flowchart of Figure 15 of the '226 patent with its use described in detail at col. 11:25-17:4, together with the alternate embodiments for adjusting the values within the correlation algorithm described at col. 17:5-18 and the alternate correlation embodiments detailed at 17:19-20:31." 5AC at ¶133.

The "correlates" and "correlating" limitations fail to inform a POSITA with reasonable certainty of the scope of the claims, particularly under Rearden's proposed construction. The claims recite ,broad functional language, i.e., "correlates the plurality of 2D frames" or "correlating 2D frames" without specifying whether the claimed correlation requires pixel-wise normalized cross-

correlation, region-based correlation, correlation at multiple resolutions, warping to an imaginary plane, use of a range-of-acceptance constraint, a Z matrix, a particular confidence threshold, or a particular criterion for when a 3D point has been successfully determined. Rearden's proposed construction compounds the uncertainty by incorporating not only Figure 15, but also "alternate embodiments" for adjusting values and alternate correlation embodiments. The Specification expressly states that "substitutable functions may be performed, such as not normalizing the data before cross-correlation or correlating regions other than pixels," which makes unclear whether the claimed "correlates" requires normalized pixel-wise cross-correlation, non-normalized correlation, region correlation, or some other substitute. The Specification also describes embodiments using more than two cameras in which multiple correlations may be averaged, combined by means "other than a simple average," or warped to the perspective of an imaginary camera outside any existing camera. A person of skill in the art would therefore lack reasonable certainty as to which disclosed operations are required to satisfy the "correlates" or "correlating" limitations and which are merely optional implementation details.

For at least these reasons, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**iii. "not identified by markers applied to the performer's face"**

Claims, 1, 9, 17, and 25 of the '248 patent recite "wherein the second plurality of 3D points on the surface of the performer's face are **not identified by markers[,] applied to the performer's face**." The Specification does not define what constitutes a "marker," and the only guidance it provides is a description of prior-art retroreflective spheres attached to the face with adhesive. Yet the Specification's own disclosed technique—applying discrete dots of phosphorescent paint directly to the performer's face to create identifiable, trackable reference features—functions in a materially similar way: both retroreflective markers and phosphorescent paint dots are physical substances applied to the face that create high-contrast, identifiable points used by cameras to track

surface movement. The Specification does not draw a clear line between the excluded category ("markers applied to the performer's face") and the included category (paint patterns applied to the performer's face), nor does it identify any principled distinction that would allow a POSITA to determine which applied identification features are "markers" and which are not. A POSITA would not know with reasonable certainty whether phosphorescent paint dots, UV-fluorescent makeup, temporary tattoos, applied fiducial stickers, or other high-contrast features applied to the face fall within or outside the scope of the negative limitation.

For at least these reasons, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**iv. "high-resolution"**

Independent claims 1, 9, 16, and 24 of the '248 patent recite a "high-resolution" 3D mesh. The Specification does not define "high-resolution" or provide any metrics or standards by which a person of skill in the art could determine what "high-resolution" is in the context of the claims. The Specification uses the term only qualitatively, *e.g.*, as an alleged improvement over prior systems, and expressly contemplates that resolution may vary depending on camera configuration and application needs, including that "lower resolution can be used." '248 patent, 19:66-20:3. This provides no baseline, threshold, or measurable metric (*e.g.*, point density, spatial accuracy, or mesh granularity) for distinguishing "high" from "non-high" resolution.

For at least these reasons, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**v. "three-dimensional (3D) mesh" / "3D mesh"**

Claims 1, 9, 16, and 24 of the '248 patent recite a "three-dimensional (3D) mesh" or "3D mesh" corresponding to the surface of the performer's face. The Specification does not define "mesh" or use the term in a technically meaningful way. Instead, the Specification consistently

describes the output of the disclosed system as a “3D surface” or “3D point cloud,” which a person of skill in the art would understand to be technically distinct from a “mesh” in the art. A “mesh” in its accepted sense requires defined connectivity between vertices (i.e., edges and faces), whereas a point cloud or surface map does not. The Specification never describes generating, storing, or manipulating mesh topology, and there is no discussion of vertices, edges, faces, triangulation, polygonal connectivity, or any other structural attribute that would distinguish a “mesh” from a raw depth map or point cloud. A person of skill in the art reading the Specification would not know with reasonable certainty whether the claim requires a fully connected polygonal mesh, a triangulated surface, or merely the Z-matrix depth map. Nor would a person of skill in the art understand at what point in the disclosed processing pipeline the claimed “mesh” is created, since the Specification describes outputting depth values and rendering a surface but never describes a mesh-generation step. The Specification does not define the term “mesh” and describes its output as a “3D surface” or a “3D point cloud.” The Specification provides no guidance on what the claimed “mesh” is.

For at least these reasons, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**vi. “within regions of the performer’s face that fold or deform” / “within regions of the performer’s face as they fold or deform”**

Claims 2, 10, 16, and 24 of the ’248 patent recite tracking 3D points “within regions of the performer’s face that fold or deform” or “within regions of the performer’s face as they fold or deform.” The Specification does not define what constitutes “folding” or “deforming” in the context of facial regions, nor does it identify which regions of the face qualify. The Specification discusses “folding” primarily in the context of cloth capture, not facial tissue, and uses “deform” only in passing to describe surfaces generally. Every facial expression involves some degree of surface deformation or folding, such as raising an eyebrow, blinking, or even subtle muscle contractions

beneath the skin. The Specification provides no threshold, metric, or objective standard for distinguishing between facial movement that qualifies as "folding or deforming" and movement that does not. A POSITA would not know with reasonable certainty whether the claims require tracking through extreme deformations (e.g., pursed lips or deep wrinkles) or whether any detectable surface change satisfies the limitation.

For at least these reasons, a person of skill in the art would lack reasonable certainty as to the scope of these terms. Accordingly, a person of skill in the art would lack reasonable certainty as to the scope of these terms, and they are thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**vii. "some or all parts of the eye's lips, or teeth"**

Claims 3, 11, 18, and 26 of the '248 patent recite tracking 3D points that "include **some or all parts of the eyes, lips, or teeth**." The Specification does not define what constitutes a "part" of the eyes, lips, or teeth in the context of 3D point tracking, nor does it explain how a 3D mesh point "includes" a part of these anatomical features. The Specification acknowledges that paint cannot be applied to the inside of the mouth or the eyeballs, but does not identify which portions of these features are "parts" within the meaning of the claim. A POSITA would not know with reasonable certainty whether the first 3D points that automatically track the second 3D points that include a 3D point at the outer corner of the lip satisfy the limitation, or whether the claim requires tracking across the full surface of the lips, eyes, or teeth. Nor would a POSITA understand whether "parts of the eyes" refers to the eyelids, the iris, the sclera, or some combination.

For at least these reasons, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**viii. "the 3D mesh for one or more time intervals corresponds to a facial expression"**

Claims 4, 12, 19, and 27 of the '248 patent recite that "the 3D mesh for one or more time intervals corresponds to a facial expression." The Specification does not define what it means for a

3D mesh to "correspond to" a facial expression, nor does it provide any criteria for evaluating this relationship. It is unclear whether the mesh must depict a recognizable expression, merely capture the surface geometry present during an expression, or bear some other undefined relationship to the expression. Nor does the Specification define what qualifies as a "facial expression." A person of skill in the art would not know whether a neutral face, a micro-expression, or an involuntary twitch satisfies the limitation because the Specification provides no standard for determining when a 3D mesh sufficiently "corresponds to" an expression or for determining the boundary of what constitutes an "expression" in the first place.

For at least these reasons, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**3. The '226 Patent**

**a. Claims Lacking Written Description and/or Enablement**

Disney contends that the asserted claims of the '226 patent are invalid under 35 U.S.C. § 112 because they lack written description and/or enablement, at least under the implicit claim constructions or asserted claim scope relied upon in Rearden's Infringement Contentions or the explicit claim constructions provided in Rearden's Fifth Amended Complaint.

**i. "communicating a digital video stream"**

Claim 1 of the '226 patent recites "**communicating a digital video stream** with at least part of a rendered 3D animated face which includes 3D facial shapes." The Specification does not describe, disclose, or contemplate "communicating" a video stream in any form, let alone a digital video stream including a rendered 3D animated face. The Specification is directed entirely to a motion capture system for generating 3D surface data from random patterns of phosphorescent paint. The closest disclosures are (1) rendering an animated representation "on a computer display 160 (or similar display device)," which describes local display rather than communication, and (2) a boilerplate passage about downloading "a computer program" via "a carrier wave or other propagation medium," which describes software distribution rather than video stream

communication. '226 patent, 2:12-14, 26:56-61. The Specification does not demonstrate possession of any method of communicating a digital video stream, let alone one containing a rendered 3D animated face with the specific multi-performance properties required by the claims. The claimed method step of "communicating" is untethered from the disclosed technology and represents subject matter the inventors did not possess at the time of filing.

For at least these reasons, the Specification does not provide written description of "communicating a digital video stream" such that the Specification demonstrates that the patentee possessed "communicating a digital video stream" within the scope of the claims. Moreover, a person of skill in the art would not be able to implement "communicating a digital video stream" as claimed without undue experimentation in view of the Specification. Further, each claim that depends from a claim that lacks written description or is not enabled as a result of this term also lacks written description and is not enabled for the same reason.

**ii. "3D facial shapes" / "3D facial surface shapes"**

Claim 1 of the '226 patent recites "at least part of a rendered 3D animated face which includes **3D facial shapes** that: are correlated to a plurality of high resolution **3D facial surface shapes** that track the high resolution 3D motion of a performer's face from a first facial performance." Neither "3D facial shapes" nor "3D facial surface shapes" appears in the Specification. The Specification consistently describes its output as a "3D surface," a "3D point cloud," or a "Z matrix" of depth values. The Specification does not describe any data structure called a "3D facial shape" embedded within a "rendered 3D animated face," nor does it describe a "3D facial surface shape" as a distinct data object that can be the subject of a "correlated to" relationship. The claims treat these as two separate categories of data (i.e., shapes within a rendered face and shapes from motion capture), but the Specification makes no such distinction and provides no structural, algorithmic, or conceptual basis for it. Accordingly, the claims sweep in any data structures that could be characterized as "3D facial shapes" or "3D facial surface shapes," without tethering those concepts to anything disclosed in the Specification. This failure to define or describe the claimed data structures means the Specification does not demonstrate possession of the full scope of the claimed genus.

For at least these reasons, the Specification does not provide written description of "3D facial shapes" or "3D facial surface shapes" such that the Specification demonstrates that the patentee possessed "3D facial shapes" or "3D facial surface shapes" within the scope of the claims. Moreover, a person of skill in the art would not be able to implement the claimed 3D facial shapes or 3D facial surface shapes without undue experimentation in view of the Specification, which provides no explanation or guidance on these terms. Further, each claim that depends from a claim that lacks written description or is not enabled as a result of these terms also lacks written description and is not enabled for the same reason.

**iii. "a first facial performance" / "a second facial performance"**

Claim 1 of the '226 patent recites "3D facial shapes that: are correlated to a plurality of high resolution 3D facial surface shapes that track the high resolution 3D motion of a performer's face from **a first facial performance**; and that correspond to similar facial expressions of a performer's face from **a second facial performance**." The Specification does not describe, reference, or contemplate the existence of two separate facial performances. The entire Specification is directed to capturing a single performer in a single motion capture session: a random pattern of phosphorescent paint is applied, cameras capture the performer's face, and the system generates 3D surface data. The Specification describes applying this captured motion data to "different animated characters" and "different computer-generated scenes," but this is a single-capture-to-multiple-uses workflow and not a disclosure of combining or relating data from two separate facial performances. The claim requires a specific relationship between two performances: the 3D facial shapes must be simultaneously correlated to surface data from one performance and correspond to expressions from a different performance. But this workflow is entirely absent from the Specification and demonstrates that the inventors did not possess a multi-performance facial animation pipeline. The Specification provides no algorithm, method, process, or conceptual framework for relating data across two performances.

For at least these reasons, the Specification does not provide written description of a "first facial performance" and "second facial performance" or the claimed relationships between them

such that the Specification demonstrates that the patentee possessed these concepts within the scope of the claims. Moreover, a person of skill in the art would not be able to implement the claimed two-performance workflow without undue experimentation in view of the Specification, which provides zero direction or guidance on this subject. Further, each claim that depends from a claim that lacks written description or is not enabled as a result of these terms also lacks written description and is not enabled for the same reason.

**iv. "correspond to similar facial expressions of a performer's face from a second facial performance"**

Claim 1 of the '226 patent recites "3D facial shapes that … **correspond to similar facial expressions of a performer's face from a second facial performance**." The Specification does not describe making any data "correspond to" facial expressions from any performance, let alone from a separate "second" performance. The Specification describes capturing a single performer's face and reconstructing 3D surfaces; it does not describe any process for evaluating, matching, mapping, or establishing correspondence between facial expressions across different performances.

The Specification's sole discussion of facial expressions is limited to capturing them with cameras—not to establishing correspondence between expressions across performances. Accordingly, the claims sweep in any method of making shapes "correspond to similar" expressions from a separate performance, without the Specification disclosing any species of this genus.

Rearden also contends that the "requirement of claim 1 of the '226 patent that the 3D facial shapes from the rendered 3D animated face also 'correspond to similar facial expressions of a performer's face from a second facial performance' refers to, is limited to, and should be construed to require use of, a specific algorithm that corresponds reference points on the rendered 3D animated face to reference points on the actor's face from a second performance, so that the facial shapes that make up the rendered 3D animated face move in a corresponding way over time as the actor's face in the second performance." 5AC at ¶137. However, the Specification does not describe, disclose, or contemplate any algorithm "that corresponds reference points on the rendered 3D animated face to reference points on the actor's face from a second performance, so that the facial shapes that make up the rendered 3D animated face move in a corresponding way over time

as the actor's face in the second performance." As described above, the Specification does not even describe, reference, or contemplate the existence of two separate facial performances.

For at least these reasons, the Specification does not provide written description of shapes that "correspond to similar facial expressions of a performer's face from a second facial performance" such that the Specification demonstrates that the patentee possessed this concept within the scope of the claims. Moreover, a person of skill in the art would not be able to implement this limitation without undue experimentation in view of the Specification. Further, each claim that depends from a claim that lacks written description or is not enabled as a result of this term also lacks written description and is not enabled for the same reason.

**v. "correlated to"**

Claim 1 of the '226 patent recites "[a] method comprising: communicating a digital video stream with at least part of a rendered 3D animated face which includes 3D facial shapes that: are **correlated** to a plurality of high resolution 3D facial surface shapes that track the high resolution 3D motion of a performer's face from a first facial performance; and that correspond to similar facial expressions of a performer's face from a second facial performance."

As noted above, Rearden contends that every use of "correlate," "correlated," and "correlating" is limited to the Figure 15 pixel-wise cross-correlation algorithm for determining the 3D location of points on the performer's face by correlating a plurality of 2D frames from a plurality of cameras at the same time interval. That proposed construction does not fit the language of claim 1 of the '226 patent. Claim 1 does not recite correlating 2D frames from multiple cameras to determine 3D locations on a performer's face. Instead, it recites rendered 3D animated facial shapes that "are correlated to" a plurality of high-resolution 3D facial surface shapes that track a performer's facial motion and correspond to similar expressions from a second performance. The claim thus uses "correlated to" to describe a relationship between rendered 3D animated facial shapes and high-resolution 3D facial surface shapes—not the Figure 15 process of correlating two 2D camera frames to compute depth.

For written description, the Specification does not demonstrate possession of the full scope of this "correlated to" limitation. The detailed Figure 15 disclosure describes correlating two 2D

frame captures from two camera perspectives to create a 3D surface, using downsampled images, warped virtual frames, and pixel-wise normalized cross-correlation to determine depth values. But claim 1 of the '226 patent concerns a downstream digital video stream with a rendered 3D animated face whose 3D facial shapes "are correlated to" high-resolution 3D facial surface shapes from one performance and correspond to similar expressions from another performance. The Specification does not describe an algorithm or objective criteria for correlating rendered 3D animated facial shapes to captured high-resolution 3D facial surface shapes, nor does it explain how the alleged correlation is performed when the rendered face differs from the performer's face or when the correlated shapes correspond to similar expressions from a second performance. The cited Figure 15 disclosure addresses reconstruction of a 3D surface from 2D camera images; it does not show possession of a method for correlating rendered animated 3D facial shapes in a digital video stream to captured 3D facial surface shapes across different performances.

The Specification likewise does not enable the full scope of the "correlated to" limitation. The Specification provides implementation detail for one embodiment of image-based surface reconstruction, but it does not teach how to correlate rendered 3D animated facial shapes in a digital video stream to high-resolution 3D facial surface shapes that track a first performance and correspond to similar expressions from a second performance. The Specification refers generally to a graphics processing unit rendering animated characters using motion data and to the possible use of captured visible-light images or texture maps, but it does not disclose a concrete algorithm for mapping or correlating rendered 3D animated facial shapes to captured high-resolution facial surface shapes under the broad conditions recited in claim 1. A POSITA would therefore be required to develop, without adequate guidance, the rules, data structures, correspondence criteria, matching thresholds, and retargeting or mapping procedures necessary to practice the full scope of claim 1.

For at least these reasons, the Specification does not provide written description of "correlated to" in claim 1 of the '226 patent such that the Specification demonstrates that the patentee possessed this concept within the scope of the claims. Moreover, a person of skill in the art would not be able to implement this limitation without undue experimentation in view of the

Specification. Further, each claim that depends from a claim that lacks written description or is not enabled as a result of this term also lacks written description and is not enabled for the same reason.

**vi. "track"**

Claim 1 of the '226 patent recites "a plurality of high resolution 3D facial surface shapes that **track** the high resolution 3D motion of a performer's face." As noted above with respect to the '248 patent, there is no written description support for tracking 3D points on the surface of the performer's face that fold or deform without using applied random patterns of phosphorescent paint. There is also no written description support for tracking high-resolution 3D motion of the performer's face without using applied random patterns of phosphorescent paint. As the Specification concedes, it "would be very difficult to achieve" "precise frame-to-frame surface region tracking" without using the disclosed embodiment using applied random patterns of phosphorescent paint. However, the claims cover all markerless systems.

For the reasons set forth above with respect to the '248 patent, the Specification does not provide written description of "a plurality of high resolution 3D facial surface shapes that track the high resolution 3D motion of a performer's face" such that the Specification demonstrates that the patentee possessed "a plurality of high resolution 3D facial surface shapes that track the high resolution 3D motion of a performer's face" within the scope of the claims. Moreover, a person of skill in the art would not be able to implement "a plurality of high resolution 3D facial surface shapes that track the high resolution 3D motion of a performer's face" without undue experimentation in view of the Specification. Further, each claim that depends from a claim that lacks written description or is not enabled as a result of these terms also lacks written description and is not enabled for the same reason.

**vii. "a different number of cameras"**

Claim 5 of the '226 patent recites "capturing each of the first and second facial performances with **a different number of cameras.**" As described above, the Specification does not describe capturing two separate facial performances, let alone capturing them with a different number of cameras. The Specification describes various camera configurations for a single motion capture session: an inner ring of close-proximity cameras and an outer ring of wide-shot cameras (cols. 23–

25; FIGS. 23–25), with varying numbers of cameras in each ring. But these configurations capture the same performer in the same session—they are not directed to capturing two different "facial performances" with a different number of cameras. The Specification does not demonstrate possession of a workflow involving two separate performances captured with different numbers of cameras and then related to one another as required by Claim 1. This limitation compounds the fundamental deficiency of the "first facial performance" and "second facial performance" terms: the Specification discloses neither the two-performance concept nor the additional detail of varying the number of cameras across performances.

For at least these reasons, the Specification does not provide written description of "capturing each of the first and second facial performances with a different number of cameras" such that the Specification demonstrates that the patentee possessed this concept within the scope of the claims. Moreover, a person of skill in the art would not be able to implement the claimed different number of cameras being used to capture first and second facial performances without undue experimentation in view of the Specification, which provides no explanation or guidance on this subject.

**b. Indefiniteness**

Disney contends that the asserted claims of the '226 patent are invalid under 35 U.S.C. § 112, at least because they are vague and indefinite. All dependent claims asserted are invalid for indefiniteness at least because they incorporate the indefinite element of the independent claim from which they depend. The following terms of the asserted claims of the '226 patent, when read in light of the Specification and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

**i. "communicating"**

Claim 1 of the '226 patent recites "**communicating** a digital video stream with at least part of a rendered 3D animated face which includes 3D facial shapes." The Specification does not define "communicating" or use the term in connection with transmitting, distributing, or otherwise making available a video stream. The only reference to any form of communication is a boilerplate hardware implementation passage stating that the invention "may be downloaded as a computer

program which may be transferred from a remote computer (e.g., a server) to a requesting computer (e.g., a client) by way of data signals embodied in a carrier wave or other propagation medium via a communication link (e.g., a modem or network connection)." '226 patent, 26:56-61. This passage, however, is directed to ***software distribution***, not to video stream communication. A person of ordinary skill would not know with reasonable certainty whether "communicating" requires active real-time transmission (e.g., streaming or broadcasting), passive availability (e.g., hosting for on-demand access), local rendering on a display, physical distribution of media, or some other mode of making a video stream available to a recipient. Nor would a POSITA understand whether the claim requires transmission to a separate device or party, or whether displaying the video stream on a local computer display satisfies the limitation. The Specification provides no definition, no examples of "communicating" a video stream, and no guidance for determining the boundaries of this term.

For at least these reasons, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**ii. "3D facial shapes" / "3D facial surface shapes"**

Claim 1 of the '226 patent recites "at least part of a rendered 3D animated face which includes **3D facial shapes** that: are correlated to a plurality of high resolution **3D facial surface shapes** that track the high resolution 3D motion of a performer's face from a first facial performance." While the claim treats these terms as distinct, there is no indication of how they differ or relate to one another. Neither "3D facial shapes" nor "3D facial surface shapes" appears in the Specification. The Specification provides no definition, taxonomy, or structural description of either term. A POSITA would not know with reasonable certainty whether these two terms refer to the same data structure or to fundamentally different things—and if different, what distinguishes a "3D facial shape" from a "3D facial surface shape."

For at least these reasons, a person of skill in the art would lack reasonable certainty as to the scope of these terms. Accordingly, these claim terms fail to distinctly point out the scope of the

claim and are thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**iii. "correlated to"**

Claim 1 of the '226 patent recites "[a] method comprising: communicating a digital video stream with at least part of a rendered 3D animated face which includes 3D facial shapes that: are **correlated** to a plurality of high resolution 3D facial surface shapes that track the high resolution 3D motion of a performer's face from a first facial performance; and that correspond to similar facial expressions of a performer's face from a second facial performance."

As noted above, Rearden contends that every use of "correlate," "correlated," and "correlating" is limited to the Figure 15 pixel-wise cross-correlation algorithm for determining the 3D location of points on the performer's face by correlating a plurality of 2D frames from a plurality of cameras at the same time interval. The "correlated to" limitation fails to provide reasonable certainty as to the scope of claim 1. The claim does not specify what it means for rendered 3D animated facial shapes to be "correlated to" high-resolution 3D facial surface shapes. It does not state whether "correlated to" requires one-to-one point correspondence, expression matching, temporal alignment, statistical correlation, geometric registration, texture locking, animation retargeting, or the Figure 15 pixel-wise cross-correlation algorithm. The uncertainty is especially acute under Rearden's proposed construction because the Figure 15 algorithm correlates 2D camera images to estimate depth, whereas claim 1 recites a correlation between rendered 3D animated facial shapes and captured 3D facial surface shapes. A POSITA would not understand with reasonable certainty how a pixel-wise normalized cross-correlation of 2D frames could be required by, or applied to, the claimed relationship between rendered 3D animated shapes and high-resolution 3D facial surface shapes in a digital video stream.

For at least these reasons, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**iv. "correspond to similar facial expressions of a**

**performer's face from a second facial performance"**

Claim 1 of the '226 patent recites "3D facial shapes … that correspond to similar facial expressions of a performer's face from a second facial performance." This limitation contains two independent layers of ambiguity. First, "similar" is a subjective term of degree—the Specification does not define what level of resemblance between facial expressions qualifies as "similar," nor does it provide any metric, algorithm, or objective standard for assessing similarity. Every facial expression shares some features with every other expression (both involve the same underlying facial anatomy), and a POSITA would not know whether two expressions must be perceptually identical, functionally equivalent (e.g., both "smiles"), geometrically close within some tolerance, or merely share some detectable commonality. Second, "correspond to" is a vague relational term and the Specification does not use the phrase "correspond to" in this context and provides no criteria for evaluating when shapes sufficiently "correspond to" expressions. The combination of these two undefined terms creates a compound ambiguity: a POSITA must determine when shapes "correspond to" expressions that are "similar" to other expressions, without any guidance for resolving either term. The Specification provides no discussion of comparing, matching, or relating facial expressions across different performances.

For at least these reasons, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**v. "first facial performance" / "second facial performance"**

Claim 1 of the '226 patent recites "3D facial shapes that: are correlated to a plurality of high resolution 3D facial surface shapes that track the high resolution 3D motion of a performer's face from a **first facial performance**; and that correspond to similar facial expressions of a performer's face from a **second facial performance**." The Specification does not define "facial performance," nor does it describe, reference, or contemplate the existence of two separate facial performances. The Specification describes a single motion capture session in which a single performer's face is captured using a random pattern of phosphorescent paint and synchronized camera. The claim

further uses the indefinite article "a performer's face" before both "first facial performance" and "second facial performance," leaving ambiguous whether the same performer or different performers are contemplated. A person of skill in the art would not know with reasonable certainty what constitutes a "facial performance" as distinct from any other capture of a face—whether it requires a directed, intentional performance, any recording of facial movement, or a specific motion capture session. Nor would a person of skill in the art understand what distinguishes the "first" from the "second" performance—whether they must be temporally separated, captured with different systems, involve different expressions, or differ in some other unspecified way. Because the Specification provides no definition, example, or context for interpreting "facial performance" as a discrete unit, and provides no basis for distinguishing a "first" from a "second" performance, a POSITA cannot ascertain the scope of these limitations with reasonable certainty.

For at least these reasons, a person of skill in the art would lack reasonable certainty as to the scope of these terms. Accordingly, these claim terms fail to distinctly point out the scope of the claim and are thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**vi. "track"**

Claim 1 of the '226 patent recites "a plurality of high resolution 3D facial surface shapes that track the high resolution 3D motion of a performer's face."

For at least the reasons set forth above with respect to the '248 patent, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**4. The '072 and '790 Patents**

**a. Claims Lacking Written Description and/or Enablement**

Disney contends that the asserted claims of the '072 and '790 patents are invalid under 35 U.S.C. § 112 because they lack written description and/or enablement, at least under the implicit claim constructions or asserted claim scope relied upon in Rearden's Infringement Contentions or the explicit claim constructions provided in Rearden's Fifth Amended Complaint.

**i. "communicating data representing a rendered animated three-dimensional (3D) face" / "communicating a movie or video that includes a rendered animated three-dimensional (3D) face"**

Claims 9 and 24 of the '072 patent recite "communicating data representing a rendered animated three-dimensional (3D) face" and claims 9 and 24 of the '790 patent recite "communicating a movie or video that includes a rendered animated three-dimensional (3D) face."

For the reasons set forth above with respect to the '226 patent, the Specification does not provide written description of "communicating data representing a rendered animated three-dimensional (3D) face" or "communicating a movie or video that includes a rendered animated three-dimensional (3D) face" such that the Specification demonstrates that the patentee possessed the claimed invention within the scope of the claims. Moreover, a person of skill in the art would not be able to implement "communicating data representing a rendered animated three-dimensional (3D) face" or "communicating a movie or video that includes a rendered animated three-dimensional (3D) face" as claimed without undue experimentation in view of the Specification. Further, each claim that depends from a claim that lacks written description or is not enabled as a result of this term also lacks written description and is not enabled for the same reason.

**ii. "correlated to"**

Claims 1, 9, 16, and 24 of the '072 patent recite "the data including a rendering of a first plurality of 3D points on at least part of the rendered animated 3D face at a first plurality of time intervals **correlated to** a [high resolution] second plurality of 3D points on at least part of a surface of a performer's face at a second plurality of time intervals" and claims 1, 9, 16, and 24 of the '790 patent recite "a rendering of a first plurality of 3D points on at least part of the rendered animated 3D face at a first plurality of time intervals **correlated to** a [high resolution] second plurality of 3D points on at least part of a surface of a performer's face at a second plurality of time intervals."

As noted above, Rearden contends that every use of "correlate," "correlated," and "correlating" is limited to the Figure 15 pixel-wise cross-correlation algorithm for determining the 3D location of points on the performer's face by correlating a plurality of 2D frames from a plurality

of cameras at the same time interval. That proposed construction does not fit the language of the claims of the ’072 and ’790 patents. The ’072 and ’790 patent claims do not recite correlating 2D frames from multiple cameras to determine 3D locations on a performer’s face. Instead, they recite a stored or communicated date or movie/video content containing rendered animated 3D points that are “correlated to” high-resolution 3D points on the surface of a performer’s face. Figure 15, by contrast, describes a method for correlating two 2D frame captures from two different camera perspectives, including warping downsampled frames to an imaginary plane and performing pixel-wise normalized cross-correlation to compute depth values for a reconstructed 3D surface.

For written description, the Specification does not demonstrate possession of the claimed “correlated to” relationship between rendered animated 3D points and high-resolution 3D points on a performer’s face. The Specification describes correlation of camera images to reconstruct a 3D surface, but the Specification does not describe what makes a rendered animated 3D point “correlated to” a captured high-resolution 3D point, does not provide an algorithm for establishing that correlation, and does not identify the required relationship between the “first plurality of time intervals” for the rendered animated face and the “second plurality of time intervals” for the performer’s face. The claims also encompass situations in which the first plurality of 3D points represent a character’s face different from the performer’s face, which further underscores the need for written description of how the alleged correlation is established between different facial geometries. The Specification does not provide such disclosure.

For enablement, the Specification does not enable the full scope of the ’072 and ’790 patent “correlated to” limitations. A person of skill in the art would not be taught how to determine or implement the claimed correlation between rendered animated 3D points and high-resolution captured 3D points across plural time intervals. Although the Specification describes using two camera frames and pixel-wise normalized cross-correlation, that process ends with a Z matrix and rendered 3D surface; the Specification does not teach how to correlate rendered animated 3D points to captured performer-surface points in the stored or communicated animation data claimed by the ’072 and ’790 patents. Nor does the Specification provide guidance for applying such a correlation where the rendered face is a different character face, where the claimed time intervals differ, or

where the correlation must persist across regions that fold or deform. The claims therefore require a person of skill in the art to supply substantial additional mapping, registration, retargeting, temporal-alignment, and correspondence techniques not enabled by the Specification.

For at least these reasons, the Specification does not provide written description of "correlated to" in claim 1 of the '072 and '790 patents such that the Specification demonstrates that the patentee possessed this concept within the scope of the claims. Moreover, a person of skill in the art would not be able to implement this limitation without undue experimentation in view of the Specification. Further, each claim that depends from a claim that lacks written description or is not enabled as a result of this term also lacks written description and is not enabled for the same reason.

**iii. "not identified by markers applied to the performer's face"**

Claims 1, 9, 17 and 25 of the '072 patent and claims 1, 9, 17 and 25 of the '790 patent recite "wherein the second plurality of 3D points on the surface of the performer's face were **not identified by markers applied to the performer's face.**"

For the reasons set forth above with respect to the '248 patent, the Specification does not provide written description of "not identified by markers applied to the performer's face" such that the Specification demonstrates that the patentee possessed "not identified by markers applied to the performer's face" within the scope of the claims. Moreover, a person of skill in the art would not be able to implement this limitation without undue experimentation in view of the Specification. Further, each claim that depends from a claim that lack written description as a result of these terms also lacks written description for the same reason.

**iv. "automatically tracked"**

Claims 1 and 9 of the '072 patent and claims 1 and 9 of the '790 patent recite "a processor **automatically tracked** the second plurality of 3D points." Claims 10, 16, and 24 of the '072 patent and claims 10, 16, and 24 of the '790 patent recite "the first plurality of 3D points **automatically tracked** the second plurality of 3D points." Unlike Claims 1 and 9, which attribute tracking to "a processor," claims 10, 16 and 24 attribute the tracking function to the rendered 3D data points

themselves. The Specification does not disclose embodiments describing a processor that automatically tracks a second plurality of 3D points, nor does it disclose an embodiment where the 3D points automatically track a second plurality of 3D points.

For the reasons set forth above with respect to the ’248 patent, the Specification does not provide written description of “automatically tracked” such that the Specification demonstrates that the patentee possessed “automatically tracked” within the scope of the claims. Moreover, a person of skill in the art would not be able to implement “automatically tracked” without undue experimentation in view of the Specification. Further, each claim that depends from a claim that lacks written description or is not enabled as a result of these terms also lacks written description and is not enabled for the same reason.

**v. “some or all parts of the eye’s lips, or teeth”**

Claims 3, 11, 18 and 26 of the ’072 patent and claims 3, 11, 18 and 26 of the ’790 patent recite “the second plurality of 3D points include **some or all parts of eyes, lips, or teeth** of the performer.”

For at least the reasons set forth above with respect to the ’248 patent, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**vi. “corresponds to a facial expression”**

Claims 4, 12, 19, and 27 of the ’072 patent and claims 4, 12, 19, and 27 of the ’790 patent recite “wherein the second plurality of 3D points at one or more time intervals **corresponds to a facial expression**.”

For the reasons set forth above with respect to the ’226 patent, the Specification does not provide written description of “3D points at one or more time intervals corresponds to a facial expression” such that the Specification demonstrates that the patentee possessed “3D points at one or more time intervals corresponds to a facial expression” within the scope of the claims. The Specification never describes what it means to correspond to a facial expression. Moreover, a person of skill in the art would not be able to implement “3D points at one or more time intervals

corresponds to a facial expression" without undue experimentation in view of the Specification. Further, each claim that depends from a claim that lacks written description or is not enabled as a result of these terms also lacks written description and is not enabled for the same reason.

**b. Indefiniteness**

Disney contends that the asserted claims of the '072 and '790 patents are invalid under 35 U.S.C. § 112, at least because they are vague and indefinite. All dependent claims asserted are invalid for indefiniteness at least because they incorporate the indefinite element of the independent claim from which they depend. The following terms of the asserted claims of the '072 and '790 patents, when read in light of the Specification and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

**i. "high resolution"**

Claims 1 and 9 of the '072 patent and claims 1 and 9 of the '790 patent recite "a **high resolution** second plurality of 3D points."

For at least the reasons set forth above with respect to the '248 patent, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**ii. "not identified by markers applied to the performer's face"**

Claims 1, 9, 17 and 25 of the '072 patent and claims 1, 9, 17 and 25 of the '790 patent recite "wherein the second plurality of 3D points on the surface of the performer's face were **not identified by markers applied to the performer's face.**"

For at least the reasons set forth above with respect to the '248 patent, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**iii. "correlated to"**

Claims 1, 9, 16, and 24 of the ’072 patent recite “the data including a rendering of a first plurality of 3D points on at least part of the rendered animated 3D face at a first plurality of time intervals **correlated to** a [high resolution] second plurality of 3D points on at least part of a surface of a performer’s face at a second plurality of time intervals” and claims 1, 9, 16, and 24 of the ’790 patent recite “a rendering of a first plurality of 3D points on at least part of the rendered animated 3D face at a first plurality of time intervals **correlated to** a [high resolution] second plurality of 3D points on at least part of a surface of a performer’s face at a second plurality of time intervals.”

The “correlated to” limitations of the ’072 and ’790 patents fail to inform a person of skill in the art with reasonable certainty about claim scope. The claims do not specify what type or degree of relationship is required for rendered animated 3D points to be “correlated to” captured high-resolution 3D points. They do not specify whether correlation requires point identity, nearest-neighbor correspondence, shared motion, expression similarity, temporal synchronization, a statistical correlation value, a pixel-wise cross-correlation value, or some other mapping. Rearden’s proposed construction makes the claims more uncertain because it imports a Figure 15 algorithm directed to correlating 2D images to estimate 3D depth into claims directed to a relationship between two sets of 3D points in rendered animation and captured facial-surface data. A POSITA would not know with reasonable certainty what operations must be performed, what data must be stored, or what relationship must exist between the first and second pluralities of 3D points for the “correlated to” limitation to be satisfied.

For at least these reasons, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**iv. “automatically tracked”**

Claims 1 and 9 of the ’072 patent and claims 1 and 9 of the ’790 patent recite “a processor **automatically tracked** the second plurality of 3D points.”

For at least the reasons set forth above with respect to the ’248 patent, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term

fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**v. “communicating”**

Claims 9 and 24 of the ’072 patent and claims 9 and 24 of the ’790 patent recite “**communicating** [data representing/a movie or video including] a rendered animated three-dimensional (3D) face.”

For at least the reasons set forth above with respect to the ’226 patent, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**vi. “within regions of the performer’s face that fold or deform”**

Claims 2, 10, 16 and 24 of the ’072 patent and claims 2, 10, 16 and 24 of the ’790 patent recite “3D points automatically tracked the second plurality of 3D points **within regions of the performer’s face that fold or deform**.”

For at least the reasons set forth above with respect to the ’248 patent, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**vii. “some or all parts of the eye’s lips, or teeth”**

Claims 3, 11, 18 and 26 of the ’072 patent and claims 3, 11, 18 and 26 of the ’790 patent recite “the second plurality of 3D points include **some or all parts of eyes, lips, or teeth** of the performer.”

For at least the reasons set forth above with respect to the ’248 patent, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

**viii. “corresponds to a facial expression”**

Claims 4, 12, 19, and 27 of the ’072 patent and claims 4, 12, 19, and 27 of the ’790 patent recite “wherein the second plurality of 3D points at one or more time intervals **corresponds to a facial expression**.”

For at least the reasons set forth above with respect to the ’226 patent, a person of skill in the art would lack reasonable certainty as to the scope of this term. Accordingly, this claim term fails to distinctly point out the scope of the claim and is thereby indefinite. Further, each claim that depends from a claim that is indefinite is also indefinite for the same reason.

### 5. Priority Claim of the Asserted Patents

Rearden “bears the burden of establishing that its claimed invention is entitled to an earlier priority date than an asserted prior art reference.”[5] *In re Magnum Oil Tools Int’l, Ltd.*, 829 F.3d 1364, 1376 (Fed. Cir. 2016). “To obtain the benefit of the filing date of a parent application, the claims of the later-filed application must be supported by the written description in the parent ‘in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought.’” *Anascape, Ltd. v. Nintendo of Am., Inc.*, 601 F.3d 1333, 1335 (Fed. Cir. 2010) (quoting *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)).

In Rearden’s May 5, 2026, Infringement Contentions, Rearden contends that the Asserted Patents “are each entitled to a priority date of no later than October 7, 2005,” which is the date

[5] The Court’s schedule required Rearden to disclose a specific priority date in its Patent L.R. 3-1(f) contentions by May 5, 2026. Rearden represented in its May 5, 2026 Infringement Contentions that the Asserted Claims of the Asserted Patents were entitled to a pre-AIA priority date of October 7, 2005. On June 2, 2026, Rearden asserted that “reduction to practice of each asserted claim occurred no later than August 21, 2005, as described in the July 20, 2011 affidavit of Stephen Perlman submitted to the Patent Office during the examination of U.S. Patent Application No. 11/255,854.” On June 8, 2026, Rearden asserted that each Asserted Claim is entitled to a pre-AIA priority date of September 15, 2004. On June 9, 2026, Disney informed Rearden that Disney does not consent to Rearden’s proposed priority date changes to August 21, 2005 or September 15, 2004. *See* June 9, 2026 T. Gooch email to J. Masur, which is hereby incorporated by reference. Rearden has not moved the Court and carried its burden to show good cause to amend its priority date. Absent Rearden satisfactorily explaining its good cause, Disney expects to oppose any such motion to amend the priority date of the Asserted Claims and seek appropriate relief, including preclusion of any reliance on an earlier priority date and any extensions or other relief warranted by Rearden’s failure to comply with the Court’s schedule and the Patent Local Rules. Disney’s arguments herein that the claims are not entitled to an August 21, 2005 or September 15, 2004 priority date shall not be treated as an admission or suggestion that Disney agrees that Rearden’s belated priority date disclosures are proper or that Rearden should be permitted to advance these theories.

the ’565 Provisional was filed. The ’565 Provisional is titled “Apparatus and Method for Performing Motion Capture Using a Random Pattern on Capture Surfaces” and is directed to applying a random pattern of paint to a performer, capturing images of the pattern using synchronized cameras and LED panels and correlating the captured images to generate a 3D point cloud. The ’565 Provisional does not disclose, describe, or even mention a “high-resolution three-dimensional (3D) mesh” as required by every independent claim of the ’248 patent—it describes only a “point cloud” of x,y,z data output. The ’565 Provisional does not disclose “communicating a digital video stream” with a “rendered 3D animated face” as required by the ’226 patent, nor does it disclose “communicating data representing a rendered animated three-dimensional (3D) face” or “communicating a movie or video that includes a rendered animated three-dimensional (3D) face” as required by the independent claims of the ’072 and ’790 patents, respectively. The ’565 Provisional’s description ends at the output of raw capture data (point clouds) and, at most, references handing that data off to third-party rendering software such as Maya for subsequent animation—it contains no disclosure of the downstream rendered, animated, or communicated outputs that are the subject of the Asserted Claims. Further, the ’565 Provisional contains no disclosure whatsoever of 3D facial shapes that “correspond to similar facial expressions of a performer’s face from a second facial performance” as required by the ’226 patent; the ’565 Provisional describes only a single-session capture workflow and does not disclose or suggest a two-performance methodology in which high-resolution facial shapes from a first performance are used to drive animation based on a second performance.

Moreover, the ’565 Provisional fails to provide written description support for the claim limitations as Rearden has construed them. Rearden has represented to this Court that “correlates” and “correlated” in the Asserted Claims are “limited to” the specific pixel-wise cross-correlation algorithm of Figure 15 of the shared Specification (col. 11:25–17:4), and that “track” and “automatically tracked” are “limited to” the specific frame-to-frame methodology of col. 20:32–21:34 and Figures 26A, 26B, and 27. While the ’565 Provisional describes a correlation process using a virtual camera and virtual screen (at pages 25–37), and describes frame-to-frame tracking of random pattern regions (at pages 41–43), these disclosures are made in the context of generating

a point cloud and locking a texture map to a captured surface—not in the context of creating a "high-resolution 3D mesh" in which "3D points" in the mesh "automatically track" "3D points on the surface of a performer's face" as required by the '248 patent claims. The '565 Provisional's tracking disclosure is directed to tracking 2D pattern regions across successive frames for texture map registration purposes; it does not describe the automatic tracking of a plurality of 3D points on a performer's face—including within regions that "fold or deform" and including "eyes, lips, or teeth"—by corresponding 3D points in a high-resolution 3D mesh, as recited in the Asserted Claims and as Rearden has construed those terms. Accordingly, the '565 Provisional does not provide written description support for the Asserted Claims, and the Asserted Claims are not entitled to a priority date of October 7, 2005. Defendants reserve all rights to further challenge the priority date of the Asserted Patents.

In Rearden's June 2, 2026 Response to Interrogatory No. 1, Rearden contends that "[t]he conception and reduction to practice of each asserted claim occurred as part of the development of the MOVA Contour technology and system. The reduction to practice of each asserted claim occurred no later than August 21, 2005, as described in the July 20, 2011 affidavit of Stephen Perlman submitted to the Patent Office during the examination of U.S. Patent Application No. 11/255,854, which was produced at REARDEN-DIS2-0000369 – REARDENDIS2-0000425." The July 20, 2011 affidavit of Stephen Perlman ("Perlman Declaration") was submitted to overcome a §102(e) rejection based on Gordon (US 2007/0200930) and was directed at claims 1–60 of the '854 application—claims directed to applying a random pattern of material to a performer, capturing sequences of images, and correlating the random pattern across images. The evidence submitted with the Perlman Declaration, including the captured images, demonstrates, at most, a single-frame 3D reconstruction from a single captured frame. This evidence does not demonstrate the creation of a "high-resolution 3D mesh" at "a plurality of time intervals," does not demonstrate that 3D points "automatically track" other 3D points on a performer's face over time, and does not demonstrate the "communicating" of any "data," "movie or video," or "digital video stream" containing a "rendered animated 3D face."

Moreover, Rearden's own claim construction positions, as set forth in its Fifth Amended

Complaint, foreclose any argument that the August 2005 draft application provides adequate written description or reduction-to-practice support for the Asserted Claims. Rearden has represented to this Court that "correlates" and "correlated" are "limited to" the specific pixel-wise cross-correlation algorithm disclosed at col. 11:25–17:4 and Figure 15 of the Specification, including the alternate embodiments at col. 17:5–20:31. The August 2005 draft application describes only a high-level conceptual flowchart for correlation and does not disclose the specific framework of the Figure 15 algorithm. Similarly, Rearden has represented that "track" and "automatically tracked" are "limited to" the specific frame-to-frame tracking methodology at col. 20:32–21:34 and Figures 26A, 26B, and 27. The August 2005 materials provide no evidence that this specific tracking methodology was reduced to practice. With respect to the '226 patent, Rearden has further represented that the "correspond to similar facial expressions of a performer's face from a second facial performance" limitation is "limited to" a specific algorithm corresponding reference points between two separate performances. The August 2005 draft application contains no disclosure whatsoever of a two-performance workflow or any algorithm for corresponding facial expressions across performances. Accordingly, the Asserted Claims are not entitled to an August 2005 priority date. As noted above, Rearden has not moved the Court or shown good cause to amend its priority date contentions. Disney reserves all rights to further challenge the priority date of the Asserted Patents.

On June 8, 2026, Rearden sent an email stating that "Rearden contends that each asserted claim is entitled to a pre-AIA priority date of September 15, 2004." Rearden has not provided any explanation or produced documents evidencing conception, reduction to practice, design, or development supporting a September 15, 2004 priority date, as required by Rule 3-2(b), which mandates production of "[a]ll documents evidencing the conception, reduction to practice, design, and development of each claimed invention, which were created on or before the date of application for the patent in suit or the priority date identified pursuant to Patent L.R. 3-1(f), whichever is earlier." Accordingly, the Asserted Claims are not entitled to a September 15, 2004 priority date. As noted above, Rearden has not moved the Court or shown good cause to amend its priority date contentions. Disney reserves all rights to further challenge the priority date of the Asserted Patents.

## VII. DOCUMENT PRODUCTION

### A. Patent L.R. 3-4(a)

Pursuant to N.D. Cal. Patent Local Rule 3-4(a), Disney has produced, made available for inspection, or identified or will produce, make available for inspection, or identify publicly available information sufficient to show the operation of any specifically identified aspects or elements of an Accused Instrumentality identified by Rearden in its N.D. Cal. Patent Local Rule 3-1(c) chart to the extent such information is in Disney's possession, custody or control. With service of this document, Disney will make source code available for inspection pursuant to the Protective Order (Dkt. 136) in this action. Documents produced pursuant to Patent L.R. 3-4(a), include the following: DISNEY_REARDEN2_00001960 - DISNEY_REARDEN2_00036682, DISNEY_REARDEN2_00036863 - DISNEY_REARDEN2_00036956, DISNEY_REARDEN2_00038232 - DISNEY_REARDEN2_00038968, and DISNEY_REARDEN2_00044871 - DISNEY_REARDEN2_00044872, DISNEY_REARDEN2_00048078 - DISNEY_REARDEN2_00048657.

### B. Patent L.R. 3-4(b)

Pursuant to N.D. Cal. Patent Local Rule 3-4(b), Disney is producing or making available for inspection or will produce or make available for inspection copies of each item of prior art identified pursuant to N.D. Cal. Patent Local Rule 3-3(a) which does not appear in the file history of the Asserted Patents to the extent such prior art is in Disney's possession, custody or control. Documents produced pursuant to N.D. Cal. Patent Local Rule 3-4(b) include the following: DISNEY_REARDEN2_00038969 - DISNEY_REARDEN2_00044870, DISNEY_REARDEN2_00044873 - DISNEY_REARDEN2_00048077, ARTEM_00000001 - ARTEM_00000105.

### C. Patent L.R. 3-4(c)

Pursuant to N.D. Cal. Patent Local Rule 3-4(c), Disney has produced or made available for inspection comparable licenses. Documents produced pursuant to N.D. Cal. Patent Local Rule 3-4(c) include the following: DISNEY_REARDEN2_00000001 - DISNEY_REARDEN2_00001959, DISNEY_REARDEN2_00048658 -

DISNEY_REARDEN2_00051100.

**D. Patent L.R. 3-4(d)**

Pursuant to N.D. Cal. Patent Local Rule 3-4(d), Disney has produced or made available for inspection—or will produce or make available for inspection—documents sufficient to show the sale, revenue, cost, and profits for the Accused Instrumentalities identified by Rearden, pursuant to N.D. Cal. Patent Local Rule 3-1(b). Documents produced pursuant to N.D. Cal. Patent Local Rule 3-4(d) include the following: DISNEY_REARDEN2_00000001 - DISNEY_REARDEN2_00001959, DISNEY_REARDEN2_00036683 - DISNEY_REARDEN2_00036862, DISNEY_REARDEN2_00036957 - DISNEY_REARDEN2_00038231.

**E. Patent L.R. 3-4(e)**

Pursuant to N.D. Cal. Patent Local Rule 3-4(e), Disney has produced or made available for inspection agreements that may be used to support Disney's damages case. Documents produced pursuant to N.D. Cal. Patent Local Rule 3-4(e) include the following: DISNEY_REARDEN2_00000001 - DISNEY_REARDEN2_00001959, DISNEY_REARDEN2_00048658 - DISNEY_REARDEN2_00051100.

Dated: August 21, 2026

Respectfully submitted,

/s/Taylor Gooch

SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2600 El Camino Real, Suite 400 Palo Alto, California 94306 Telephone: (650) 858-6000
Facsimile: (650) 858-6100

JOSEPH TAYLOR GOOCH (SBN 294282)
Taylor.Gooch@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
50 California St., Suite 3600 San Francisco, California 94111
Telephone: (628) 235-1000
Facsimile: (628) 235-1001

KELLY M. KLAUS (SBN 161091)
kelly.klaus@mto.com
BLANCA F. YOUNG (SBN 217533)
blanca.young@mto.com
JOHN L. SCHWAB (SBN 301386)
john.schwab@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, 27th Floor
San Francisco, California 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 21, 2026, I caused to be served a true and correct copy of the foregoing document to the following counsel of record, in the manner so indicated.

**By Electronic Mail**

Gregory J. Lundell
HG LAW LLP
111 North Market Street, Suite 900
San Jose, California 95113
Telephone: +1 669 213 1056
Facsimile: +1 669 500 7375

BRIAN J. BECK (*pro hac vice*)
brian.beck@hglaw.com
HG LAW LLP
75 Broad Street, Suite 510
New York, New York 10004
Telephone: +1 669 213 1058
Facsimile: +1 669 500 7375

*Attorneys for Plaintiffs and Counterdefendants REARDEN LLC and REARDEN MOVA LLC*

Dated: August 21, 2026

*/s/Taylor Gooch*
Taylor Gooch